# EXHIBIT 1

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THERISA D. ESCUE, BILLY R. ESCUE, JR., KIM SCHELBE, BRIAN P. WEATHERILL, KENNETH C. MORANDI, JILL JEFFRIES, and DANIEL SINGH on behalf of themselves and all others similarly situated, | Case No. 2:24-cv-10853 |
| | Hon. Brandy R. McMillion |
| Plaintiffs, | Hon Mag. David R. Grand |
| v. | **JURY TRIAL DEMANDED** |
| UNITED WHOLESALE MORTGAGE, LLC, UWM HOLDINGS CORPORATION, SFS HOLDING CORP., and MATHEW RANDALL ISHBIA, | **CLASS ACTION** |
| Defendants. | |

# <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

THE PARTIES....................................................................................9

JURISDICTION AND VENUE .............................................................11

FACTUAL ALLEGATIONS ...............................................................12

    I.    Wholesale Mortgages, Unlike Retail Mortgages, Are Originated Through Third Party Intermediaries: "Independent" Mortgage Brokers ...............................................................................12

    II.    According to UWM and Others, the Core Value Proposition of the Wholesale Channel Arises from the Mortgage Broker's "Independence" from the Lender .......................................................16

    III.    UWM's Position in the Wholesale Mortgage Industry.....................39

    IV.    UWM Employs Tactics Designed to "Cultivate Loyalist Brokers" Who Steer Borrowers into UWM Mortgages Even When Those Mortgages Are Not in the Borrowers' Best Interest.....44

        A.    UWM Imposes Contractual Requirements on Brokers to Prevent Them from Exercising Independent Judgment...........44

        B.    UWM Carefully Monitors Broker Loyalty and Punishes Brokers Who Honor The Duties They Owe to Borrowers by Shopping for Lower Rates With UWM's Competitors ......53

        C.    UWM Sustains and Grows Its Group of Corrupted Broker Partners by Offering Value to Brokers If They Demonstrate Their Commitment to Funneling Loans to UWM......................................................................................57

    V.    UWM's Tactics Have Caused Thousands of Mortgage Brokers to Funnel Loans to UWM, Costing UWM Borrowers Billions in Above-Market Costs...........................................................................76

    VI.    The "Loyalist Brokers" Who Participate in UWM's Scheme Work Collectively to Advance Shared Goals ...................................90

VII. After Plaintiffs Filed This Action, UWM Has Perpetuated Its Scheme and Continues to Misrepresent the Nature of Its Relationship with the Corrupted Brokers ........................................100

VIII. Plaintiffs' Mortgage Loans With UWM ..........................................105

    A. Plaintiffs Therisa and Billy Escue's UWM Mortgage...........105

    B. Plaintiff Kim Schelble's UWM Mortgage.............................113

    C. Plaintiff Brian Weatherill's UWM Mortgage........................126

    D. Plaintiff Kenneth Morandi's UWM Mortgage ......................133

    E. Plaintiffs Jill Jeffries's and Daniel Singh's UWM Mortgage....................................................................141

TOLLING ALLEGATIONS ................................................................150

CLASS ACTION ALLEGATIONS ....................................................152

    I. Class Definitions ...............................................................152

    A. The Nationwide Class ..............................................152

    B. The Statewide/Multi-State Subclasses....................................153

    II. Rule 23 Allegations.........................................................158

CLAIMS FOR RELIEF .......................................................................164

    I. Claims of the Nationwide Class.......................................164

    II. Claims of the Nationwide Class, or, in the Alternative, the Statewide/Multi-State Subclasses ....................................212

    III. Claims of the State/Multi-State Subclasses.....................224

PRAYER FOR RELIEF ......................................................................245

Plaintiffs Therisa D. Escue, Billy R. Escue, Kim Schelble, Brian P. Weatherill, Kenneth C. Morandi, Jill Jeffries, and Daniel Singh, on behalf of themselves and all others similarly situated, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## INTRODUCTION

1.     This straightforward case seeks to hold the largest wholesale mortgage lender in the United States, Defendant United Wholesale Mortgage, LLC ("UWM"), accountable for orchestrating and executing a deliberate scheme, in coordination with a host of corrupted mortgage brokers, to deceive hundreds of thousands of borrowers into paying billions of dollars in improper fees and excessive interest rates to finance their homes.  The fraudulent scheme—and the illicit enterprise that UWM has assembled to perpetrate it—undermines the fundamental structure and purpose of the wholesale mortgage industry in America.

2.     UWM and the brokers hired by class members hold out the wholesale channel as the best way for borrowers to obtain the most affordable mortgages because, unlike in the retail channel, borrowers in the wholesale channel are represented and guided by "independent" mortgage brokers who are supposed to survey options on their behalf and shop for the most competitive prices and rates.  In reality, however, despite emphatic claims to the contrary, UWM does everything in its power to ensure that the mortgage brokers in its network are anything but

1

"independent." Through systematic misrepresentations, deception, and unlawful inducements, UWM has corrupted brokers' independence and conspired with them to induce class members to retain a broker in the wholesale channel on the premise that those brokers are independent and working on each class member's behalf when those brokers are, in reality, UWM loyalists who then cooperate in a scheme with UWM to funnel those unsuspecting borrowers into UWM loans that are materially more expensive than the available alternatives. As a result, UWM has moved billions of dollars from the pockets of borrowers across the country into its own.

3. The residential mortgage industry in the United States is divided into two channels: retail and wholesale. American borrowers are likely most familiar with the retail channel, which constitutes the majority of the overall mortgage market. The retail channel is made up of numerous large national and regional financial institutions such as Chase, Bank of America, Citi, and many other household names. To obtain a mortgage through the retail channel, a prospective borrower reaches out directly to the financial institution and interacts with a loan officer who works for that specific institution. The loan officer then provides the prospective borrower with information and prices about the mortgage options offered only by that specific financial institution.

4. The key difference between the wholesale and retail channels is that, in the wholesale channel, the prospective borrower does not speak directly to the

lenders (e.g., they cannot simply walk into the lending institution and speak to its loan officer).  Instead, to access offerings in the wholesale channel, the prospective borrower must hire an "independent mortgage broker" whose duties include, among other things, surveying the pricing and options offered by a variety of wholesale lenders, presenting the information to the borrower, counseling the borrower regarding the available options, and helping the borrower complete and submit loan application paperwork to lenders.  For the broker's work on behalf of the borrower, the independent mortgage broker is handsomely rewarded with a fee up to 4% of the principal amount of the loan upon closing.

5.     According to UWM itself, the core value proposition underlying the wholesale channel—as distinct from the retail channel—is the hired independent mortgage broker's *independence*.  Unlike a loan officer at a retail lender, an "independent" mortgage broker owes loyalty to the borrower, not the bank.  Because the broker is not tied to any particular lending institution, the broker can collect and present options from many different lenders to ensure the borrower receives the most competitively priced options in their best financial interest.

6.     Indeed, this distinction is the centerpiece of UWM's marketing messages to the public, which are aimed at convincing prospective borrowers to get their mortgages through the wholesale channel instead of the retail channel because

"brokers are better." Here is how Defendant Mat Ishbia, the Chief Executive Officer

of UWM, describes the role of the mortgage broker:

> "Mortgage brokers are completely independent. They are not captive or connected to my company or any company. They are independently shopping. . . . We really believe that the best place for a borrower to get a loan, that's at an independent mortgage broker. That's because the broker has access to multiple lenders instead of just one lender. If you are a banker, you have access to just your lender."[1]

7.    And here is Mr. Ishbia again extolling the benefits of the wholesale

channel over the retail channel:

> "***Brokers have more products than any retail lender or big bank because they have access to multiple lenders***. So if UWM has a unique product, brokers have access to that, just as they have access to Flagstar or Caliber's unique products. ***So being a broker gives you more product options, not less, because brokers have access to all lenders.***"[2]

8.    And here again is Mr. Ishbia touting the ability of independent

mortgage brokers to secure "the best deal" for borrowers by shopping the wholesale

market including at UWM's competitors like Quicken (now called Rocket

Mortgage):

---

[1] Tracey Velt, *Transcript of Interview with Mat Ishbia*, Feb. 15, 2019, available at https://www.realtrends.com/articles/mat-ishbia-ceo-united-wholesale-mortgage/.

[2] Kimberly Greene, *In order to grow, mortgage brokers need to know how to combat falsehoods*, Mortgage Professional America, Mar. 13, 2019, https://www.mpamag.com/us/mortgage-industry/business-growth/fighting-myths-one-at-a-time/162167.

"And so, what's going to take us to number one is really just educating consumers because when people realize the best way to get a mortgage is cheaper, faster, and easier to go to a mortgage broker. ***So go to findamortgagebroker.com. You find a local mortgage broker. And they shop. They send you to me at UWM, or to Quicken, or whoever the best deal for you is. But you get a lower rate***."[3]

9. This is, of course, what thousands of so-called independent brokers themselves represent to their customers as well. On their websites, social media pages, and direct communications with borrowers, brokers hold themselves out as "trained professionals" who serve as "trusted guides" that "represent you." As one broker website puts it:

"***Mortgage Brokers represent you, the customer, not the lender***. Because they are not employees of a lending institution, ***Brokers are not limited in the product they can offer you***. . . . There is a wide assortment of options and features available to homebuyers today. ***Shopping around takes a lot of time and effort***. The mortgage process within today's very competitive marketplace intimidates many homebuyers. ***It pays to work with a mortgage professional who will represent you and ensure the mortgage you get is the one best suited to your needs***."[4]

10. The problem is that this is all a giant put-on that UWM orchestrates. In fact, UWM even *authors* many of these brokers' promises to, among other things,

---

[3] *Interview with Mat Ishbia*, Yahoo! Finance Live, Dec. 4, 2020, https://www.facebook.com/MatIshbiaUWM/videos/1330920580574049/.

[4] Edge Home Finance, https://edgehomefinance.com/about-us/.

shop around and to work on the borrower's—not the lender's—behalf in UWM-authored marketing templates that it provides to brokers to ensure substantial uniformity in the deceptive marketing. While UWM proclaims that "brokers are better" because they are "not captive or connected" to any one lender, but instead "independently shop" to get borrowers the "best deal," UWM works deliberately to ensure this is not the case. Instead, in pursuit of increased revenues and market share, UWM has corrupted thousands of so-called "independent" mortgage brokers to make them *captive and connected to UWM*, so that they *do not* "independently shop." This means borrowers *do not get the "best deal."* Instead, *they get the UWM deal*—no matter what—*even if it is significantly more expensive, as it almost always is.*

11. As a result, hundreds of thousands of American consumers have been duped. In reliance on misleading representations and fraudulent omissions made to the public by UWM and the thousands of brokers it has roped into its enterprise, plaintiffs and members of the class each entered the wholesale channel rather than the retail channel and engaged an "independent" mortgage broker believing—as UWM wanted them to believe—that they would be getting "independent" advice and representation to help them find the most affordable and suitable mortgage loan available among multiple lenders. But instead, these hundreds of thousands of unsuspecting borrowers did not obtain any such "independent" advice or

representation—rather, they were ensnared in UWM's scheme, and steered, without their knowledge, into UWM loans.

12. The statistics are astonishing. As of 2023, nearly half of all UWM mortgages are originated by brokers who refer 75% or more of their business to UWM. Over the past three years, UWM has issued nearly $39 billion in mortgages through purportedly "independent" brokers who refer 99% of their business to UWM. And during last year alone, more than 8,000 so-called "independent" brokers funneled 99% or more of their mortgages to UWM, worth at least $11.7 billion. In short, those brokers are not "independent" brokers shopping around to other lenders. They are not seeking the best prices for their principals. They are instead captive to UWM. Through a series of intentional and illegal practices, UWM has thus corrupted a large swath of brokers and turned them into the functional equivalent of "loan officers" that retail financial institutions use.

13. These corrupted brokers are in essence employees in the UWM enterprise. And thanks to a blizzard of misrepresentations and omissions from UWM and its broker partners that demonstrate a clear intent to deceive, hundreds of thousands of borrowers who finance their homes with UWM loans have entered into a mortgage transaction under a false understanding. While these borrowers reasonably believed they did their due diligence in seeking out an independent mortgage broker who would prioritize *their* needs—*not UWM's*—in reality, by

working with certain UWM-captive brokers, these borrowers were essentially and unknowingly predestined to get a UWM loan, even if it was not in their interests to do so.

14. The consequences to these UWM borrowers have been devastating. Not only were they deprived of the very "independent" representation that they sought (and paid for) in making one of the largest financial decisions of their lives, but UWM rarely offered the best available pricing throughout the past four years and routinely charged fees and costs that substantially exceeded their competitors' offerings to the tune of billions of dollars.

15. At bottom, UWM and its corrupted brokers have been richly rewarded for their illicit activities, siphoning billions of dollars from consumers in fees and costs by funneling them to UWM loans against their financial interests. Consumers are the unwitting victims in the scheme, mere afterthoughts in UWM's scheme to enrich itself. This action therefore seeks to rectify UWM's cynical, destructive campaign to take advantage of American borrowers who sought exactly what UWM, its CEO Mat Ishbia, and their corrupted brokers promised—"independent[] shopping," honest "access to multiple lenders instead of just one lender," and "the best deal" at the "lowest rate"—but who received exactly the opposite, costing them billions of dollars.

16.    Plaintiffs Therisa D. Escue and Billy R. Escue are residents of Tennessee.

17.    Plaintiff Kim Schelble is a resident of North Carolina.

18.    Plaintiff Brian P. Weatherill is a resident of Florida.

19.    Plaintiff Kenneth C. Morandi is a resident of California.

20.    Plaintiffs Jill Jeffries and Daniel Singh are residents of Florida.

21.    Defendant United Wholesale Mortgage, LLC ("UWM"), formerly known as United Shore Financial Services, LLC, is a limited liability company formed in the state of Michigan with a principal place of business in Pontiac, Michigan.

22.    UWM Holdings, LLC ("Holdings LLC") is a limited liability company formed in the state of Delaware with a principal place of business in Pontiac, Michigan.  Holdings LLC is the sole member and manager of UWM.

23.    Defendant UWM Holdings Corporation ("Holdings Corp.") is a Delaware corporation with a principal place of business in Pontiac, Michigan.  Holdings Corp. is the publicly traded corporate parent of Holdings LLC and its operating subsidiary, UWM.

24.    Defendant SFS Holding Corp. ("SFS Corp.") is a Michigan corporation with a principal place of business in Pontiac, Michigan.  Prior to the closing of a

business combination transaction in January 2021, SFS Corp. was the sole member and owner of UWM. Currently, SFS Corp. holds and controls approximately 79% of the combined voting power of the common stock of Holdings Corp. and thereby controls Holdings Corp. and its subsidiaries, including Holdings LLC and UWM. With respect to Holdings Corp., SFS Corp. "[has] the ability to determine all corporate actions requiring stockholder approval, including the election and removal of directors and the size of [its] Board, any amendment to [its] certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of [its] assets."[5] SFS Corp. is owned and controlled by members of the Ishbia family, including Mathew Ishbia, his brother Justin Ishbia, and his father Jeffrey A. Ishbia. SFS Corp., Holdings Corp., Holdings LLC, and UWM are referred to collectively herein as the "UWM Entities".

25. Defendant Mathew Randall Ishbia is the Chief Executive Officer of UWM, the Chairman, President and Chief Executive Officer of Holdings Corp., the Secretary and Director of SFS, and a resident of Bloomfield Township in the state of Michigan.

---

[5] UWM Holdings Corporation, Annual Report (Form 10-K) ("UWM 2023 Form 10-K") at 33 (Feb. 28, 2024),
https://www.sec.gov/edgar/browse/?CIK=1783398&owner=exclude.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and at least one class member is a citizen of a state different than the Defendants.

27.     Personal jurisdiction over Defendants is proper because Defendants either (i) reside, are headquartered and/or incorporated in Michigan; (ii) regularly conduct business in Michigan, and/or (iii) have otherwise intentionally availed themselves of the Michigan consumer market by engaging in or facilitating mortgage loan transactions with consumers in Michigan.  Personal jurisdiction is also proper because Defendants knowingly entered into a conspiracy with Michigan-based Defendants to deceive Plaintiffs and the class and deprive them of benefits of hiring mortgage brokers, and overt acts in furtherance of the conspiracy were committed in Michigan for the benefit of Defendants. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because numerous Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at

issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

## FACTUAL ALLEGATIONS

### I. Wholesale Mortgages, Unlike Retail Mortgages, Are Originated Through Third Party Intermediaries: "Independent" Mortgage Brokers

29. Residential mortgage loans in the United States generally fall into one of two categories: (1) retail mortgage loans, and (2) wholesale mortgage loans.

30. Retail mortgage loans are originated through a direct interaction between the prospective borrower and the lender. In the retail setting, the borrower's financial interests are not represented by a third-party broker with fiduciary duties to the borrower. The borrower approaches the lender directly and works with an in-house loan officer to (i) complete a loan application, (ii) consider the various mortgage products offered by the lender, and (iii) submit the necessary documentation for income verification and underwriting. The entire loan origination transaction occurs within the corporate structure of the retail lender and the loan is closed using lender-supplied funds.[6] Direct-to-consumer mortgage loans account for the majority of mortgage loans in the United States—over 61.2% (or $982

---

[6] *See* Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 FR 11280, 11284, https://www.federalregister.gov/documents/2013/02/15/2013-01503/loan-originator-compensation-requirements-under-the-truth-in-lending-act-regulation-z.

billion) as of 2023.[7]  Major retail lenders include big banks (like Wells Fargo, Bank of America, and Chase), online non-bank mortgage lenders (like Rocket Mortgage and LoanDepot), and credit unions (like Navy Federal Credit Union).

31.    The remaining 38.8% (or $623 billion) of mortgage loans are originated through what is often called the "wholesale channel."[8]  Wholesale mortgage loans, unlike retail mortgage loans, are originated through a process that involves a third-party intermediary—an independent mortgage broker.[9]   Instead of interacting directly with the lender, the prospective borrower hires the services of a mortgage broker who (i) collects relevant information about the borrower's finances and the amount of the desired loan, (ii) surveys the wholesale market to determine what loan products and rates are available to the borrower from a variety of wholesale mortgage lenders, (iii) helps the borrower evaluate the options to select the loan with the best pricing, and (iv) communicates with the lender on the borrower's behalf to complete the application and close the loan.  Borrowers rely on the relationships and

---

[7] Inside Mortg. Fin., *First-Lien Mortgage Originations by Production Channel* (published Feb. 29, 2024),
https://www.insidemortgagefinance.com/products/313551-originations-by-production-channel-2003-4q23-pdf.

[8] *Id.*  This channel is sometimes called the "third-party origination" or "TPO" channel as well.

[9] Unless otherwise indicated, the term "broker" as used herein refers collectively to mortgage brokers who operate in the wholesale channel and the individual loan officers who work with and for them.

expertise of their broker to find and recommend the loan product that is most affordable.

32.    Upon closing, mortgage brokers receive compensation, typically in the form of a fee or commission equivalent to between 1% and 4% of the principal amount of the loan.  Broker compensation is usually paid through the lender, though in some cases, the borrower may pay directly instead.  Even when broker compensation is paid by the lender, however, borrowers often pay extra financing charges to the lender to cover the cost of broker compensation.

33.    Independent mortgage brokers' conduct and compensation is subject to standards and limits prescribed by various federal and state statutes and authorities. In the wake of the financial crisis of 2008, which was fueled in part by incentives that drove deceptive and reckless business practices on the part of mortgage brokers, legislation at federal and state level sought to strengthen and codify rules concerning brokers' duties to their clients and the manner in which brokers may be compensated.

34.    At the federal level, mortgage brokers are subject to requirements under the Truth in Lending Act ("TILA"), as modified by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which places limitations and caps on broker compensation,[10] and prohibits brokers from steering consumers into

---

[10] *See, e.g.*, 12 C.F.R. § 1026.43(e)(3)(i); Consumer Financial Protection Bureau, *Summary of the final rule on mortgage loan originator qualification and*

higher-cost mortgage loans based on the prospect of additional benefit to the broker unless such loans are in the borrower's interest.[11]  Mortgage brokers are also subject to the Real Estate Settlement Practices Act ("RESPA"), which prohibits a lender from providing any "fee, kickback or thing of value" to a broker pursuant to any agreement or understanding that the broker will refer mortgage loan business to a particular lender.[12]

35.    At the state level, numerous state legislatures have passed statutes concerning mortgage brokers' duties to borrowers.[13]  Moreover, even aside from the statutes specifically defining a mortgage broker's duty, states across the country have recognized a mortgage broker's heightened responsibility based on its agency or fiduciary relationship with the borrower.    And through various consumer

---

*compensation practices* (Jan. 2013), https://files.consumerfinance.gov/f/201301_cfpb_loan-originator-compensation-rule_summary.pdf.

[11] *See, e.g.*, 15 U.S.C. § 1639(p)(2); 12 C.F.R. § 1026.36(e).

[12] *See* 12 U.S.C. § 2607(a); 12 C.F.R. § 1024.14(b).

[13] *See, e.g.*, Cal. Civ. Code § 2923.1 ("A mortgage broker providing mortgage brokerage services to a borrower is the fiduciary of the borrower"); N.C. Gen. Stat. Ann. § 53-244.109(9)-(10) ("Any mortgage broker engaged in the mortgage business . . . shall . . . [r]epresent the borrower's best interest in the course of brokering a mortgage loan . . . [and] have a duty of loyalty to the borrower, which shall include a duty not to compromise a borrower's right or interest in favor of another's right or interest, including a right or interest of the mortgage broker.").

protection laws, states prohibit business practices that deceive, mislead, defraud, or are unfair toward consumers.

36.     Lenders like UWM are keenly aware of brokers' obligations to their borrowers under state and federal law.  For instance, in its most recent Annual Report submitted to the Securities and Exchange Commission ("SEC"), UWM advises investors that brokers "are subject to parallel and separate legal obligations" and that "[w]hile these laws may not explicitly hold the originating lenders responsible for the legal violations of [brokers], U.S. federal and state agencies increasingly have sought to impose such liability."[14]

## II.     According to UWM and Others, the Core Value Proposition of the Wholesale Channel Arises from the Mortgage Broker's "Independence" from the Lender

37.     Borrowers who are interested in obtaining mortgages have a key, threshold decision to make:  whether to enter into the retail channel or the wholesale channel.  UWM – and the brokers with which it has conspired – work to persuade prospective borrowers to enter into the wholesale channel.  The more borrowers that enter the wholesale channel, the more potential clients UWM and those brokers have in the market.  By contrast, prospective borrowers who enter the retail channel instead cease to be a potential borrower for UWM and a client for wholesale channel brokers.

_____
[14] UWM 2023 Form 10-K at 15.

38.     In view of this, UWM and the brokers with which it has conspired tout that a key distinguishing feature of entering the wholesale mortgage channel rather than the retail channel is that, in the wholesale channel, a borrower engages an independent mortgage broker who represents the borrower through the open market process.  That is a premium service, that borrowers pay a premium for, as distinct from the retail channel where a borrower does not retain a broker and thus does not pay for such services.

39.     Buying a home is the most consequential financial transaction that most Americans will make in their lifetimes.  For many, the process can be overwhelming. Prospective borrowers that choose to enter the wholesale channel and hire mortgage brokers—rather than simply entering the retail market—do so because they are promised a trusted agent that will guide them through the process and provide them confidence and security in connection with this important decision in their lives.  The assurance of the mortgage broker's "independence" and undivided loyalty is what the borrower is paying for.  When a borrower hires an independent broker, the borrower is paying for assuredness that the broker will honestly serve his or her principal in an unconflicted manner, and that the broker does not maintain relationships with lenders that limit, and/or that are designed to limit, the broker's ability to present competitive and affordable mortgage options.

40.     As one UWM-funded industry trade group, the Association of Independent Mortgage Experts ("AIME"), has explained, the independence of the mortgage broker is essential from the borrower's perspective. For the borrower, the value of working with an independent mortgage broker derives primarily from the broker's ability "review loan offerings from different lenders to find the best option for borrowers" and to "negotiate with mortgage lenders to get the most competitive interest rates and pricing."[15] If brokers are captive to a particular lender and do not independently represent the interests of their clients, borrowers are deprived of the economic benefit of an open competitive market for wholesale loans.

*Figure 1*



---

[15] *See* Figure 1, *Independent Mortgage Brokers Create Value for Homeowners Across America*, AIME Infographic, https://aimegroup.com/wp-content/uploads/2022/07/AIME-Infographic-Print-Original-Format-1.pdf.

41.     A broker's independence also is essential to the broker's ability to be economically competitive—or at least it should be in a functioning, non-corrupted market for wholesale loans.  Brokers attract borrowers by promising to find them the most competitive loan terms available.  To actually find competitive loan terms for borrowers, brokers must survey a variety of lenders in the market because lenders are constantly competing with one another to earn business themselves, and no individual lender is always offering the best terms.  In other words, in a properly functioning wholesale mortgage market, brokers can successfully compete for business from prospective borrowers only by working with multiple lenders and allocating loans to whichever lender is offering the most attractive terms at the relevant time.

42.     As AIME has explained:  "One of the most important things for brokers, ***and what makes them brokers***, is their ability to work with a variety of lenders."  "In order to remain competitive in an increasingly competitive purchase environment, mortgage brokers need to provide an array of loan options from a variety of wholesale mortgage lenders to fully support the changing demographics of the American homeowner."[16]  A broker, AIME explains, should distribute loans

---

[16] *How to Grow Your Brokerage by Diversifying Your Mortgage Lenders*, AIME, Jul. 7, 2021, https://aimegroup.com/how-to-grow-your-brokerage-by-diversifying-your-mortgage-lenders/.

among at least seven different lenders, with no lender receiving more than 31.4% of the broker's loans[17]

*Figure 2*



43. Mortgage brokers acknowledge the importance of maintaining their independence—or at least the appearance of independence—from any particular wholesale lender in the market. As one broker who previously has sent loans to UWM has explained, if borrowers knew that a broker was funneling loans to a

---

[17] Figure 2, *How to Grow Your Brokerage by Diversifying Your Mortgage Lenders*, AIME, Jul. 7, 2021, https://aimegroup.com/how-to-grow-your-brokerage-by-diversifying-your-mortgage-lenders/.

particular lender, that broker would be at a "huge competitive disadvantage" because borrowers would flock to competitors who can actually tout their independence and lower rates.

44.　Put differently, in the wholesale channel, if Broker A is independent and Broker B is captive to one lender, and these facts are actually disclosed to (rather than concealed from) prospective borrowers, Broker A will out-compete Broker B and win more business from prospective borrowers over time.  This is unsurprising: prospective borrowers who choose to enter into the wholesale channel in the first place do so *because they prioritize the confidence and security that comes with having an independent broker working on their behalf.*  They do not enter the wholesale channel to hire a broker who operates in substantially the same way as a loan officer in the retail channel.

45.　Consistent with this, numerous industry websites, publications, and experts routinely tout the "independence" of mortgage brokers as the central reason why borrowers should hire and rely on them.  A broker's lack of attachment to any particular lender, they often explain, creates flexibility enabling the broker to shop across multiple lenders to find the borrower the best available loan.  For example, industry experts and trade groups, including organizations funded by UWM, have said:

a. "Brokers work for the borrower, not the bank. *__Independent mortgage brokers have flexibility to shop rates from multiple lenders__* with unmatched earning potential."[18]

b. "*__One of the most important things for brokers, and what makes them brokers, is their ability to work with a variety of lenders__*. Not only does that ability allow brokers to shop for the best price and process for their clients, but also allows them to handle unconventional loans. That optionality may be even more important as a more diverse and younger group of people begin looking for homes."[19]

c. "Mortgage brokers are the matchmakers of the home-buying process. *__They work on the homebuyer's behalf and shop multiple lenders to find the rates and terms that meet their clients' needs__*. Mortgage brokers usually rely on their relationships with wholesale lenders . . . who offer discounted rates that aren't available directly."[20]

d. "Typically, *__brokers provide . . . [m]ore options to the consumer__*, by enabling them to shop the market for the best price."[21]

e. "A mortgage broker works to connect home buyers or homeowners with the best mortgage rates possible. . . . *__[W]ith a mortgage broker__*

---

[18] *Why Brokers Are Better*, brokersarebetter.com, https://brokersarebetter.com/why-brokers-are-better/.

[19] *How To Grow Your Brokerage By Diversifying Your Mortgage Lenders*, AIME Group, Jul. 7, 2021, https://aimegroup.com/how-to-grow-your-brokerage-by-diversifying-your-mortgage-lenders/.

[20] *Wholesale Mortgage vs Retail Mortgage: What's the Difference?*, beamortgagebroker.com, Mar. 27, 2020, https://www.beamortgagebroker.com/blueprint-blog/wholesale-mortgage-vs-retail-mortgage.

[21] *Mortgage 101: What's the Difference Between a Mortgage Broker and a Mortgage Banker?*, AIME Group, https://aimegroup.com/wp-content/uploads/2022/07/AIME_BankerVsBroker.pdf.

*in your corner, you gain access to a wider network of lenders* – and that alone could pave the way to a really good deal."[22]

    f. "If you're the type of shopper who always buys at the first store or gets overwhelmed by options, a bank or online lender may be best. ***If you want a mortgage veteran to shop loans and communicate with lenders on your behalf to find you the best rate (think lower monthly payments), you'll need to find a mortgage broker.***"[23]

46.    UWM routinely promotes, echoes, and amplifies the same messages concerning the critical importance of mortgage broker independence.

47.    In particular, UWM's CEO Mat Ishbia regularly and publicly touts mortgage brokers' ability to independently shop options from multiple lenders as a key reason why the "broker" channel is more beneficial than retail.  For example, Ishbia has said:

    a. "Mortgage brokers are completely independent. They are not captive or connected to my company or any company. They are independently shopping. . . . We really believe that the best place for a borrower to get a loan, that's at an independent mortgage broker. That's because the broker has access to multiple lenders instead of just one lender. If you are a banker, you have access to just your lender."[24]

    b. "The broker versus banker, we're all originators out there trying to help consumers, which is great. ***We believe that options are better***, more options are better than less and that's why we believe in the broker channel and that's why we've invested all of our time and

---

[22] Maurie Backman, *What Is a Mortgage Broker*, The Ascent, Feb. 22, 2023, https://www.fool.com/the-ascent/mortgages/what-mortgage-broker/.

[23] *Id.*

[24] Tracey Velt, *Transcript of Interview with Mat Ishbia*, Feb. 15, 2019, available at https://www.realtrends.com/articles/mat-ishbia-ceo-united-wholesale-mortgage/.

effort in trying to help the broker channel grow and thrive because it's best for consumers and best for our loans and that's where we've been aligned for the last couple of years."[25]

c. "***Brokers have more products than any retail lender or big bank because they have access to multiple lenders***. So if UWM has a unique product, brokers have access to that, just as they have access to Flagstar or Caliber's unique products. ***So being a broker gives you more product options, not less, because brokers have access to all lenders.***"[26]

d. "Wholesale lenders must offer competitive pricing to compete. They don't have a captive loan like big banks and retail lenders do. Retail lenders know that if a loan comes to their system, they are getting that loan whether their price is 4.5% or 4.625%, it doesn't matter. ***In wholesale, if their rate is 4.625% instead of 4.5%, they don't have a chance to compete. The loan will go somewhere else.*** So thinking that it's more expensive to go to a middleman is just not true."[27]

e. "Whether you're shopping for a house, an airline ticket or groceries, ***it's always better to have options.*** Imagine what life would be like if you were limited to only one choice for everything. It's the same thing when it comes to mortgages. ***Loan originators on the retail side are captive to one set of programs***, one set of rates and one set of turn times. They're limited to the products, pricing and programs that they have in-house. ***On the other hand, brokers have access to numerous lenders, which ensures they have far more options when***

---

[25] *Id.*

[26] Kimberly Greene, *In order to grow, mortgage brokers need to know how to combat falsehoods*, Mortgage Professional America, Mar. 13, 2019, https://www.mpamag.com/us/mortgage-industry/business-growth/fighting-myths-one-at-a-time/162167.

[27] *Id.*

*it comes to products, pricing, guidelines, and turn times, which in turn means better solutions for clients*."[28]

f. "And so, what's going to take us to number one is really just educating consumers because when people realize the best way to get a mortgage is cheaper, faster, and easier to go to a mortgage broker. ***So go to findamortgagebroker.com. You find a local mortgage broker. And they shop. They send you to me at UWM, or to Quicken, or whoever the best deal for you is. But you get a lower rate***."[29]

g. "[W]e're wholesale, which means we offer lower rates. And you have to get our rates through an ***independent*** mortgage broker. ***Mortgage brokers offer lower rates and fees to consumers. It's not my opinion. It's fact***. It's backed up by data after data, after data point that ***if you go alone to, uh, you know, mortgage broker, findamortgagebroker.com or wherever you may go to find a local mortgage broker, you will get lower rates***."[30]

h. "What excites me is the impact we can make on consumers because consumers don't know how to get a mortgage. They still think you call a bank or you ask your parents and you put 20 percent down. It's just the wrong way. You got to go to findamortgagebroker.com. You find a local person that's an expert and they will shop on your behalf."[31]

---

[28] Mat Ishbia, *Game over: Independent mortgage broker shops are obvious choice for LOs*, HousingWire, Apr. 1, 2019, https://www.housingwire.com/articles/48679-game-over-independent-mortgage-broker-shops-are-obvious-choice-for-los/.

[29] *Interview with Mat Ishbia*, Yahoo! Finance Live, Dec. 4, 2020, https://www.facebook.com/MatIshbiaUWM/videos/1330920580574049/.

[30] *Mat Ishbia on Leadership and Mortgage Lending*, Masters in Business, BLOOMBERG, at 17:00, Jul. 16, 2021, https://podcasts.apple.com/us/podcast/mat-ishbia-on-leadership-and-mortgage-lending/id730188152?i=1000529129066.

[31] *Mat Ishbia – CEO of United Wholesale Mortgage Speaks on Company Culture and Leadership*, The Casey Adams Show, at 18:00, Nov. 4, 2021, https://www.youtube.com/watch?v=-Nq5cXfW2J4.

i. "***Brokers are independent*** loan officers that are not captive to one lender, ***not captive to me***, not captive to anyone. ***They're independent***. And if I'm a loan officer, why would I want to be captive? I'd rather be independent. And so it's happening."[32]

j. "[O]ur job is to empower mortgage brokers. . . ***They are the fastest, easiest, and cheapest way to get a mortgage. And that's not my opinion its supported by data and facts***. And so what my job is, is to make sure. That they stay fastest and easiest. We already know they're cheaper. So if, if you learn nothing from me or nothing, like ***the cheapest way to get a mortgage is through a mortgage broker and that's findamortgagebroker.com***."[33]

48.     And Ishbia is not the only one at UWM attempting to convince consumers of brokers' independence. In fact, UWM's representations concerning the importance of brokers' independence and access to options are so pervasive they can be characterized as the cornerstone of UWM's marketing message.

49.     UWM's public-facing social media accounts frequently emphasize brokers' independence and ability to shop across multiple lenders. As one emblematic example on UWM's Instagram account demonstrates, UWM represents to the public that the key attributes of an independent mortgage broker are that he or

---

[32] *Mat Ishbia on how UWM is prepared for the 2022 market*, Power House Podcast, HousingWire, at 0:20, Mar. 24, 2022, https://podcasts.apple.com/us/podcast/mat-ishbia-on-how-uwm-is-prepared-for-the-2022-market/id1426081802?i=1000555098554.

[33] *Mortgage Rate Predictions from the Nation's #1 Lender w/Mat Ishbia*, BiggerPockets Real Estate Podcast, at 13:00, Sep. 6, 2022, https://podcasts.apple.com/na/podcast/biggernews-september-mortgage-rate-predictions-from/id594419649?i=1000578498263.

she "WORKS ON YOUR BEHALF," "PROVIDES MORE LOAN OPTIONS," and is "NOT TIED TO ONE LENDER."[34]

*Figure 3*



50.     UWM's     public-facing     broker     directory     website, MortgageMatchup.com (which is discussed in more detail in Section V.C. *infra*), also emphasizes broker independence.  In a UWM-authored blog post intended to educate prospective borrowers about the difference between the retail and wholesale channels, UWM represents:  "A loan officer is an employee of a bank or retail lender that can only offer mortgage loan products and rates on behalf of their employer. In contrast, ***a mortgage broker works on your behalf to secure the home loan that best suits your situation and needs.*** Brokers can work alone or within a mortgage

---

[34] Figure 3, @uwmlending, Instagram (Oct. 30, 2020), https://www.instagram.com/p/CG-jVgGJTrI/.

brokerage, but ***they all leverage access to multiple lenders to present the best loan options available***."[35]

51. Broker independence is likewise a point of emphasis in UWM's investor-facing communications. In UWM's 2022 Annual Report to the SEC, for example, the company included a section explaining the benefits of the wholesale channel for borrowers, which stated: "Independent Mortgage Brokers are able to provide borrowers with multiple options on product structure and pricing rather than being rooted in a single platform offering, which we believe empowers borrowers and enhances their borrowing experience." It further stated: "In the wholesale channel, the interests of the Independent Mortgage Broker and the borrower are aligned to achieve the best outcome for the borrower . . . ."[36]

52. The purpose and effect of these messages is to convey not only that a broker's independence is essential to her or his ability to source competitive loan pricing for borrowers, but also that each broker who originates a loan through UWM is "completely independent," has "access to all lenders," "shops" for the best price

---

[35] *5 Facts about Your Local Mortgage Broker*, MortgageMatchup.com, https://mortgagematchup.com/resources/blog/5-facts-about-your-local-mortgage-broker.

[36] UWM Holdings Corporation, Annual Report (Form 10-K) ("UWM 2022 Form 10-K") at 5 (Mar. 1, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783398/000178339823000008/uwmc-20221231.htm. Notably, UWM removed this language from its 2023 Annual Report.

without being "captive or connected" to UWM, and that they choose UWM to "get a lower rate."

53.    UWM does not stop there.  Pursuant to UWM's instructions, mortgage brokers themselves frequently parrot similar representations to the public.  In an effort to win prospective borrowers' trust, confidence, and ultimately their business, thousands of brokers and loan officers across the country consistently emphasize their lack of attachment to any single lender and their consequent freedom to act on a borrower's behalf and in pursuit of the borrower's best interests.  For example, brokers' websites, social media platforms, public statements to the press, and private statements to prospective borrowers often include representations like:

    a.   "Shopping around for the most affordable option is not just for cars or vacations, it's for mortgages, too.  We're brokers—we partner with a variety of lenders to find the ideal solution for you."[37]

    b.   "Retail mortgage rates leaving a lot to be desired?  You're not alone, and you're not out of options!  Wholesale brokers (like me!) can shop multiple lenders to find the most competitive rates on the market.  DM me to see how much you could save!"[38]

    c.   "Getting something you want for less requires a little comparison shopping—that's exactly what independent mortgage brokers like

---

[37] Whitney Bulbrook, LinkedIn, May 12, 2024, https://www.linkedin.com/posts/whitney-bulbrook-cv_shopping-around-for-the-most-affordable-option-activity-7195482882801381377-WxH6?utm_source=share&utm_medium=member_desktop.

[38] Whitney Bulbrook, LinkedIn, Feb. 20, 2024, https://www.linkedin.com/posts/whitney-bulbrook-cv_retail-mortgage-rates-leaving-a-lot-to-be-activity-7165782176146317312-cZH8/.

me do every day.  Call me and we'll find the right home loan option for you."[39]

    d.  "Why work with big banks and corporations when independent mortgage professionals provide faster closings, better service and lower rates?  We shop multiple lenders to find the best rate and product for your needs."[40]

    e.  "When you work with a local independent mortgage broker like me . . . You're getting a mortgage expert . . . I have the access and know-how to shop dozens of lenders on your behalf . . You get all the benefits of shopping around without having to do the legwork."[41]

    f.  "Banks are a one-stop shop.  They shop once, then they stop.  Work with an independent mortgage broker that doesn't stop shopping until they find the option that suits you best!  Call today."[42]

    g.  "Retail lenders and banks offer fewer options!  Independent mortgage brokers like us are able to partner with multiple lenders to find you great loans and rates.  Reach out to me to see what I can do for you."[43]

---

[39] Jason Hands at Simple Home Lending, Facebook, Feb. 9, 2024, https://www.facebook.com/jrthands/photos/getting-something-you-want-for-less-requires-a-little-comparison-shopping-thats-/932276458907219/?paipv=0&eav=AfbQWuG90-KBV_F7vvOkbhkb24mqqXfZfO0j-kXviB4vejyP7vcsfX2c6QGMlRESAks&_rdr.

[40] @skyeclosesmaine, Instagram, May 26, 2021, https://www.instagram.com/p/CPVv6z-Aqiv/?hl=en.

[41] @skyeclosesmaine, Instagram, Feb. 28, 2022, https://www.instagram.com/p/CaiXy3orFd4/?hl=en&img_index=1.

[42] Lee Lieberman, LinkedIn, Mar. 31, 2023, https://www.linkedin.com/posts/lee-lieberman-7133296_banks-are-a-one-stop-shop-they-shop-once-activity-7047601888912887808-qYgD/.

[43] Erik, Fritsche, LinkedIn, Dec. 23, 2023, https://www.linkedin.com/posts/activity-7144356005483589632-UHkS?utm_source=share&utm_medium=member_desktop.

h. "As a mortgage broker at Epoch Lending, I'm not captive to what only one company or lender can offer . . . I have options to suit all of my clients' needs – if the program exists, I can get access to it. This allows me, and every other broker, to help more people achieve homeownership."[44]

54.   UWM is directly involved in these and other representations that many brokers make to their current and prospective clients.  UWM instructs brokers to use marketing tools designed by UWM's in house marketing team to standardize and coordinate the promotional appeals that brokers make to prospective borrowers.

55.   To take one example, UWM has partnerships with at least two website development vendors—LenderHomePage and TAYGO—and provides brokers in its network "turnkey website templates."[45]   Brokers can simply select a template with marketing language and features that UWM itself has produced, reviewed, and approved, and then customize their website by adding their specific colors and branding.  Among other things, the templates come with "[b]uilt-in SEO" (search engine optimization), "[a]utomated chat engagement," "[m]obile apps," and "[m]ortgage marketing support."[46]

---

[44] Quote from Chad Cattani of Epoch Lending in *Mortgage Banker Vs. Mortgage Broker: Why Independence Is Better*, AIME Group, Mar. 1, 2022, available at https://aimegroup.com/mortgage-banker-vs-mortgage-broker-why-independence-is-better/.

[45] Figure 4, https://www.lenderhomepage.com/uwm/

[46] *BUILD YOUR OWN WEBSITE*, https://www.uwm.com/grow-your-business/more-marketing-tools/build-your-own-website.

*Figure 4*



56.     UWM embeds marketing messages in these templates that advertise these brokers' purported independence.  For example, UWM provides brokers a template that includes a "blog post" titled "How Working With A Mortgage Professional Can Save You Money," which explains: "Mortgage professionals specialize in finding mortgages that meet your needs – they're not a salesperson trying to push a particular loan product. Instead, they help you find a loan that fits your financial situation, which enables you to save cash."[47]

---

[47] Figure 5, *How Working With A Mortgage Professional Can Save You Money*, https://on-lab-wwj4.lhp3.lhpdomains.com/blog/how-working-with-a-mortgage-professional-can-save-you-money.

## *Figure 5*



### How Working With A Mortgage Professional Can Save You Money

Learn about the benefits of working with a mortgage professional and how it can save you money.

Dec 14, 2022

Whether purchasing your first house or refinancing your existing mortgage, you might have considered working with a mortgage professional. A mortgage professional, such as a loan officer or broker, can help you save time and money, offer sound advice when dealing with tough situations, and help guide you through the whole borrowing process.

Home buyers who have worked with mortgage professionals will tell you that they secured better mortgage deals, which saved them thousands on their loans.

Here's what you need to know about the advantages of working with a mortgage professional.

#### What is a Mortgage professional?

A mortgage professional is a person or company that helps borrowers find the right lender for their financial situation. They'll work directly with you to help you pick the right mortgage and then find a deal that matches your standards — whether you're seeking to remortgage your existing house, a real estate investor, a first-time homebuyer, and everything in between.

#### Who Should Use a Mortgage professional?

You may want to work with a mortgage professional if:

- You want a local industry expert to assist you with the application process.
- You would like to work with a mortgage professional to help you waive or reduce your loan fees.
- Your FICO score is below average, or you run your own business and have difficulty finding a loan that will work for you. A mortgage professional can help you get access to mortgages that benefit you.
- You want to use a mortgage professional to help you qualify for better interest rates.

#### What are the Benefits of Using a Mortgage Professional

- A mortgage professional has intimate knowledge of available lending programs. They use their expertise and lending relationships to find the best financing option and help find where there's flexibility in fees and rates.
- Mortgage professionals specialize in finding mortgages that meet your needs –they're not a salesperson trying to push a particular loan product. Instead, they help you find a loan that fits your financial situation, which enables you to save cash. A good mortgage professional will understand your financial situation and find a mortgage that matches your criteria.
- You can save yourself time and effort by working with a mortgage professional. Not only will they find and vet loans, and they will also manage your loan mortgage process! Mortgage professionals deal with paperwork, keep underwriting on track, etc., which helps close the loan faster.
- They can give you insights into how much home you can afford and how you can improve loan approval.

57.     This very same "blog post" appears over and over on the websites of broker after broker, thus amplifying and parroting UWM's own deceptive messaging and misrepresentations to prospective borrowers. [48]   In this way, UWM uses its

---

[48] Figure 6, https://www.visiononemortgage.com/blog/how-working-with-a-mortgage-professional-can-save-you-money;

corrupted brokers as a vehicle for UWM to induce borrowers to enter the wholesale channel, retain those brokers, and ultimately be funneled into a UWM loan.

*Figure 6*



https://www.steadfastmortgage.com/blog/how-working-with-a-mortgage-professional-can-save-you-money; https://www.hawaiiloans.com/blog/how-working-with-a-mortgage-professional-can-save-you-money; https://www.libertyrva.com/blog/how-working-with-a-mortgage-professional-can-save-you-money.

58. Additionally, UWM instructs brokers to use a marketing portal called "Brand 360," which includes a tool called "Brand Builder." As UWM describes it:

> "[Brand Builder] is like having your own team of marketing professionals without the expense. Use Brand Builder to promote your business to borrowers and real estate agents by sending out completely customized emails and fliers, or create social graphics and videos and post them directly to your social account. Start by selecting a campaign or product, choose from dozens of professionally written and designed materials, and then personalize them with your company logo, font, and color. You can even swap out images for ones that are better representative of your area or region of the country."[49]

59. UWM's account executives strongly encourage all brokers and loan officers in UWM's network to use each of its Brand 360 tools, including Brand Builder. They also frequently give training presentations to educate brokers and loan officers on how to use UWM's various marketing tools. As one UWM account executive explained in one such presentation: "The reason I love Brand 360 is you set it, and you forget it. You take the five minutes to do your profile—your headshot, your website, your social media linkage, turn on your licenses, select a few compliance logos—and you're done. *We do everything for you*."[50]

---

[49] *Brand 360 Brand Builder*, https://www.uwm.com/grow-your-business/brand-builder (accessed Aug. 13, 2024).

[50] Figure 7, *Unlock Pro Elite Status: Your Guide to Top Mortgage Turn Times*, YouTube, Dec. 6, 2023, https://www.youtube.com/watch?v=KPGIGA2UdqA .

*Figure 7*



60.     And with respect to Brand Builder, UWM emphasizes that the marketing materials the tool produces are "completely branded" to the particular broker or loan officer, concealing UWM's involvement in the creation of the marketing materials.  As the same training presentation makes clear:  "***there is nothing UWM on it***."[51]

61.     UWM representatives even affirmatively instruct brokers *not to change* the UWM-authored marketing content.  As a UWM account executive has explained in regard to the marketing materials generated by Brand Builder, "if you do change some verbiage, you get a little message that pops up, hey Corrina you're changing

---

[51] *Id.*

the verbiage, you may want to check with compliance, something along those lines, *so I would just advise you, do not change anything.*"

62.    As a result, thousands of brokers and loan officers across the country send their prospective clients duplicated representations about the benefits of using an "independent" mortgage broker.[52]   And UWM instructs brokers not to change messages prospective clients see, while failing to disclose its own involvement in the "independent" brokers' marketing.

---

[52] Figure 8, The Loan Guys, Facebook, Mar. 30, 2021, https://www.facebook.com/TheLoanGuys; Angie Parke, LinkedIn, Mar. 31, 2021, https://www.linkedin.com/posts/angie-parke-33b5a219a_were-mortgage-experts-who-know-how-to-shop-activity-6783025341582639104-bR5o/; Rolf Monson, LinkedIn, Apr. 6, 2021, https://www.linkedin.com/posts/rolf-monson-19628671_were-mortgage-experts-who-know-how-to-shop-activity-6785244864264081409-FMnO/; @fen23, X.com, Mar. 28, 2021, https://x.com/fen23/status/1376142034818506753; Elliott Bowman, Your Mortgage Copilot, Mar. 31, 2021, https://yourmortgagecopilot.com/2021/03/31/we-shop-til-we-drop-your-rate/; Above All Mortgage, Facebook, Mar. 31, 2021, https://www.facebook.com/amythelendinglady; @murilofairml, Instagram, Jan. 27, 2020, https://www.instagram.com/p/B7126gzoy3G/; Vicki Jones, LinkedIn, Dec. 15, 2021, https://www.linkedin.com/posts/vjonestx_were-mortgage-experts-who-know-how-to-shop-activity-6876921639876079616-HTrP/; *see also* Appendix A.

*Figure 8*










63.     The problem, as explained below, is UWM's and these brokers' representations concerning broker "independence" are deliberately and knowingly false and misleading.

### III. UWM's Position in the Wholesale Mortgage Industry

64. In 2012, shortly after Ishbia became UWM's CEO, UWM was the eighth-largest wholesale lender for broker-originated loans in the country, responsible for approximately $5.9 billion in loans and 3% of all broker-originations annually.[53]

65. Over the next decade, UWM's annual originations and market share for broker-originated loans grew substantially.[54] In 2020, UWM became the largest wholesale lender.[55] It subsequently became the largest mortgage lender overall—retail or wholesale—accounting for more than $107.9 billion of mortgage originations annually.[56]

---

[53] Inside Mortg. Fin., *Top Broker and Correspondent Producers 2012* (published Aug. 22, 2018), https://www.insidemortgagefinance.com/ext/resources/files/pdfs/imfpubs_reports/t/o/p/_/b/top_broker_correspondent_producers_4q12.pdf?1558553175.

[54] *See* Figure 9, UWM Broker Origination & Market Share (2012-2023), based on Inside Mortg. Fin. data.

[55] Inside Mortg. Fin., *Top Third-Party Originators: 12M20* (published Feb. 18, 2021), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2020/4Q20/IMF2107-03.pdf?1613667066

[56] Inside Mortg. Fin., *Top 50 Mortgage Lenders: 12M23* (published Jan. 25, 2024), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2023/4Q23/IMF2404-01.pdf?1706200716.

*Figure 9*



66.     UWM's business practices in pursuit of greater market share are widely regarded as bitterly aggressive.  For example, one of UWM's competitors is Rocket Mortgage, LLC ("Rocket Mortgage") (formerly known as Quicken Loans).[57]  Ishbia explained in a recent interview in regard to Rocket Mortgage's CEO, Dan Gilbert: "He doesn't like me and I don't like him.  That's how it is. . . . His company used to be No 1 in mortgage; UWM, my business, is No. 1 in mortgage. I don't like the way

---

[57] *See, e.g.*, David Krechevsky, *Ishbia Takes Shots At Gilbert, His Lending & NBA Rival*, National Mortgage Professional, May 4, 2023, https://nationalmortgageprofessional.com/news/ishbia-takes-shots-gilbert-his-lending-nba-rival; Arnie Aurellano, *UWM vs. Rocket Mortgage: Here's where things stand now*, Scotsman Guide, Mar. 29, 2021, https://www.scotsmanguide.com/news/uwm-vs-rocket-mortgage-heres-where-things-stand-now/.

they do business in a lot of things. He probably doesn't like the way we do things. We're in the same town. We compete. We're winning. That's what it is right now."[58]

67.    During 2020 and 2021, the hostility between UWM and Rocket Mortgage reached new levels.  In September 2020, Rocket Mortgage's wholesale lending division rebranded as "Rocket Pro TPO" and increased its service offerings to mortgage brokers, hoping to cut into UWM's share of the broker origination market.[59]  Rocket's expansion in the wholesale channel threatened UWM's share of the broker origination market because Rocket was regularly able to offer lower pricing, and had other advantages in the marketplace (including, for example, that Rocket was ranked higher than UWM in industry publications like Bankrate and J.D. Power in regards to satisfaction, affordability, availability, and borrower experience).

68.    What followed was what many industry observers called a "mortgage war" between the companies, with each side deploying increasingly aggressive

---

[58] *AD Wreaks Havoc With Kevin O'Connor, Suns Owner Mat Ishbia Stops By, Plus Chris Mannix on the Failing Celtics* at 00:59:04–21, The Bill Simmons Podcast, May 3, 2023, https://podcasts.apple.com/us/podcast/ad-wreaks-havoc-with-kevin-oconnor-suns-owner-mat/id1043699613?i=1000611550020.

[59] Michael Bates, *Quicken Loans Unit to Be Rebranded Rocket Pro TPO*, MortgageOrb, Sep. 22, 2020, https://mortgageorb.com/quicken-loans-unit-to-be-rebranded-rocket-pro-tpo; *QLMS Is Becoming Rocket Pro TPO*, YouTube, Sep. 22, 2020, https://www.youtube.com/watch?v=l5sCGnCpsL4.

public relations and commercial tactics to gain an edge over the other.[60] This "mortgage war," which included dueling Super Bowl ads, culminated in UWM's implementation and enforcement of a contractual ultimatum, which effectively prohibited any broker who does business with UWM from submitting any mortgage loan applications to Rocket Mortgage, as discussed in greater detail in Section IV.A below.

69. Amidst this increasingly hostile competitive environment, in January 2021, the UWM Entities completed a merger transaction with Gores Holdings IV, Inc., a special purpose acquisition company (a "SPAC"). As a result of the SPAC transaction, Holdings Corp., UWM's corporate parent, became a publicly traded company initially valued at $16.1 billion.

70. The Ishbia family has maintained majority ownership and control of the UWM Entities and their affiliates both before and after the SPAC merger. In addition to Mat Ishbia, Mat's father Jeffrey Ishbia, and his brother, Justin Ishbia,

---

[60] Breana Noble, *Pontiac's United Shore roughs up Detroit's Rocket Mortgage in Super Bowl ad*, The Detroit News, Jan. 31, 2020, https://www.detroitnews.com/story/business/2020/01/31/pontiacs-united-shore-roughs-up-detroits-rocket-mortgage-super-bowl-ad/2858164001/; JC Reindl, *UWM CEO issues ultimatum, escalates war against Rocket Companies*, Detroit Free Press, Mar. 4, 2021, https://www.freep.com/story/money/business/2021/03/04/united-wholesale-mortgage-ultimatum-rocket-companies/4578357001/; James Kleimann, UWM & Rocket both declare victory in broker war, HousingWire, Mar. 18, 2021, https://www.housingwire.com/articles/uwm-rocket-both-declare-victory-in-broker-war/.

also sit on the board of UWM's corporate parent, Holdings Corp. Justin Ishbia likewise manages the family's holding company, SFS Corp., which remains the majority and controlling owner of Holdings Corp.'s stock.

71. Today, UWM is the largest wholesale mortgage lender with a market share of more than 48.1% of all broker-originated mortgage loans.[61] It is also the largest mortgage lender *overall*, responsible for more than 7.8% of all mortgage origination volume in the country.[62] According to UWM's statements, the company rapidly grew and maintained its revenues and market share in the wholesale market by building what it calls a "Competitive Moat" through its "unique partnership model" which results in "a continually sticky customer base and significant pricing power."[63]

---

[61] Inside Mortg. Fin., *Top Wholesale-Broker Platforms: 12M23* (published Feb. 29, 2024), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2023/4Q23/IMF2409-04.pdf?1709219683.

[62] Inside Mortg. Fin., *Top 50 Mortgage Lenders: 12M23* (published Jan. 25, 2024), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2023/4Q23/IMF2404-01.pdf?1706200716.

[63] UWM Holdings Corporation Presentation at 18, Mar. 1, 2024, https://investors.uwm.com/news-and-events/events-and-presentations/default.aspx.

## IV. UWM Employs Tactics Designed to "Cultivate Loyalist Brokers" Who Steer Borrowers into UWM Mortgages Even When Those Mortgages Are Not in the Borrowers' Best Interest

72.     As UWM explains to its investors, a core aim of its business model is to "*cultivate 'loyalist' brokers who then expand the customer network*."[64]   When UWM refers to "loyalist" brokers, it means brokers who direct their loyalty, first and foremost, *to UWM*—not to the hundreds of thousands of American consumers whose best financial interests those brokers are duty-bound to represent and protect.   It achieves this through a variety of means explained below.

### A. UWM Imposes Contractual Requirements on Brokers to Prevent Them from Exercising Independent Judgment

73.     One of UWM's primary means of "cultivating 'loyalist' brokers" and eliminating their "independence," is the enforcement of onerous and restrictive provisions in its Wholesale Broker Agreement.   UWM mandates that any broker who wishes to do business with UWM must first agree to its Wholesale Broker Agreement.   The Wholesale Broker Agreement sets forth, among other things, the terms and conditions under which UWM agrees to consider purchasing and/or funding mortgage loans provided by the broker, and which govern UWM's payment of fees to the broker.   UWM will not fund loans from or pay the fees of brokers who refuse to be bound by its Wholesale Broker Agreement.

---

[64] UWM Holdings Corporation Presentation at 6, Mar. 1, 2024, https://investors.uwm.com/news-and-events/events-and-presentations/default.aspx.

74. At least two provisions in UWM's Wholesale Broker Agreement specifically and explicitly bar brokers from shopping for loans in the best financial interest of their clients by forcing them to either ignore more competitive offerings from non-UWM lenders or to conceal them from their clients. Violating either provision exposes a broker to termination of their relationship with UWM and/or exorbitant financial penalties.

75. *First*, UWM has implemented and continues to enforce a policy—the "All In" policy—that contractually prohibits any broker who does business with UWM from shopping for loans from two of its competitors, Rocket Mortgage and Fairway Independent Mortgage. The prohibition is categorical: it applies regardless of circumstance, without exception—even if the loan products offered by those lenders are lower-cost and in the best interest of the broker's client.

76. By way of background, in September 2020, Rocket Mortgage launched its new rebranded wholesale lending services division, "Rocket Pro TPO."[65] At the time, Rocket Mortgage was the number one overall mortgage lender in the country, with UWM ranking third,[66] while UWM was the number one wholesale mortgage

---

[65] *QLMS Is Becoming Rocket Pro TPO*, YouTube, Sep. 22, 2020, https://www.youtube.com/watch?v=l5sCGnCpsL4.

[66] Inside Mortg. Fin., *Top 100 Mortgage Lenders: 9M2020* (published Dec. 8, 2020), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2020/3Q20/IMF2048_01.pdf?1607619759.

lender, with Rocket Mortgage ranking second in that category.[67]  UWM viewed

Rocket Mortgage's increased investment in the wholesale channel as a threat.

77.    Several months after Rocket Mortgage's wholesale lending rebrand,

UWM decided to take a drastic and controversial step.  On or around March 4, 2021,

UWM distributed a written amendment to its Wholesale Broker Agreement to every

broker in its network.  Many brokers received the amendment electronically through

UWM's EASE platform, and others received it through communications with UWM

account executives or other personnel.  The amendment provided:

> United Wholesale Mortgage, LLC ("UWM") is amending
> its broker, correspondent and financial institution
> agreements by adding a representation and warranty that
> its clients will not submit loans to either Rocket Mortgage
> or Fairway Independent Mortgage. Client acknowledges
> and agrees, that until client provides written notice
> terminating its agreement with UWM, client and its
> employees will not submit mortgage loan applications or
> mortgage loans to either Rocket Mortgage or Fairway
> Independent Mortgage for review, underwriting, purchase
> and/or funding (unless such loan was locked with Rocket
> Mortgage or Fairway Independent Mortgage prior to
> March 15, 2021). If client or client's employees breach
> this representation and warranty, client agrees to pay
> liquidated damages to UWM of: (i) Five Thousand Dollars

---

[67] Inside Mortg. Fin., *Top Wholesale-Broker Channels: 9M2020* (published Nov. 25, 2020), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2020/3Q20/IMF2046_07.pdf?1606322169.

($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00), whichever is greater.[68]

*Figure 10*



78. Brokers who received the amendment electronically were presented with an option at the bottom of their screens to either accept or decline the amendment. Those who declined the amendment were shown a message which stated: "By declining this amendment you are terminating your relationship with United Wholesale Mortgage. You will be able to close any loans currently in our pipeline, however. Please confirm below."

---

[68] Figure 10, ECF No. 1-1, Ex. A at 3, *The Okavage Group, LLC v. UWM Holdings Corporation et al.*, 21-cv-00448-WWB-LLL (M.D. Fla. Apr. 23, 2022)

79.    For brokers who had not yet signed UWM's Wholesale Broker Agreement before the effective date of the ultimatum (March 15, 2021), UWM altered its standard Wholesale Broker Agreement by adding a provision at Section 3.03(x) requiring all brokers to represent, warrant, and covenant, with respect to each mortgage loan the broker submits to UWM, that the broker "will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding." UWM also added a liquidated damages provision at Section 7.30 which specifies the damages for a breach of Section 3.03(x) shall be "the greater of: (i) Five Thousand Dollars ($5,000.00) per loan closed with Rocket Mortgage, Fairway Independent Mortgage . . . , or (ii) Fifty Thousand Dollars ($50,000.00), as liquidated damages for such breach without the need for proof of damages by UWM."[69]

80.    The implementation of UWM's "All-In" ultimatum had an immediate impact. According to UWM, within one week of the announcement "a majority of the largest independent mortgage broker shops across the country . . . signed the UWM all-in addendum representing over 90% of broker shops who will no longer work with Rocket Mortgage or Fairway Independent Mortgage Corporation."[70]

---

[69] ECF No. 1-2 at 3.03(x), 7.30, *United Wholesale Mortgage, LLC v. America's Moneyline, Inc.*, 22-cv-10228-LJM-EAS (E.D. Mich. Feb. 3, 2022).

[70] Press Release, *LARGEST MORTGAGE BROKER SHOPS IN AMERICA ARE ALL-IN WITH UNITED WHOLESALE MORTGAGE*, UWM, Mar. 11, 2021,

During an earnings call in or around May 2021, Ishbia stated of the "All-In" ultimatum initiative: "I couldn't have imagined it going so well." According to UWM, of the 12,000 brokers in its network before the ultimatum became effective, only 600 refused to sign and 1,000 did not respond. In the first month after the ultimatum took effect (April 2021), brokers submitted 17,000 more loan applications to UWM than they had in February.[71]

81.　　UWM's effort to compel brokers to funnel more loans to it (and away from its competition) by threatening brokers' interests as opposed to enriching borrowers' interests had its intended effect. As Ishbia explained in a February 2023 interview: "The penalty of working with Rocket . . . is you don't get to work with UWM. And nobody is willing to take that chance. . . . Once you have brokers that don't work [with] UWM, they lose out. That's why of the 12,000 brokers, 11,500 all stayed with UWM."[72]

---

https://www.uwm.com/about-us/media-resources/press-releases/2021/march-11-2021.

[71] JC Reindl, *United Wholesale CEO: Our hardball tactic against Dan Gilbert firm a big success*, Detroit Free Press, May 11, 2021, https://www.freep.com/story/money/business/2021/05/11/united-wholesale-mortgage-rocket-companies/5021895001/.

[72] Brenda Noble, *Mat Ishbia happy to take battle with Dan Gilbert into new arena*, The Detroit News, Feb. 14, 2023, https://www.detroitnews.com/story/business/2023/02/14/mat-ishbia-happy-to-take-battle-with-dan-gilbert-into-new-arena/69900833007/.

82.     Not all brokers succumbed to UWM's strong-arm tactics.  In an interview with National Mortgage Professional in August 2023, one such broker, who previously sent loans to both UWM and Rocket Mortgage, explained:  "When the ultimatum came out in 2021 that was a deal breaker for me.  If you lose that ability to choose it's an entire danger to the whole broker community."  Another broker who declined the "All-In" ultimatum, called UWM the "anti-broker model." He elaborated: "[T]hey always say brokers are better.  Whoever says one thing and does the other thing, you shouldn't work with them."[73]  Another such broker was asked by an interviewer: "If there was never an ultimatum . . . if that never existed, would you have continued using Rocket and United Wholesale depending on which one better served your client at the time?"  Swindell's response was:  "One hundred percent.  That's our job—it's to provide the best options for our clients."[74]

83.     Consistent with UWM's intent and these brokers' observations, UWM's "All-In" policy has resulted in an increasingly captive network of brokers. UWM forces brokers to consent to its "All-In" ultimatum as a precondition of submitting any loan application to the company or accessing any of UWM's

---

[73] Katie Jensen, *Brokerage Brawlers Discuss Ultimatum & Broker Independence*, National Mortgage Professional, Aug. 29, 2023, https://nationalmortgageprofessional.com/news/brokerage-brawlers-discuss-ultimatum-broker-independence.

[74] *Brokers under fire for working with UWM*, YouTube, Feb. 1, 2024, https://www.youtube.com/watch?v=4vyb5j0Tr6s.

technology or services. Consequently, any borrower who hires a broker that does business with UWM is necessarily missing out on loan products offered by other lenders, including where those loan products have a lower rate and/or lower origination costs. Essentially, because of the ultimatum, brokers are forced to go "All-In" for UWM as opposed to their clients.

84.     Given the critical mass of brokers that collectively joined UWM's restrictive efforts, the defecting brokers were drowned out by the growing army of UWM loyalists.

85.     *Second*, in addition to the "All-In" policy, UWM mandates that every broker who wishes to do business with UWM must accept the restrictive rate "Lock-In" policy, which is also operationalized through its Wholesale Broker Agreement. It is common in mortgage loan transactions for borrowers to seek to "lock-in" the interest rate in a lender's offer to protect against the possibility that the interest rate may increase between the rate quote and the execution of loan documents, which could be weeks later. Lenders offer to lock-in their quoted interest rates at the beginning of the loan origination process to provide borrowers certainty that the quoted price will be honored on the closing date, even if interest rates have increased in the interim. But such "Lock-In" offers generally bind ***the lender*** to the interest rate; they do not preclude ***the borrower or the broker*** from continuing to shop the market for better terms in the lead up to closing.

86.     UWM, however, imposes decidedly anti-consumer "Lock-In" terms.

In particular, Section 2.03(a) of the Wholesale Broker Agreement provides:

> UWM will provide price protection for the Mortgage Loans which it agrees to purchase and/or fund hereunder in the form of a written lock-in confirmation pursuant to its lock-in policies and in accordance with UWM's lending requirements. The time at which the interest rate for a Mortgage Loan is locked in shall be at Broker's option, provided, however, a Mortgage Loan with a locked in interest rate must be presented to UWM for purchase and/or funding before the expiration of the lock-in period. For purposes of the Agreement, the "lock-in period" shall be determined in accordance with UWM's lending requirements. If a Mortgage Loan is not presented for funding by UWM within the lock-in period, such Loan may be re-priced at the sole option of UWM. ***The transfer or sale by Broker of a Mortgage Loan locked in by UWM during the lock-in period to another entity, shall constitute a violation of the Agreement, and the Broker shall be liable, and promptly indemnify UWM, for any loss sustained as a result thereof by UWM.*** In addition, Broker shall notify UWM immediately should any commitment by UWM for a locked-in Mortgage Loan be canceled, withdrawn, or otherwise determined not to be set for purchase and/or funding by UWM.[75]

87.     Under Section 2.03(a), accordingly, once a mortgage broker obtains a "locked-in" rate quote from UWM on the borrower's behalf, the broker is effectively precluded from shopping for a loan from another lender that would be more advantageous for the borrower—even if such offers from other lenders exist and the broker is aware of them. If, after the rate is locked-in with UWM, the broker tries

---

[75] Wholesale Broker Agreement § 2.03(a) (emphasis added).

to fulfill his or her responsibilities to the borrower by alerting him or her to a better rate or finding and placing a mortgage loan with another lender on better terms, "the Broker shall then be liable, and promptly indemnify UWM, for any loss sustained as a result thereof by UWM."

88.    No other wholesale lender imposes such strict no-shop restrictions in connection with rate-locks.  This provision is unique to UWM.  The effect is that a rate-lock with UWM not only "locks-in" the interest rate, it "locks-in" the borrower to a UWM mortgage, even if there are better options elsewhere that broker is precluded from presenting.

89.    Critically, neither UWM nor the brokers disclose the terms of UWM's Wholesale Broker Agreement to borrowers prior to the borrower's engagement of the broker or the closing of the loan.  So at all relevant times, borrowers are entirely unaware of the significant contractual restrictions—like the "All-In" and "Lock In" provisions—that UWM imposes on their brokers.  The concealment and non-disclosure of these restrictions from borrowers, including the Plaintiffs, is a component of UWM's scheme.

**B.    UWM Carefully Monitors Broker Loyalty and Punishes Brokers Who Honor The Duties They Owe to Borrowers by Shopping for Lower Rates With UWM's Competitors**

90.    Importantly, UWM's "All-In" and "Lock-In" policies are not just public relations stunts or empty threats.  UWM expends significant resources to

police brokers' transactions to ensure that none of the brokers in its network submit a single loan or loan application that violates any provisions in its Wholesale Broker Agreement, including its "All-In" and "Lock-In" policies.

91.    To this end, UWM compiles and closely monitors information available from public and private databases, which enables it to track every mortgage loan in which each of the brokers in its network is involved.  Among other things, UWM maintains a detailed internal database, which contains information on every broker and loan officer in its network.  At all times, for example, UWM knows and tracks:

    a. How many loans each broker and loan officer has sent to UWM over various time ranges (e.g., in the last month, the last year, over the lifetime of the broker's or loan officer's relationship with UWM);

    b. What percentage of total loans and total loan volume each broker and loan officer has sent to UWM (e.g., in the last month, the last year, over the lifetime of the broker's or loan officer's relationship with UWM);

    c. How often each broker and loan officer is using various UWM services and technological platforms; and

    d. Whether a broker or loan officer has originated a loan that is not in compliance with either UWM's "All-In" or "Lock-In" policies.

92. UWM's account executives and other employees are tasked with monitoring UWM's databases to ensure that brokers' and loan officers' engagement with and fidelity to UWM remains high. Brokers and loan officers have reported receiving harassing communications from UWM employees demanding to know why the percentage of loans they sent to UWM versus other wholesale lenders dropped in the preceding month. Brokers and loan officers have likewise reported receiving similar communications from UWM after placing loans with rival lenders. In directing employees to make these harassing communications, UWM intended to influence, and did influence, mortgage brokers to act in the interests of UWM rather than the borrowers.

93. Because of UWM's effort to continuously monitor brokers' and loan officers' transactions, whenever a broker or loan officer closes a loan that is not in compliance with the company's "All-In" or "Lock-In" policies, UWM is aware.

94. UWM also routinely takes legal action against brokers to enforce the restrictions in its Wholesale Broker Agreement. In the three years since UWM first implemented its "All-In" ultimatum, the company has brought at least five lawsuits against various brokerage firms seeking damages for alleged breaches of the ultimatum provisions in its Wholesale Broker Agreement.

a. In February 2022, UWM sued Mid Valley Funding & Investment, Inc. in the Eastern District of Michigan seeking at least $310,000 in damages. The parties settled the dispute on June 5, 2023.[76]

b. In February 2022, UWM sued California broker America's Moneyline, Inc. in the Eastern District of Michigan seeking at least $2,800,000 in damages. The action remains pending.[77]

c. Also in February 2022, UWM sued Kevron Investments Inc. in the Eastern District of Michigan seeking at least $110,000 in liquidated damages. The action remains pending.[78]

d. In December 2023, UWM sued Madison Atrina LLC d/b/a District Lending in the Eastern District of Michigan seeking at least $685,000 in damages. The action remains pending.[79]

---

[76] *United Wholesale Mortg., LLC v. Mid Valley Funding & Inv., Inc.*, Case No. 22-cv-10396-LJM-CI (E.D. Mich.); *see also* Flávia Furlan Nune, "UWM and broker shop Mid Valley settle 'ultimatum' lawsuit," HOUSINGWIRE, Jun. 6, 2023, https://archive.ph/G3grj#selection-1269.2-1271.19.

[77] *United Wholesale Mortg., LLC v. Am.'s Moneyline, Inc.*, Case No. 22-cv-10228-LJM-EAS (E.D. Mich.).

[78] *United Wholesale Mortg., LLC v. Kevron Invs., Inc.*, Case No. 2:22-CV-10395-LJM-EAS (E.D. Mich).

[79] *United Wholesale Mortg., LLC v. Madison Atrina LLC*, Case No. 2:23-CV-13176-LJM-KGA (E.D. Mich).

e. Finally, in January 2024, UWM sued Atlantic Trust Mortgage Corporation in the Eastern District of Michigan seeking at least $355,000 in damages. The action remains pending.[80]

## C. UWM Sustains and Grows Its Group of Corrupted Broker Partners by Offering Value to Brokers If They Demonstrate Their Commitment to Funneling Loans to UWM

95. UWM also corrupts brokers by offering them value in exchange for the brokers' demonstration of loyalty to UWM, including through funneling clients to UWM. In view of its market position, UWM is uniquely suited to direct borrowers to brokers and thus to control brokers' deal-flow—the lifeblood of a broker's revenue stream.

96. Often, UWM will expressly offer value to brokers in exchange for the brokers increasing the rate at which they funnel loans to UWM. As discussed above, UWM tracks wholesale brokers' funneling rates. When UWM finds that a broker's funneling rate is unacceptably low, UWM has been known to offer the broker value – such as an offer to waive penalties to the broker for a borrower's early pay-off – expressly contingent on the broker increasing the rate at which he funnels loans to UWM.

---

[80] *United Wholesale Mortg., LLC v. Atlantic Trust Mortg. Corp.,* Case No. 24-cv-10216-TGB-DRG (E.D. Mich.).

97. In addition, in May 2018, UWM launched a borrower-facing website called FindAMortgageBroker.com. The website, according to UWM, purportedly was designed to serve both as a national search engine that prospective borrowers could use to locate a mortgage broker in their area, and as an educational guide with written and video content explaining the value of using a mortgage broker. As UWM's CEO Mat Ishbia stated in the press release announcing the new website: "FindAMortgageBroker.com gives consumers nationwide a platform to easily locate nearby mortgage brokers and learn about why they're the best choice for getting a mortgage."[81]

98. Since its launch, the website has featured content describing the supposed value proposition for using an independent mortgage broker—namely that a broker's allegiance lies with the borrower, not an individual lender, and thus a broker can shop offers from multiple lenders to find the best deal for the borrower. For example, beginning no later than May 2021 the front page of the website stated:

> "Connecting with an independent mortgage broker means having a local expert by your side for one of life's biggest financial decisions. ***Because they are independent, licensed professionals, mortgage brokers can shop multiple lenders — giving them access to more home loan options than what a bank or online lender can offer.***

---

[81] Caroline Basile, *United Wholesale Mortgage launches consumer-facing broker website*, HousingWire, May 8, 2018, https://www.housingwire.com/articles/43304-uwm-launches-consumer-facing-broker-website/.

The result is a cheaper, faster and easier mortgage for you. . . .”[82]

*Figure 11*



You deserve to work with a mortgage expert who works for you

Search for a local independent mortgage broker who can get you a cheaper, faster, easier mortgage

Search by Address, City or ZIP code

Why are brokers better? Watch a video to find out.

Connecting with an independent mortgage broker in your area means having a local expert by your side for one of life's biggest financial decisions. Because they are independent, licensed professionals, mortgage brokers can shop multiple lenders — giving them access to more home loan options than what a bank or online lender can offer. The result is a cheaper, faster and easier mortgage for you. One that is tailored to your specific home financing needs. So, whether you're buying a home or refinancing, find your perfect mortgage match by working with a local independent mortgage broker.

99. The explanatory video that resided at the top of the homepage conveys

a similar message. The narrator explains:

> "Most banks and big online lenders only offer their own
> mortgage products, with limited options, limited
> communication, and lengthy waiting periods that can drag
> out your closing. When you work with an independent
> mortgage broker, you have a local mortgage expert on
> your side to personally advise you throughout the process,
> and who has your best interest in mind. ***They'll shop***

---

[82] Figure 11, https://findamortgagebroker.com, Retrieved from *Internet Archive*, (archived on May 18, 2021), https://web.archive.org/web/20210518114811/https://findamortgagebroker.com/.

***dozens of lenders to find the right home loan for your needs . . . .***"[83]

*Figure 12*



100. Other "Guides" and articles on the website likewise describe a mortgage broker as "a home loan expert that connects prospective homeowners with willing mortgage lenders" and who "shop[s] around to find the best interest rates, terms, and loan products" that meet the borrower's needs.[84]

---

[83] Figure 12, https://findamortgagebroker.com, Retrieved from *Internet Archive* (archived on May 18, 2021), https://web.archive.org/web/20210518114811/https://findamortgagebroker.com/.

[84] *5 Facts About Your Local Mortgage Broker*, Jan. 22, 2021, https://findamortgagebroker.com/resources/guides/all-guides/guides/2021/01/23/5-facts-about-working-with-a-local-mortgage-broker, Retrieved from *Internet Archive* (archived on May 18, 2021), https://web.archive.org/web/20210518100649/https://findamortgagebroker.com/resources/guides/all-guides/guides/2021/01/23/5-facts-about-working-with-a-local-mortgage-broker.

101. In January 2024, UWM rebranded FindAMortgageBroker.com, changing its name to MortgageMatchup.com.[85] The rebranded website contains much of the same content, including the broker search directory, UWM's representations that mortgage brokers "shop around to find the best interest rates, terms, and loan products that meet your needs,"[86] and that the search engine will help the prospective borrower connect with a local mortgage broker who is an "independent, licensed professional in your area who can shop on your behalf and give you access to more home loan options… than a bank or an online lender."[87]

102. UWM has spent, and continues to spend, considerable effort and millions of dollars in advertisements to promote its website in order to drive more web traffic to the content it features. Among other things, UWM promoted FindAMortgageBroker.com in two television commercials that aired during Super Bowl LIV in 2020 and Super Bowl LV in 2021 respectively.[88]

---

[85] Press Release, *UWM Rebrands FindAMortgageBroker.com to Mortgage Matchup*, UWM.com, Jan. 17, 2024, https://www.uwm.com/about-us/media-resources/press-releases/2024/january-17-2024.

[86] *See Facts About Your Local Mortgage Broker*, https://mortgagematchup.com/resources/blog/facts-about-your-local-mortgage-broker.

[87] https://mortgagematchup.com/

[88] Figure 13, Kimberly Greene, UWM challenges Rocket Mortgage in first-ever Super Bowl ad, MPAmag.com, Jan 31, 2020, https://www.mpamag.com/us/news/general/uwm-challenges-rocket-mortgage-in-first-ever-super-bowl-ad/212162; *FindAMortgageBroker.com Superbowl LV*

*Figure 13*




103. UWM's CEO Mat Ishbia also frequently promotes the website during interviews and on social media.[89]  For example, in a January 2021 interview with Bloomberg, Ishbia explained:  "You know, it's all about you know finding great mortgage brokers.  So we work with great mortgage brokers.  FindAMortgageBroker.com.  There's a lot of great mortgage brokers.  It's the cheapest, fastest, easiest way to get a mortgage.  And so what we're really big on is helping advocate for them, and help educate consumers that the best way to get a mortgage is to go through them.  Then you get great partners. . . ."

---

*Commercial*, Mat Ishbia's Facebook Page, Feb. 2, 2021, https://www.facebook.com/MatIshbiaUWM/videos/421213375778520/.

[89] *See, e.g.*, Figure 14, *Mat Ishbia Bloomberg 1.15.21*, Mat Ishbia's Facebook Page, Jan. 15, 2021, https://www.facebook.com/MatIshbiaUWM/videos/432886534423072/; Mat Ishbia's Facebook Page, Mar. 4, 2021 at 1:38 PM, https://www.facebook.com/MatIshbiaUWM.

*Figure 14*



104.    In reality, FindAMortgageBroker.com (now MortgageMatchup.com) is a tool for UWM to compel brokers to steer loans to UWM.

105.    From the brokers' perspective, it is critical to be featured in the search results of the FindAMortgageBroker.com.  It is also highly valuable to them—much like the value to businesses in securing priority search results on Google, which businesses pay substantial amounts to accomplish. This means that UWM has enormous market power through its directory website.

106.    And UWM leverages that power.  In short, UWM uses the website to steer borrowers on FindAMortgageBroker.com *to the brokers that steer the most loans to UWM by featuring them in search results*.  The message to brokers is simple: *the more you steer borrowers to UWM, the more UWM will steer borrowers*

*to you on FindAMortgageBroker.com and thus increase your deal-flow and revenue.*

107. The specifics are as follows: To be listed on UWM's broker directory, a broker must be a "UWM Partner" who has signed UWM's Wholesale Broker Agreement. The results from the broker search engine therefore exclude brokers who (a) do not do business with UWM; and/or (b) who do business with UWM's chief competitor, Rocket Mortgage.

108. None of this is disclosed on the website. On the contrary, the statements on the website, in combination with pervasive public representations by company representatives and UWM itself (including through the brokers) (*see supra* Section II), are intended to mislead consumers into believing the brokers do *not* have undisclosed allegiances or connections to UWM.

109. When borrowers visit the website, they are invited to enter their address, city, or ZIP code into a search bar at the top of the screen.[90] The algorithm that determines the search results, however, ranks brokers according to their "PRO Score," a numerical value that UWM assigns every broker in its network as part of its "PRO Rankings" system. As UWM explains on its broker-facing website, "[t]he higher your PRO Score . . . the more visibility you'll have on Mortgage Matchup."[91]

---

[90] Figure 15, https://mortgagematchup.com/.

[91] *PRO Rankings*, https://www.uwm.com/pro-rankings (accessed Mar. 16, 2024).

*Figure 15*



110. A broker's "PRO Score" is calculated each month based on actions the broker has taken in the prior month. Brokers earn "points" toward their PRO Score by, among other things, (i) submitting loan applications with UWM, (ii) visiting UWM's campus, (iii) communicating with UWM account executives, and (iv) engaging with UWM's content online.[92]

---

[92] Figure 16, *PRO Rankings Scoring Key*, https://www.uwm.com/pro-rankings-scoring-key.

*Figure 16*



111. Each of these components of a broker's PRO Score is a proxy for loyalty to UWM. The brokers who are most loyal to UWM, and who place the highest proportions of their loans with UWM, receive the highest PRO Scores and the accompanying promotional services and access to other benefits.

112. For example, brokers can earn up to 50 points each month by achieving up to six "Ultimate Loan Submissions." To achieve an "Ultimate Loan Submission" a broker must submit a loan application while using at least five of UWM's exclusive tools for compiling, organizing, and verifying borrower information—tools that can

only be used in connection with UWM loan submission.[93]  Similarly, brokers can earn points by ordering a "Memory Maker" on high proportions of their loans (5 points for 50-69% of their loans; 10 points for 70% or more of their loans).  But "Memory Makers"—personalized thank you gifts for real estate agents or borrowers, like cutting boards or welcome mats—can only be ordered for loans placed with UWM.  So essentially, brokers can earn these points only if they place an increasing proportion of their loans overall with UWM.

113.   As a result, the search results on FindAMortgageBroker.com (and now MortgageMatchup.com) are deliberately biased toward brokers who are corrupted in favor of UWM.  The website is designed to steer borrowers to brokers who funnel nearly all their business to UWM, regardless of whether UWM offers the most competitive loan terms.  Conversely, brokers who do not funnel loans to UWM can expect UWM (through mortgagematchup.com) to *decrease* the number of borrowers that seek their services.  And finally, the search results are designed to categorically exclude brokers who *ever* refer borrowers to Rocket Mortgage, even when Rocket Mortgage offers better prices.

114.   To illustrate the point, if a borrower enters a ZIP code in Chapel Hill, North Carolina into the search bar, the top six brokers that appear in the results are Patrick Roman (NMLS #204441), Whitney Bulbrook (NMLS #48522), Stephen

---

[93] *Ultimate Loan Submission*, https://www.uwm.com/ultimate-loan-submission.

Fitzpatrick (NMLS #92185), Teante Gray (NMLS #2080243), Erica Sanders (NMLS #390083), and Robert Bajakian (NMLS #77324).[94]  Each of those brokers funneled nearly all of her or his loans to UWM (and they also effectively pledged to withhold information from borrowers about any lower interest rates offered by Rocket).  Roman sends upwards of 80% of his loans to UWM.  Bulbrook sends 99%. Fitzpatrick sends 100%.  Gray sends 89%.  Sanders sends 86%.  Bajakian sends 92%.  Accordingly, none of these brokers is actually shopping across multiple lenders for the best loans available for their clients.  Instead, they are sending the vast majority of their clients to one lender: UWM.

*Figure 17*

---

[94] Figure 17, https://mortgagematchup.com/search?query=27514.

115. Together, the website and PRO Score system create a powerful mechanism to corrupt so-called "independent" brokers into UWM loyalists. With up to tens of thousands unique visitors per month, UWM's website is among the most valuable and important sources of business generation for mortgage brokers in the United States. These tools have become a critical component of UWM's participation in funneling borrowers to UWM against the borrowers' interests.

116. Placement on FindAMortgageBroker.com and MortgageMatchup.com is not the only inducement that UWM provides to brokers to influence and interfere with their decision making. UWM also uses its PRO Rankings and LO Partner Points programs to provide financial and other benefits to brokers who steer their customers to UWM.

117. In short, and with respect to the Pro Rankings System, brokers increase their "PRO Score" and "PRO Ranking status" by funneling more borrowers to UWM.[95] The "PRO Score" that UWM assigns to each broker in its network provides them access to one of three "status" tiers—PRO Basic (for scores of 0-49), PRO Plus (for scores of 50-69), or PRO Elite (for scores of 70+).[96]

---

[95] *PRO Rankings*, https://www.uwm.com/pro-rankings.

[96] Figure 18, UWM's LinkedIn Page, https://www.linkedin.com/posts/united-wholesale-mortgage_weve-made-some-powerful-changes-that-make-activity-7022203122810839040-lt9P/.

*Figure 18*

Points are combined for a total PRO Score that'll
put you in one of three tiers for that month:

**PRO Elite**    **PRO Plus**    **PRO** Basic
PRO Score of 70+    PRO Score of 50-69    PRO Score of 0-49

118.    UWM provides increasingly attractive financial and other benefits to brokers depending on the "status" tier they achieve by funneling loans to UWM.  As Ishbia recently explained on UWM's Instagram feed:  "Being PRO Elite matters.  You get more FindAMortgageBroker.com leads.  You get more opportunity.  Faster turn times.  All the things matter with PRO Elite."[97] Whether characterized as getting "more leads" or "more opportunities," in substance what brokers receive is UWM's valuable assistance in making more money for themselves, regardless of the consequences to borrowers.

119.    One particularly crucial benefit for brokers who achieve PRO Plus or PRO Elite status is faster turn times.  This is a highly valuable benefit for mortgage brokers.  The more time that passes between the beginning of the approval process and closing, the greater the chance that something might derail the transaction—an interest rate fluctuation, cold feet from the buyer, etc.  Because brokers only get

---

[97] @uwmlending, Instagram, Oct. 2, 2023,
https://www.instagram.com/p/Cx5sgI1uFee/?img_index=1.

compensated if the mortgage loan closes, speed is therefore paramount to brokers. Time spent on a transaction that was too slow to close is time wasted for the broker. The faster transactions can close, the more deal-flow brokers can generate and process, the more money they can make for themselves.

120.    Generally, when a new loan file is submitted to UWM for underwriting, it will take more than two days for UWM's underwriters to review and verify the information in the file and send it back to the broker.  For brokers who achieve PRO Plus status, however, UWM's underwriters will guarantee completion of initial underwriting within two days.  For brokers who achieve PRO Elite status, the initial underwriting turn time is guaranteed within one day.  And if the file is returned with conditions—that is, if the underwriter is requesting additional documentation or clarification concerning certain information in the file—UWM will ensure the additional information is reviewed and confirmed also within one day, but again, only if the submitting broker has PRO Plus or PRO Elite status.[98]

*Figure 19*

| | PRO Elite | | PRO Plus | | PRO Basic | |
| | PRO Score of 70+ | | PRO Score of 30-69 | | PRO Score of 29 or lower | |
| | Initial UW | Conditions | Initial UW | Conditions | Initial UW | Conditions |
| --- | --- | --- | --- | --- | --- | --- |
| Conventional | 1 | 1 | 2 | 1 | 2+ | 1+ |
| FHA | 1 | 1 | 2 | 1 | 2+ | 1+ |
| Non-Agency* | 2 | 1 | 3 | 2 | 3+ | 2+ |
| USDA | 1 | 1 | 2 | 1 | 2+ | 1+ |
| VA | 1 | 1 | 2 | 1 | 2+ | 1+ |
| Last updated on March 17, 2024 | | | | | | Turn Times Details |

[98] Figure 19, *PRO Rankings*, https://www.uwm.com/pro-rankings.

121. Again, the message that UWM sends to brokers through this scheme is clear:  the more loans you funnel to UWM, the faster UWM will process loans for you, and the more money you will make.

122. Additionally, by achieving elevated PRO status or accruing LO Partner Points—"points" that can be redeemed for various gifts and other benefits—brokers can gain access to exclusive UWM teaser products such as interest rate discounts, "1% down" products, and rate relocks.  But, again, *these are offered only to those brokers who first prove their loyalty by funneling borrowers to UWM*.  And even those offerings generally do not convert into actual savings for clients.  As discussed below, even after accounting for such offerings, UWM borrowers who worked with UWM's corrupted brokers routinely pay hundreds or even thousands more than they would have with even just a median loan product (much less, the most competitive product at the time).

123. Through its FindAMortgageBroker.com website and its PRO Rankings and LO Partner Points programs, UWM sends a clear and unmistakable message to the population of "independent brokers" in the market:  If you funnel loans to UWM rather than shop on behalf of your customers, UWM will enrich you.  The predictable result is that brokers—chasing their self-interest—accede to UWM's inducement, resulting in the dynamic described below in Sections V and VI, where UWM and

thousands of brokers collude to drive an unconscionable proportion of borrowers to UWM who would be better off getting their loans elsewhere.

124. As discussed above in Section II, UWM also creates advertising materials that it provides to its corrupted brokers for no cost. These benefits, which are not disclosed to borrowers, enable corrupted brokers to take UWM-created social media and video content, insert the broker's own branding, and present it as their own.[99] For example, individual brokers and brokerage firms can take the television commercial UWM produced for the Super Bowl to promote FindAMortgageBroker.com and pass it off as their own, as One Stop Financial Group, LLC—a firm whose brokers funnel over 90% of their loans to UWM—does on its Facebook page.[100] Producing these marketing materials (or hiring an firm to design them) would otherwise cost brokers upwards of tens of thousands of dollars.

*Figure 20*

 

---

[99] *Brand 360 Brand Builder*, https://www.uwm.com/grow-your-business/brand-builder.

[100] Figure 20, One Stop Financial Group, LLC's Facebook Page, Oct. 20, 2023, https://www.facebook.com/onestopfinancialgroupllc/videos/358371569860194; United Wholesale Mortgage's YouTube Channel, Jan. 31, 2020, https://www.youtube.com/watch?v=-X4dvNICep4.

125.   UWM also frequently flies corrupted brokers to its campus in Pontiac, Michigan for days-long conventions, training courses, and events, which often feature lavish meals and live entertainment, all at UWM's expense.

126.   Among other things, UWM hosts an annual convention called "UWM LIVE!" during which it welcomes "thousands of brokers" to its campus for "a packed day of insights, connections and fun."[101]   The event includes speeches on broker practices from wholesale industry stakeholders including UWM personnel and brokers, as well as networking sessions to provide broker attendees opportunities to discuss their brokerage activities with one another and UWM.

*Figure 21*

---

[101] Figure 21, *UWM Live!*, https://www.uwm.com/uwm-live.

127. Numerous brokers who have attended UWM LIVE! and UWM's many other in-person networking events and trainings describe them as raucous parties, heavy on free perks for attendees.

128. UWM and Ishbia ensure that the top brokers and loan officers who demonstrate the highest degrees of loyalty—steering exceptionally high volume and high percentages of loans to UWM—are rewarded handsomely. Every year, for example, UWM distributes an "Excellence Award" to brokers with high UWM loan funneling percentages. It also distributes "Top Broker" awards to the top brokers and loan officers in every state, "Top 1%" awards to the brokers who rank in the top 1% of all brokers ranked by UWM loan volume, and "Elite 100" awards to the brokers who UWM has ranked in the top 100 of all UWM broker partners across the country.

129. In addition to the recognition, these awards often come with extravagant benefits, including vacations, meals, and entertainment. In 2019, for example, UWM and AIME funded an "awards trip" to a 5-star luxury hotel, the Andaz Costa Rica Resort at Peninsula Papagayo, for a select group of high-funneling brokers and loan officers.[102]

---

[102] Figure 22, Melanie Walburg, LinkedIn, Jan. 31, 2020, https://www.linkedin.com/posts/melaniewalburg_grateful-pumpedfor2020-brokersarebetter-activity-6629008645722030080-Bubr?utm_source=share&utm_medium=member_desktop.

*Figure 22*



## V. UWM's Tactics Have Caused Thousands of Mortgage Brokers to Funnel Loans to UWM, Costing UWM Borrowers Billions in Above-Market Costs

130. UWM's tactics were intended to cause, and did cause, a steadily increasing proportion of mortgage brokers to refer the vast majority of their borrower-clients to UWM without shopping for loans that are in those borrower-clients' best financial interests. This trend is evident throughout the wholesale mortgage industry—up and down the market, in every geography.

131. According to publicly available data, starting in 2021, the year UWM's "All-In" ultimatum went into effect, the proportion of loan officers who steer 75% or more of their loans to UWM has expanded dramatically.

132. By last year, 2023, of the 30,229 loan officers who sent at least one loan to UWM, 12,936 loan officers sent more than 75% of their loans to UWM, which

constituted more than 42% of the loan officers who sent at least one loan to UWM, up from approximately 22% in 2020. And of those loan officers, 8,665 sent more than 99% of their loans to UWM. Between 2020 and 2023, the proportion of loan officers who steer virtually all (99% or more) of their loans to UWM more than doubled, increasing from 13.4% of the total UWM loan officer population to over 28.7% of the loan officer population.[103]

*Figure 23*



---

[103] Figures 23 & 24, Analysis of publicly available data.

*Figure 24*



133. As the population of loan officers who steer loans to UWM has expanded, the loans that are generated by those loan officers have become increasingly critical to UWM's business overall. Figure 25 below shows this trend. In 2020, loan officers who sent 99% or more of their loans to UWM accounted for approximately 4% of UWM's brokered loans (16,423 loans total). By 2023, that number had more than tripled to 14% (30,252 loans total). Similarly in 2020, loan officers who sent more than 75% of their loans to UWM accounted for

approximately 22% of UWM's total brokered loan volume ($32,094,902,497). By 2023, that number had doubled to 45% ($35,993,472,073).[104]

*Figure 25*



134. In particular, the loan volume attributable to the loan officers who are the most prolific loan-funnelers—those who send 99% or more of their loans to UWM—has accounted for an increasing amount of UWM's business. From 2021 to 2023, these fully captive loan officers, who send 99% or more of their business to UWM, have accounted for over $32.9 billion of UWM's loan volume. In the same time period, the loan officers who send at least 75% of their business to UWM have accounted for over $153.3 billion of UWM's loan volume.

---

[104] Figure 25, Analysis of publicly available data.

135. Even when considering only loan officers who originate a minimum of five loans in a year, the proportion of loan officers who send more than 75% of their loans to UWM is also steadily increasing.[105] In 2020, 12% of all loan officers who originated five or more loans in a year (2,972 loan officers total) sent 75% or more of their loans to UWM. By 2023, that number more than doubled to 27% of all such loan officers (5,385 loan officers total).

136. These loan officers—who originate at least five loans in a year and who funnel at least 75% of their loans to UWM—likewise account for a growing proportion of the total loans and loan volume that UWM originates. In 2020, this group accounted for 96,761 loans, the collective value of which was $30,730,894,873 (or 21.6% of UWM's total brokered loan volume). In 2023, this group accounted for 86,049 loans, the collective value of which was $31,601,648,995 (or 39.9% of UWM's total brokered loan volume). From 2021 to 2023, the total loan volume generated by these loan officers is over $143.1 billion.

---

[105] Likewise, from 2021-2023, the overall volume of loans brokered by (1) loan officer who broker a minimum of five loans in a year and sent more than 75% of their loans to UWM is of a substantially similar magnitude to that of (2) all loan officers who sent 75% or more of their loans to UWM, including loan officers who brokered fewer than five loans in a year. For example, in 2023, the first category of loan officers sent 97,333 loans to UWM with a collective loan volume of $35,993,472,073. In 2023, the second category of loan officers sent 86,049 loans to UWM with a collective loan volume of $31,601,648,995.

137.   The same phenomenon presents when considering data at the *broker level* as opposed to the *loan officer* level.  For instance, in 2020, 1,752 brokers (or 12.2% of all brokers that brokered at least five loans that year) funneled 75% or more of their total loans to UWM.  By 2023, that number ballooned to 2,622 (or 29.2% of all brokers that brokered at least 5 loans that year).

138.   The data is clear, moreover, that this loan funneling behavior among loan officers and brokerages is neither a naturally occurring phenomenon, nor a function of UWM offering more affordable loans than the competition.  One way to evaluate this is to compare UWM's loan origination fees to those of other lenders for mortgage loans at comparable interest rates.  Origination fees are upfront fees paid by the borrower to the lender as compensation for executing and processing the loan.  Origination fees do not correlate with anything of value to the borrower; they are simply higher costs that inure to the benefit of the lender (and the broker, to the extent the broker's fee is paid out of the overall origination fee).  Thus, among the loan products with the same interest rates, the borrower's only financial motivation is to obtain the product with the lowest origination fee.

139.   Publicly available data published pursuant to the Home Mortgage Disclosure Act ("HMDA") demonstrates that UWM consistently charges higher origination fees than the *median* wholesale lender—let alone the most competitively priced lenders.  According to one analysis of HMDA data, in 2020, borrowers paid

on average $211 more in closing costs for a UWM loan as compared to a borrower who paid the median amount of closing costs for a similar loan from another wholesale lender controlling for interest rates. By 2023, that discrepancy had more than quadrupled. Borrowers paid over $865 more than the median for a UWM loan, controlling for loan type and interest rate.

140. When comparing UWM borrowers' origination costs to more competitively priced lenders (those whose origination costs are at the twentieth percentile), UWM borrowers paid, on average, approximately $2,500 more in 2023.

141. In addition to having higher costs (while controlling for interest rates), UWM also does not offer lower interest rates when controlling for costs. In 2023, its rates were consistently at or above the median. Indeed, Defendant Ishbia has boasted to investors that he can "set the margins daily" and dictate the costs and rates borrowers pay. "It's not market-driven," Ishbia said on an earnings call last year. "Every day, I look at the pricing, I set it with our capital markets team. Personally, I do it."

142. Calculated rate spreads do not materially change the analysis. When individual UWM loans are compared to substantially similar loans available at the same time from other wholesale lenders, the data shows that UWM's loans are systematically more expensive, regardless of whether or not UWM claims that its average rate spread is purportedly lower than that of other wholesale lenders. This

is true for numerous reasons, including that (i) different lenders calculate the inputs to a rate spread calculation differently, meaning that comparing rate spreads across lenders is not reliably an apples-to-apples comparison; and (ii) a crude comparison of lenders' average rate spread fails to control for the different mix of loan products that different lenders offer.

143.    The consideration of FICO scores also support the conclusion that UWM's loans are systematically more expensive.    For example, according to UWM's 2023 10-K: "For the year ended December 31, 2023, our originated loans had a weighted average loan to value ratio of 82.89%, and a weighted average FICO score of 737. For the year ended December 31, 2022, our originated loans had a weighted average loan to value ratio of 79.67%, and a weighted average FICO score of 738."[106]    For comparison, according to Rocket Mortgage's 2023 10-K, its originated loans had a weighted average FICO score of 733 in both 2023 and 2022.[107] Based on the difference in the weighted average FICO score, Rocket Mortgage would be expected to have more expensive loans, on average, than UWM—but the opposite is true: UWM had more expensive loans, on average, than Rocket.

_____

[106] UWM 2023 Form 10-K at 59.

[107] Rocket Companies, Inc., Annual Report (Form 10-K) at 61 (Feb. 27, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/1805284/000180528424000009/rkt-20231231.htm.

144.    Consistent with this, UWM is the largest wholesale lender by a wide margin—it originates approximately half of all wholesale loans and 8% of all residential mortgages in the country.  As a consequence of its position, UWM lends to borrowers across the distribution of FICO scores, and there is nothing to indicate that UWM originates a disproportionate percentage of its loans to borrowers with poor credit.

145.    On its face, the behavior of a broker or loan officer who steers such high proportions of her loans to a single lender—UWM—is incompatible with the notion that the broker or loan officer is "independent" or working on the borrower's behalf, much less that the broker or loan officer is meeting the fiduciary and agency duties owed to her clients.  In fact, it is essentially statistically impossible for the corrupted brokers and loan officers to be fulfilling their duties—and doing the job for which they are being handsomely paid—to survey the market for multiple lenders and present their borrower clients with the best mortgage option.

146.    As a former member of the National Association of Mortgage Brokers has stated:  "I have been tracking rate sheets on wholesale lenders for 17 years, and I can tell you there's not one time in history, not one time close in history, when I can see consistently sending more than 40% of loans—and that's generous, usually it's closer to 20% or 30%—to any one lender."  Another professional in the mortgage lending industry, who provided over $2.6 billion in loans in 2023, stated that brokers

should generally be working with "seven to ten" lenders, but in no event should be working with any fewer than "three to five."

147.    But for UWM's tactics, the brokers who do business with UWM would have maintained their independence and acted on behalf of their clients—not UWM—including by evaluating options from multiple lenders to offer their borrowers into economically advantageous mortgages.  However, because of UWM's tactics, thousands of brokers have represented to borrowers that they would act that way, but then instead acted with loyalty to UWM (not their clients), abandoned their duties to their clients, and funneled increasingly higher percentages of their business to UWM alone.  The upshot is that if UWM borrowers had worked with brokers that did not participate in the UWM scheme, those borrowers would have actually obtained the services they sought when they entered into the wholesale channel to begin with, including obtaining the benefit of having a professional acting independently and on their behalf to place them into more competitively priced mortgages.  Instead, UWM borrowers are on the hook for billions of dollars in excessive fees and costs.

148.    UWM's representations at the core of its advertising and marketing materials (including those made through the brokers it provides them to)—that "brokers are better" because they are "not captive or connected" to any one lender, and instead "independently shop" to get borrowers the "best deal"—are therefore

false.  The data demonstrates that brokers in UWM's network are captive; they are not independently shopping; and they certainly are not getting borrowers the "best deal."  These representations are not false by coincidence—they are false because *UWM and its corrupted brokers are structuring their relationships for the purpose of making those representations false*.

149.    Further, the brokers who have conspired with UWM in this way are an identified group.  UWM monitors the activities of the brokers in the wholesale channel, including the rates at which they funnel loans to UWM along with which brokers agree to the "All In" ultimatum.  UWM therefore knows which brokers are participating in the scheme and which are not.  They also can be identified in the publicly-available data.  For example, attached as Appendix B is a list of 2,502 loan officers who have funneled over 75% of their loans to UWM from 2021-2023 and are in the 75th percentile of total volume of loans brokered.  According to the data, over that period, these loan officers funneled 270,693 loans to UWM with a total value of *over $93 billion*.[108]  These and other core participants in the scheme and enterprise are known, tracked, and identified.  And Appendix A reflects a non-exhaustive collection of examples of loan officers and brokers who have funneled

---

[108] The list of loan officers in Appendix B has been anonymized to the extent any of the loan officers listed therein are not identified in this First Amended Complaint as having brokered Plaintiffs' UWM loans.  Plaintiffs are prepared to identify each of the loan officers listed in Appendix B if the Court would like.

over 75% of their loans to UWM—including many loan officers listed in Appendix B—participating in the misleading and deceptive marketing messages that they and UWM have conspired to disseminate in furtherance of the scheme.

150. UWM has reaped enormous rewards from the increasing prevalence of brokers' loan funneling conduct, which it deliberately causes and substantially assists through its business practices. The increases in loan funneling within UWM's broker network have translated directly into increases in market share, fueling and sustaining the company's position as the originator of more than 48.1% of all broker-originated mortgages loans in the country and nearly 8% of all mortgages regardless of channel.

151. In November 2022, as a result of this surge of growth, UWM surpassed Rocket Mortgage to become the largest mortgage lender by volume in the United States—retail or wholesale. For Ishbia, as somebody driven by a relentless desire for UWM to be recognized as "number one," attaining that distinction was a massive personal and professional triumph. It also earned him bragging rights in his bitter rivalry with fellow billionaire and NBA team owner Dan Gilbert, the founder and owner of Rocket Mortgage. In a November 2022 voicemail Ishbia left for the CEO of AIME (a UWM-bankrolled broker trade group) which reveals his mindset and motivations, Ishbia said, of Gilbert and Rocket Mortgage:

> "We fucking took those cocksuckers down. Fuck them.
> And we're gonna keep fucking sticking it to them forever.

Fuck those guys. We're number one. We kicked the shit out of them. Brokers are number one. UWM is number one. You're number one. We're all number one together. And fuck them. I fucking hate them with all my heart. And we're gonna keep kicking their ass every fucking day. . . ."[109]

152. UWM's aggressive business practices and market share growth have translated into increasing revenue for UWM directly at borrowers' expense. According to an analysis of publicly available data, between 2021 and 2023, UWM dramatically drove up closing costs for borrowers by charging substantially higher origination fees than its competitors particularly with respect to loans originated through brokers who steer a majority of their business to UWM. The data establishes, moreover, that the more a broker funnels loans to UWM, the more the borrowers on those loans overpay. For example, in 2022, borrowers who obtained a mortgage loan through a broker who funnels 50% of her loans to UWM paid, on average, hundreds of dollars more in origination fees than the median amount of origination fees in the wholesale market for comparable loans, while borrowers who got a loan from a 99% steerer paid over a thousand dollars more.

153. If mortgage brokers were not conspiring with UWM to perpetrate its scheme and instead were actually shopping in a functioning wholesale market,

---

[109] *From FB Group Rocket Pro TPO vs UWM: Voicemail Mat Ishbia left Anthony Casa.*, Reddit, Feb. 24, 2024, https://www.reddit.com/r/pillar7/comments/1ay3wcb/from_fb_group_rocket_pro_tpo_vs_uwm_voicemail_mat/.

UWM would also have a strong incentive to lower its origination fees to make its offerings more competitive relative to other lenders. A large mortgage company like UWM should have a *greater* ability to drive its overall origination costs down by capitalizing on efficiencies and economies of scale to offset overhead expenses related to loan administration and processing. These dynamics make UWM's substantially higher origination fees all the more jarring.

154. In the aggregate and when controlling for interest rate and loan type, between 2021 and 2023, UWM borrowers who got a mortgage through brokers who send at least 75% of their business to UWM paid at least $400,000,000 more in origination fees than those borrowers would have if their brokers had simply shopped around and obtained a loan for them with the median amount of origination fees.

155. But as UWM represents to the public, independent brokers have a duty not merely to find a median deal for their clients—rather, they have a duty to shop around to find them the best deal they can. If the brokers who send 75% or more of their loans to UWM had actually shopped around to find their borrowers the best deal possible—*i.e.*, a loan with the lowest origination fees available on the market— those borrowers would have saved, in the aggregate, well over $2.7 billion. As a direct and proximate result of UWM's scheme, UWM has profited, and borrowers have lost, billions of dollars.

## VI. The "Loyalist Brokers" Who Participate in UWM's Scheme Work Collectively to Advance Shared Goals

156. The brokers who participate in this scheme do so pursuant to a common understanding that they share with one another and with UWM: namely, that they will act in furtherance of UWM's strategy by (a) funneling high proportions of loans to UWM, (b) keeping their UWM-funneling and failure to shop around concealed from borrowers, and (c) in so doing, avoiding exposing their co-conspirator brokers as UWM loyalists which would undermine the corrupted brokers' ability to compete and thus undercut the scheme's effectiveness.

157. Brokers' conduct in furtherance of UWM's scheme demonstrates their participation in concerted, conspiratorial activity.

158. *First*, the brokers who participate in the UWM scheme act collectively and in uniform ways. They each funnel high proportions of their loans to UWM to impose higher than market costs on their clients. They falsely claim to be "independent" mortgage brokers,[110] and they often covertly use UWM-provided marketing materials to accomplish that purpose. They are subject to the central control of UWM, including through its Wholesale Broker Agreement—and consistent with that Agreement, they each have refrained from placing a loan with Rocket Mortgage or Fairway Mortgage on or after March 15, 2021.

---

[110] *See* Appendix A.

159. Additionally, in furtherance of UWM's scheme, brokers systematically conceal material information from their borrower-clients such that borrowers are uniformly underinformed or misinformed when they reach the closing table. Among other things, brokers who participate in the scheme fail to disclose:

a. The fact that they are bound, under UWM's Wholesale Broker Agreement, to not shop for or present loans from Rocket Mortgage or Fairway Independent Mortgage;

b. The fact that they are bound, under UWM's Wholesale Broker Agreement, to not shop for or present loan options from any other lender once the borrower's interest rate has been locked;

c. The fact that they face penalties and/or legal exposure for violating any terms in UWM's Wholesale Broker Agreement that restrict their ability to independently shop;

d. The fact that, in exchange for originating a larger proportion of their loans with UWM, they are eligible to receive valuable perks and benefits from UWM, including meals, trips, gifts, apparel, entertainment, awards, referrals, access to preferential loan products and discounts, and/or access to preferential placement on UWM's broker search engine;

e. The fact that they use marketing materials that were produced, created, or otherwise reviewed and approved by UWM;

f. The fact that UWM's loans are often more expensive than substantially similar alternatives from other lenders in the wholesale market;

g. The fact that, as a result of UWM's system of contractual restrictions and incentives, they have conflicts of interest that can impact their performance of services on behalf of their clients;

h. The fact that they are not independently shopping for loans in the borrower's best interest; and/or

i. The fact that they originate the vast majority, or in some cases virtually all, of their loans with UWM.

160. Had UWM or the brokers not made affirmative misrepresentations and/or disclosed these and other material facts to the class members and Plaintiffs, those borrowers would not have closed on their mortgages or agreed to the disclosure forms presented to them at closing. On information and belief, that is *why* UWM and the brokers do not disclose those facts—such disclosure fundamentally would undermine their scheme.

161. *Second*, the brokers who participate in the UWM scheme take action that would contravene their own self-interest absent the conspiracy to conceal the

scheme from prospective borrowers. As discussed above, brokers must be independent and shop from a variety of lenders to be competitive in the wholesale brokerage market. Thus, in the ordinary course, it would be against a broker's self-interest to funnel the vast majority of their loans to one lender assuming that material fact were disclosed to prospective clients. After all, prospective borrowers are paying their broker a fee to shop around to multiple lenders. Prospective borrowers would be highly likely to find and choose a different broker who *is* offering more affordable loan products, and the UWM-captive brokers would not be able to compete. But, armed with the knowledge that UWM and other conspiring brokers would conceal and not disclose this scheme to the market, these conspiring brokers participate in the scheme to enrich themselves and to avoid UWM-imposed penalties.

162. Indeed, UWM-captive brokers *know* that a significant and growing population of brokers are likewise captive to UWM and likewise failing to present more affordable loan products from non-UWM lenders to their clients, including through their knowledge of the terms of the Wholesale Broker Agreement, their attendance at UWM-sponsored events, their communications with other brokers, their communications with UWM, and with full knowledge of the handsome rewards (and severe punishments) that UWM hands out to keep brokers in line.

163.   With that knowledge, these captive brokers can freely act in ways that ordinarily would be against their own self-interest because they are reasonably assured that the economic benefits of participating in the scheme will outweigh the potential detriments of losing business to the shrinking proportion of brokers who are truly independently shopping.  Moreover, but for the coordination and concerted action between and among the brokers and UWM, it would be easier to expose the scheme.

164.   *Third*, the funneling activity of these brokers and loan officers marks an abrupt shift in behavior compared to market practices before UWM started implementing its scheme.  Historically, wholesale brokers competed with each other based on their independence and ability to shop across the wholesale lender market on their clients' behalf.  The better terms they could obtain for their clients by leveraging competition among numerous wholesale lenders, the more their client following grew, and the more revenue they could generate.  Now, however, the market has changed dramatically.  UWM has now put a scheme in place whereby UWM and these brokers grow their revenues and market share without having to shop around—but the problem is that it relies on misrepresentations and material omissions made to consumers and breaches of duties owed to them under state and federal law.  As a result, the prevalence of loan funneling and UWM's market share

has increased precipitously within a compressed period of time and the participating brokers have been enriched, all to the consumer's detriment.[111]

165. *Fourth*, the brokers and loan officers who participate in the UWM scheme share a common motive: to induce prospective borrowers to enter the wholesale market channel, to increase the total number and volume of loans they originate despite failing to provide loans at competitive rates and costs, and to thereby increase the commission and fee revenue they are able to generate. UWM and each of these brokers pursue this shared goal, including by cooperating to deploy deceptive marketing materials into the marketplace, concealing the reality of the these corrupted brokers' relation with UWM, and failing to disclose these material facts at any stage of their work purportedly on behalf of prospective borrowers, all in breach of their legal obligations under federal and state laws.

166. *Fifth*, to justify their uniform conduct favoring UWM, brokers and loan officers who participate in the scheme often use the same pretextual justifications for why UWM earns disproportionate amounts of business even if consumers end up paying higher costs and/or fees for UWM loans. But none of those justifications withstand scrutiny. For example:

---

[111] *See* Figure 9 and Figures 23-25.

a. UWM and its captive brokers often claim that UWM offers "easier approval processes." But UWM's denial rates are comparable to those of other wholesale lenders.

b. UWM and its captive brokers often claim that UWM offers superior "state of the art" technology and client services. But much of the purportedly "state of the art" technology UWM provides is matched by other wholesale brokers, and the value that UWM's technology and client services provide to brokers and loan officers does not necessarily translate to the borrower, who is ultimately the broker's client to whom the broker owes duties.

c. UWM and its captive brokers often claim that UWM offers faster turn times and a more efficient underwriting process. But other wholesale lenders offer comparable or faster turn times on applications. And UWM expressly reserves its fastest guaranteed turn times only for loan officers who achieve PRO Elite status, including by funneling high proportions of their loans to UWM in the first instance.

d. Moreover, none of UWM's pretextual justifications even purports to explain why it would be necessary for brokers to mislead consumers with false representations of "independence" and to

conceal the true nature and extent of their relationship with UWM. The reality is they mislead prospective borrowers and conceal that these brokers are not independent because (i) if they disclosed that, they would cease to be competitive in a market that prospective borrowers enter into *because* of the promise of having an independent broker working on the borrower's behalf; (ii) those brokers would cease to be able to funnel high volumes of loans to UWM; and (iii) the commercial purpose of the scheme—to inflate UWM's and these brokers' deal-flow and revenues based on deception—would be thwarted.

167. *Sixth*, the brokers and loan officers who participate in the UWM scheme have numerous opportunities to coordinate, collaborate, and exchange information in furtherance of their collective activity. In particular:

a. UWM strongly encourages in-person visits to its campus in Pontiac, Michigan and attendance at broker training and networking events. As part of its LO Partner Points and PRO Rankings programs, UWM offers loan officers increasing numbers of "points" toward their PRO Ranking status for visiting the campus multiple times in a 12-month period—25 points for two visits, 30 points for three visits.

b. UWM hosts its annual UWM LIVE! event, which convenes thousands of brokers in one place to exchange information on market intelligence and best practices on marketing and technology use.

c. UWM sponsors[112] and provides funding, organization, and support for numerous networking and training events hosted by AIME, including AIME's annual "Fuse National Conference," which it calls the "largest annual gathering of independent mortgage professionals in the country."[113]

d. Additionally, brokers and loan officers often coordinate, collaborate, and exchange information online, including on social media platforms like Reddit and Facebook. For example, when UWM announced its "All In" policy, it did so during a virtual Facebook Live meeting with brokers, which UWM convened and hosted on its Facebook page. During the meeting, brokers interacted with UWM personnel and one another, including by posting comments encouraging adherence to UWM's scheme and inviting collusion, such as:

---

[112] *Sponsors*, https://aimegroup.com/sponsors/.

[113] *Events*, https://aimegroup.com/events/.

i. "We are ALL IN";

ii. "We are all family! Brokers are better when we work together";

iii. "Brokers are family. We don't go against our family";

iv. "You're either with the captain [UWM] or off the boat";

v. "Team Broker!"

vi. "unstoppable together"

vii. "BROKERS---WAKE UP!!!! Stop sending files to the enemy! Protect your book of business"; and

viii. "all for one"

168. As a result of these corrupted brokers cooperating within UWM's scheme, brokers recognize and talk about what the data plainly shows – there are two categories of brokers in the wholesale mortgage market now: UWM brokers and everybody else. Wholesale brokers have even taken to referring to these corrupted brokers as effectively being retail arms of UWM.

169. Thus, in a context where UWM and these brokers are inducing prospective borrowers to enter the wholesale channel rather than the retail channel on the promise of them getting the benefit of an "independent" wholesale mortgage broker to work on their behalf, UWM and these brokers are working together to implement a business model that is predicated on providing those prospective borrowers exactly the opposite of what they came for: an experience where the loan officer that they hire as an "independent" advisor is effectively a retail arm of UWM,

working toward the lender's and the broker's interests, rather than the borrower's. Put differently, through this scheme, UWM is leveraging the upside of operating in the wholesale channel by marketing to prospective borrowers (including through the brokers) the benefit of working with independent brokers in the wholesale channel, while growing its revenues and market share by surreptitiously implementing a retail channel model through which an army of loyalist brokers effectively operate as its retail loan officers and funnel unknowing borrowers into UWM loans. In these ways, among others, UWM and these corrupted brokers are functioning as a continuous unit, with a unity of purpose, and within a superstructure that UWM centrally controls to deceive prospective borrowers in furtherance of UWM's scheme.

## VII. After Plaintiffs Filed This Action, UWM Has Perpetuated Its Scheme and Continues to Misrepresent the Nature of Its Relationship with the Corrupted Brokers

170. On April 9, 2024, one week after this action commenced, UWM issued a statement addressed to its "Partners"—*i.e.*, mortgage brokers who continue to funnel loans to UWM. In the statement, UWM does not dispute that thousands of brokers are directing the vast majority of their clients into UWM loans. Instead, it purports to now embrace that fact, stating that:

> "***It is not uncommon nor illegal for a broker to send most or all of their business to a specific lender.*** This is not unique to UWM brokers. Nor this industry. UWM is audited by multiple regulators and organizations every

year including FHFA, Fannie Mae and Freddie Mac and every year [sic] and there are zero findings like what is being presented in this shallow article and subsequent lawsuit. ***We are 100% confident nothing needs to change or will change*** . . . . ***The only way they win is if UWM or brokers change behavior***."[114]

171. Additionally, in its statement, UWM makes an explicit offer to pay attorneys' fees and other defense costs for any brokers who may be called to serve as witnesses in this action, or who otherwise need representation in connection with this action. Specifically, the statement provides:

> "If any of our Partners get roped into their frivolous lawsuit, UWM will cover your attorneys' fees in connection with these fraudulent claims. We have seen 'ambulance chasing' attorneys try to scare consumers and brokers. We will be there to defend you. Keep focused on building your business they way you have been for years – the right way for consumers and brokers, and we will continue to grow and win together."[115]

---

[114] Figure 26, @uwmlending, Instagram, Apr. 9, 2024, https://www.instagram.com/p/C5ipFCqsMc1/.

[115] *Id.*

*Figure 26*

---

**UWM Partners,**

UWM is the No. 1 mortgage lender in the country for the last two years and the No. 1 wholesale lender for the last nine years. We built our reputation by supporting and advocating for mortgage brokers across the country. Recently our business, the wholesale channel, and our integrity were attacked. Under no circumstances will we stand silent and let anyone lob unfounded accusations against our community. We will always defend you, your hard work, and your integrity.

Some of you may have seen a ridiculous article (manufactured by a brand-new hedge fund called Hunterbrook) with obvious connections to Rocket Mortgage:

- The author, pretending to be a "journalist," worked at a Rocket Mortgage affiliated broker for the last 5 years, was actively working on this "report" while employed there, left 2 months ago to work for Hunterbrook and this just happened to be Hunterbrook's first scheme; and
- Before launching its attack, Hunterbrook not only shorted UWM stock, it bought Rocket stock

The Hunterbrook attack contains numerous lies, including there being something wrong with brokers choosing to send most of their business to a specific lender. Mortgage brokers on average use 3-5 lenders and evaluate the various needs of each borrower including speed, service, rate and cost/fees. It is not uncommon nor illegal for a broker to send most or all their business to a specific lender. This is not unique to UWM brokers. Nor this industry. UWM is audited by multiple regulators and organizations every year including FHFA, Fannie Mae and Freddie Mac and every year and there are zero findings like what is being presented in this shallow article and subsequent lawsuit. We are 100% confident nothing needs to change or will change because of Hunterbrook's disinformation. The only way they win is if UWM or brokers change behavior.

If any of our Partners get roped into their frivolous lawsuit, UWM will cover your attorneys' fees in connection with these fraudulent claims. We have seen "ambulance chasing" attorneys try to scare consumers and brokers. We will be there to defend you. Keep focused on building your business the way you have been for years – the right way for consumers and brokers, and we will continue to grow and win together.

Our competitors have been abusing the court system since day one. Back in 2021, many claimed UWM was doing something wrong with the All-In initiative, asserting that it was against the law, antitrust rules were broken, and brokers shouldn't work with UWM because of it. The play didn't work then, and it won't work now. Fast forward three years and not only has the wholesale channel significantly grown and gained market share, UWM has been successful in each lawsuit resolved to date – including two separate federal judges ruling in February and March respectively that cases brought should be dismissed, affirming the soundness of this initiative.

Brokers' market share is now the highest in 15 years, and the average consumer saves thousands of dollars per loan when working with an independent mortgage broker rather than the retail channel. For example, the average 30-year fixed rate mortgage for 2023 as reported by Freddie Mac was 6.81%. The average rate for the $97.6 billion of mortgages originated by UWM that were sold into Fannie Mae and Freddie Mac securities in 2023 was 6.51%.

Winners win, losers talk about winners. UWM and our Partners are winners. UWM remains focused on brokers and consumers and winning each day. There is one thing this "report" got correct – UWM is No. 1, and it is entirely because of all of you.



172.    UWM's April 9, 2024 statement is thus a transparent offer of value—

cash—to brokers on the overt threat that the brokers would *lose* if they "change[d]

behavior." The statement is part of a clear effort to induce those brokers to remain

loyal and continue advancing the interests of the enterprise.

173. The class action complaint to which UWM's April 9, 2024 statement was responding unmistakenly alleges that UWM's captive brokers built their businesses in recent years by conspiring with UWM to deprive borrowers of the honest services they paid to receive. Thus when UWM instructs its broker network to "[k]eep focused on building your business they way you have been for years," it is a clarion call for brokers to continue participating in the alleged unlawful conduct.

174. The statement also makes clear that UWM acknowledges no wrongdoing. To the contrary, UWM explicitly states "[w]e are 100% confident nothing needs to change or will change" and that "[i]t is not uncommon nor illegal for a broker to send most or all of their business to a specific lender."

175. Notwithstanding UWM's statement to its "Partners"—i.e., captive brokers—that it purportedly is fine that they funnel clients to UWM, UWM continues to outwardly claim that its brokers do the opposite: that they independently shop around from hundreds of lenders to get the best loan for their clients. In fact, on April 23, 2024 – twenty-two days after Plaintiffs initiated this action and thirteen days after it instructed brokers to continue cooperating in the scheme (and offered to indemnify them for doing so) – UWM stated the following in a federal court pleading:

> UWM is a Pontiac, Michigan-based wholesale mortgage lender *that works exclusively with independent mortgage brokers* and non-delegated correspondent lenders ("Broker Partners") across the country. UWM does not

work directly with borrowers—as do retail lenders—until after a loan has funded. Rather, ***the Broker Partners communicate directly with borrowers and select from over 100 wholesale lenders to choose the lender and loan product they believe to the borrower's best option.***[116]

176. That is, of course, plainly inconsistent with the data showing that thousands of the "Broker Partners" are not shopping around across "over 100 wholesale lenders" and that they are instead funneling loans to UWM, as alleged above and in Plaintiffs' April 2, 2024, Complaint. And it is plainly inconsistent with UWM, after Plaintiffs initiated this action, instructing its so-called "independent" "Broker Partners" to continue funneling loans to UWM and that doing so is appropriate.

---

[116] *United Wholesale Mortgage, LLC v. Madison Atrina LLC d/b/a District Lending*, Case No. 2:23-cv-13176, ECF No. 17 at ¶¶ 8-9.

## VIII. Plaintiffs' Mortgage Loans With UWM

### A. Plaintiffs Therisa and Billy Escue's UWM Mortgage

177.   Plaintiffs Therisa and Billy Escue (together, the "Escues") bought their home located in Portland, Tennessee in or around 2001.

178.   In or around February 2022, the Escues decided to refinance the mortgage on their home. Rather than approaching a retail lender, the Escues hired a mortgage broker—James Elkins, who, at the time, was a senior loan officer at NEXA Mortgage, LLC ("NEXA").

179.   Elkins has worked as a mortgage broker for over 25 years. According to information available through the Nationwide Multistate Licensing System ("NMLS"), Elkins is licensed to originate mortgages in two states—Tennessee and Florida. He is currently affiliated with Wholesale Mortgage Group, LLC, an entity based in White House, Tennessee. At the time the Escues refinanced their home, he headed a branch of NEXA which operated the website LendNationwide.com.

180.   Elkins's prior firm, NEXA, is a large residential mortgage brokerage firm headquartered in Chandler, Arizona. The firm is licensed to do business in 48 states, along with the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. In 2023, NEXA Mortgage originated more than 16,793 mortgage loans across the country totaling over $5.7 billion in loan volume. NEXA is what is known in the industry as a "mega broker," a full-service brokerage firm with in house loan

processing capabilities that works with thousands of individual loan officers across the country.

181. Elkins and NEXA market themselves as "independent" mortgage brokers. For example, on LendNationwide.com, the website for the NEXA branch Elkins operated, which was taken down after this action was filed, Elkins and the firm represented to the public: "We work with multiple lenders and we can provide our clients with extremely competitive pricing. Now you can do all your comparison shopping with one company without wasting time with several banks or brokers."[117] Elkins also represented on his personal Facebook pages that he offers a "Full Suite of Loan Products with Over 200 Lenders."[118]

*Figure 27*



---

[117] https://lendnationwide.com/index.php.

[118] Figure 27,
https://www.facebook.com/photo/?fbid=246469271468519&set=pb.10008316343
0611.-2207520000;
https://www.facebook.com/photo/?fbid=1447670722721948&set=ecnf.100024371
028946.

182. The Escues, who were acquainted with Elkins through a family connection, hired Elkins to serve as their agent in the refinancing process and to advise them as to the best and most affordable mortgage loan options available, regardless of which entity would act as the lender. Based on discussions the Escues had with Elkins, it is the Escues' understanding, at the time they hired Elkins, that Elkins agreed to provide such advice in connection with their mortgage search.

183. As a result of the confidential relationship of trust and reliance between the Escues, on the one hand, and Elkins, on the other, and the fact that Escues hired Elkins to serve as their mortgage broker and agent in connection with the refinancing of their home, under Tennessee and federal law, Elkins owed fiduciary duties to the Escues. In his capacity as a fiduciary, Elkins had a duty, among other things, to (i) put the Escues' interests before his own, (ii) diligently survey the wholesale market on the Escues' behalf; (iii) present the Escues with the best and most affordable loan options available to them; and (iv) disclose to the Escues all material facts that might affect his ability to perform his responsibilities in a diligent and unconflicted manner.

184. Despite his representations to the contrary, Elkins is not, in fact, an "independent" mortgage broker under any definition. Instead, he is a corrupt UWM loyalist.

185. According to publicly available data, in 2021, Elkins sent 99.5% of his loan volume to UWM. In 2022, he sent 100% of his loan volume to UWM.

186. Elkins, moreover, is among the top mortgage brokers in Tennessee. Between 2020 and 2022, Elkins originated more than $242,160,000 in mortgage loans.

187. Elkins does not independently shop for the most competitively priced mortgage loans for his borrowers. Rather, he intentionally funnels his borrowers to UWM.

188. Elkins signed UWM's Wholesale Broker Agreement and, at all relevant times, has been bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits Elkins from sending any loans to Rocket Mortgage. Elkins has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021. Elkins's agreement to boycott Rocket Mortgage did not serve the interests of the Escues, and was not disclosed to them, even though it was a material fact that Elkins had a duty to disclose. Elkins participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs, and utilizes UWM's technology products and services. He has also visited UWM's campus, including to network with UWM personnel and

other brokers, to attend UWM-sponsored meals and parties, and/or to participate in UWM-organized training sessions.

189. When the Escues first approached Elkins about their desire to refinance their home, Elkins knew he would refer them to UWM regardless of UWM's pricing vis-à-vis other available options. He did not disclose this fact.

190. Despite that knowledge, Elkins advised the Escues that he intended to diligently survey the loan options available from numerous other wholesale mortgage lenders and find the option that was most affordable and best aligned with the Escues' financing needs.

191. The Escues believed and relied upon Elkins's representations, which he parroted from UWM and amplified through marketing materials and assistance received from UWM, that he would diligently and independently shop for a loan in their best financial interests. Indeed, the expectation that Elkins would shop for the best loan on their behalf was the entire reason why the Escues hired Elkins in the first place.

192. Notwithstanding Elkins's representations to the Escues and in his borrower-facing advertising, Elkins never in fact conducted any meaningful search of loan options from non-UWM lenders at all. Instead, Elkins searched for and recommended only loan options from UWM. Elkins never seriously considered sending the Escues to any lender other than UWM.

193. Neither Elkins nor UWM ever disclosed to the Escues that Elkins had signed an agreement—UWM's Wholesale Broker Agreement—which meaningfully restricted his ability to shop for mortgage loans in their best interest. Elkins and UWM also never disclosed to the Escues that Elkins sent the vast majority of his clients to UWM, and that he received valuable benefits from UWM in exchange.

194. At all relevant times, UWM was aware of Elkins's and NEXA's fiduciary relationship and responsibilities with respect to their clients, including the Escues. However, in pursuit of attaining and sustaining ever increasing market share, UWM induced and substantially assisted Elkins's and NEXA's breach of their fiduciary responsibilities vis-à-vis the Escues through its aggressive tactics of restricting Elkins's and NEXA's ability to shop multiple lenders and to exercise independent judgment while simultaneously providing them value in exchange for steering. UWM was fully aware that in steering the vast majority of his loans to a single lender—UWM—Elkins was breaching the fiduciary duties he owed to his clients, including the Escues.

195. Ultimately, on February 28, 2022, Elkins originated the Escues' refinancing loan from UWM. The Escues' UWM loan was a conventional 18-year fixed rate loan with an interest rate of 3.499% and a principal amount of $243,200.

196. As a fee for his services, Elkins earned a $2,324 commission which was paid by UWM.

197. According to publicly available data, the mortgage loan Elkins procured for the Escues was not the most affordable option on the market. In the same month that Elkins originated the Escues' loan, multiple other wholesale lenders were offering loans with the same parameters in all material respects, for borrowers with substantially profile to the Escues', while charging significantly lower rates.

198. Because Elkins only presented the Escues with options from UWM and no other lender, the Escues overpaid significantly for their mortgage loan.

199. The expensiveness of a mortgage loan is a function of (i) the interest rate the borrower pays and (ii) the upfront costs and fees the borrower pays relative to the interest rates and upfront cost and fee structures available in the market for a comparable borrower seeking a comparable loan at the relevant time.

200. The Escues' closing disclosure indicates that they did not pay any origination fee or discount points to UWM at the time of closing. So the upfront fees and costs on the Escue loan do not indicate its expensiveness. Rather, the expensiveness of the Escues' loan is apparent when considering the interest rate and the specific type of loan involved.

201. The Escues' loan was a fixed-rate loan with an 18-year term. Generally, loans with shorter terms have lower interest rates than equivalent loans with longer terms. As of February 3, 2022, a few weeks before the Escues' refinancing loan closed, the benchmark interest rate for a 30-year fixed rate

mortgage loan was 3.55%.[119]  The benchmark interest rate for a 15-year fixed rate mortgage loan was 2.77%.[120]  The Escues' interest rate for their 18-year term loan—which should have been much closer to a rate for a 15-year loan than a 30-year loan—was 3.499%, just 0.051% off the 30-year benchmark rate.  The rate was thus substantially above-market, given the date and term length of the loan.

202.    Additionally, because Elkins structured the Escues' loan to provide them $2,452.89 cash back at closing, which exceeds a $2,000 threshold set under the Fannie Mae and Freddie Mac Selling Guidelines, the Escues' loan was classified as a "cash-out refinance" loan, and thus subject to an additional price increase, making their loan even more expensive.  Neither Elkins nor UWM ever informed the Escues of the consequences of structuring their loan in this way and never explained that by taking $2,452.89, they would be increasing their loan costs substantially.

203.    The Escues' story is just one among thousands.  During February 2022, the same month the Escues got their UWM loan, Elkins was involved in 13 other loan transactions.  All 13 went to UWM.  Between 2021 and 2022, Elkins was involved in 451 loan transactions, 449 of which went to UWM.  In the aggregate, UWM borrowers who used Elkins over the last three years paid at least hundreds of

---

[119] *Mortgage Rates*, Primary Mortgage Market Survey, Freddie Mac, https://www.freddiemac.com/pmms.

[120] *Id.*

thousands more in origination fees and costs than they otherwise would have if Elkins had found them the most affordable loan available. In practical effect, Elkins was an exclusive loan officer for UWM, given that he originated close to 100% of all loans with UWM across the hundreds of mortgages reference above. Elkins did not disclose this fact to borrowers. On the contrary, he falsely represented he was an independent mortgage broker who would shop for the best loan.

204. This result is precisely what UWM's scheme and the steering enterprise is designed to produce. UWM ensured that Elkins would put the financial interests of UWM and himself above the borrower's interests by contractually restricting Elkins's ability to independently shop while offering valuable benefits in exchange for an increasing rate of referrals.

205. The Escues are among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

## B. Plaintiff Kim Schelble's UWM Mortgage

206. Plaintiff Kim Schelble and his wife, Yvette Cho, bought their home in Chapel Hill, North Carolina on June 3, 2021.

207. Schelble sought to finance 80% of the purchase price and sought to find a competitively priced mortgage.

208. Schelble hired Whitney Bulbrook as his mortgage broker.

209. Bulbrook is the founder, owner and president of mortgage brokerage firm called Carolina Ventures Mortgage, LLC ("Carolina Ventures").

210. Bulbrook has been the top producing mortgage broker in North Carolina in each of the last six years. In 2023 alone, she originated $108,075,822 in mortgage loan volume, the twenty-seventh highest total of any broker in the country.[121] Carolina Ventures, is likewise among the top producing firms in the state.

211. In borrower-facing marketing materials and social media, Bulbrook holds herself out as a "trusted guide" for her clients whose independence from any particular lender allows her to pursue her clients' "best interest."[122] Nowhere does she disclose her relationship with UWM. Nor does she disclose that, in practical effect, she is an exclusive loan officer for UWM, by virtue of originating loans with UWM close to 100% of the time across hundreds of mortgages. On the contrary, Bulbrook falsely represented she was independent and would shop for rates across a variety of lenders.

---

[121] *2023 Top Mortgage Brokers*, Scotsman Guide.

[122] Figure 28, Carolina Ventures' Facebook Page, Sep. 27, 2023 at 2:00 PM & Mar. 28, 2024 at 2:00 PM,
https://www.facebook.com/CarolinaVenturesMortgage/.

*Figure 28*




212. The homepage of Bulbrook's website features a video that emphasizes the concepts of "shopping" and "choices" in describing the benefits of working with a mortgage broker as opposed to a retail lender like a bank. The narrator of the video says the following:

> Meet your local licensed mortgage broker. She's not a big corporation or a bank. She doesn't advertise on TV. She doesn't do car loans, trade stocks, or offer checking accounts. She does one thing. And she does it better than anyone else. She shops for great deals on mortgages. So why get a personal shopper for your mortgage? Because you want an advocate. And choices. Lot's of choices. Choices set up competition between lenders. And that's good for you. The sales people at banks and big lenders can't show you the big picture. But a broker compares deals from hundreds of banks and lenders of all sizes across the U.S., then organizes and presents those choices based on your location, financial situation, timeline and other factors. She can then help you choose the best mortgage for your circumstances. And a better mortgage

can save you time, frustration, and most importantly, $20, $50, or even $100 or more off your monthly payments. So when it comes to the biggest purchase of your life, don't take the first offer that comes along. Get an expert who shops on your behalf. Get an independent mortgage broker.[123]

*Figure 29*



213. Many of Bulbrook's borrower-facing marketing materials are developed using UWM's "Brand 360" suite of marketing resources, including its "Brand Builder" tool which enables individual brokers or loan officers to customize UWM-produced social media posts, fliers, and other marketing materials and to pass them off as their own without any indication that UWM prepared them.

214. Bulbrook utilizes UWM's marketing resources for her realtor-facing marketing materials as well. In her realtor-facing marketing materials, Bulbrook

---

[123] Figure 29, https://www.carolinaventures.com/

emphasizes her ability to "shop" on her clients' behalf until she drops their interest rates.[124]

*Figure 30*



215.    Under North Carolina and federal law, Bulbrook was a fiduciary who owed a duty of loyalty to her client, Schelble.  In her capacity as a fiduciary, it was Bulbrook's responsibility, among other things, to (i) put Schelble's interests before her own, (ii) diligently survey the wholesale market on Schelble's behalf; (iii) present Schelble with the best and most affordable loan options available to him; and (iv) disclose to Schelble all material facts that might affect her ability to discharge her duties in a diligent and unconflicted manner.

---

[124] Figure 30, Carolina Ventures Mortgage's Facebook Page, Jun. 1, 2023, https://www.facebook.com/CarolinaVenturesMortgage/videos/932812668028132.

216. Despite her representations to the contrary, however, Bulbrook is not, in fact, an "independent" mortgage broker under any reasonable definition. Instead, she is a corrupt UWM loyalist. Bulbrook does not independently shop for the most competitively priced mortgage loans for her borrowers. Rather, she intentionally funnels her borrowers to UWM.

217. According to publicly available data, from 2019 to 2023, Bulbrook sent virtually all—***99.6%***—of her business to UWM. In other words, Bulbrook sent $552,104,915 of loan volume to UWM and only $2,163,000 to all other wholesale lenders.[125]

*Figure 31*

218. In 2021, she sent 509 loans (99.4% of all her loans) to UWM, and 3 loans to another lender. In 2022 and 2023, she sent all her loans (100%) to UWM.

_____

[125] Figure 31, Analysis of publicly available data.

219.   Bulbrook has signed UWM's Wholesale Broker Agreement and is bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits Bulbrook from sending any loans to Rocket Mortgage.  Bulbrook has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021.  Bulbrook also participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs.  Bulbrook has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and to participate in UWM-organized training sessions.  And she has been a featured speaker at UWM-sponsored events to present UWM's sales and communication strategies to other brokers.[126]  UWM, in fact, created the video on Bulbrook's homepage.[127]

---

[126] Figure 32, United Wholesale Mortgage's Facebook Page, Nov. 18, 2021, https://www.facebook.com/UnitedWholesaleMortgage/videos/6374415879299453/.

[127] United Wholesale Mortgage's Facebook Page, Aug. 9, 2016, https://www.facebook.com/UnitedWholesaleMortgage/videos/10153577260762000/.

*Figure 32*



220.    As a result of Bulbrook's repeated demonstrations of loyalty and referrals of business to UWM, UWM has rewarded her with travel, meals, valuable perks, and VIP treatment.  For example, six months after UWM went public in 2021, Bulbrook was among the select group of brokers that UWM invited on an all expenses paid trip to New York to ring the closing bell at the New York Stock Exchange with CEO Mat Ishbia in celebration of National Mortgage Broker's Day. Bulbrook attended and stood immediately to Ishbia's right as he rung the closing bell on July 21, 2021.[128]

---

[128] Figure 33, Whitney Bulbrook's LinkedIn Page, https://www.linkedin.com/posts/whitney-bulbrook-cv_congrats-to-my-broker-partner-whitney-bulbrook-activity-6825845793128255488-h9i4/?trk=public_profile_like_view.

*Figure 33*



221. More importantly, UWM has rewarded Bulbrook with top placement on its broker directory website. When Schelble's ZIP code is typed into MortgageMatchup.com—UWM's online broker directory—Bulbrook appears among the top three results.[129]

222. When Schelble first approached Bulbrook about his need for a loan to purchase his home, Bulbrook knew she would place Schelble in a UWM loan.

---

[129] Figure 17, *supra*.

223.   Despite that intention, Bulbrook advised Schelble that she intended to diligently survey the loan options available from numerous other wholesale mortgage lenders, and find the option that was most affordable and best aligned with Schelble's financing needs.   Schelble believed and relied upon Bulbrook's representations, which she parroted from UWM and amplified through marketing materials and assistance that UWM provided to her, that she would diligently and independently shop for a loan in his best interests.   Indeed, the expectation that Bulbrook would shop for the best loan on her behalf was the entire reason why Schelble hired Bulbrook in the first place.

224.   Notwithstanding Bulbrook's representations, Bulbrook never in fact conducted any meaningful search of loan options from non-UWM lenders at all. Instead, Bulbrook searched for and recommended only loan options from UWM. Bulbrook never seriously considered sending Schelble to any lender other than UWM.

225.   Neither Bulbrook nor UWM ever disclosed to Schelble that Bulbrook had signed an agreement—UWM's Wholesale Broker Agreement—which meaningfully restricted her ability to shop for mortgage loans in his best interest. Bulbrook and UWM also never disclosed to Schelble that Bulbrook sent virtually all of her clients to UWM, or that she received valuable benefits and perquisites from UWM.

226. At all relevant times, UWM was aware of Bulbrook's fiduciary relationship and responsibilities with respect to her clients, including Schelble. However, in pursuit of attaining and sustaining increasing market share, UWM induced and substantially assisted Bulbrook's breach of her fiduciary responsibilities vis-à-vis Schelble through its aggressive tactics of restricting Bulbrook's ability to shop multiple lenders and to exercise independent judgment while simultaneously providing Bulbrook things of value in exchange for steering. UWM was fully aware that in steering the vast majority of her loans to a single lender—UWM—Bulbrook was breaching the fiduciary duties she owed to her clients, including Schelble.

227. Ultimately, on June 3, 2021, Bulbrook originated Schelble's loan from UWM. Schelble's UWM loan was a conventional 30-year mortgage loan at a fixed interest rate of 2.750% for a principal amount of $536,000.

228. As a fee for her services, Bulbrook earned a 2% commission on the principal amount of the loan, totaling $10,720.00, which UWM paid to Carolina Ventures Mortgage, LLC

229. Schelble paid closing costs totaling $25,991.16, of which $5,383.85 was categorized as loan costs.

230. Schelble's top priority for financing his home was securing the most competitive interest rate. The 2.750% interest rate Bulbrook secured from UWM met Schelble's expectations. Schelble did not realize at any point prior to closing,

that he would be paying $2,953.41 in "discount points" as a condition of securing the 2.750% interest rate. Neither Bulbrook nor UWM ever discussed "points" with Schelble or explained that his interest rate was conditioned on his purchase of "points." As importantly, Bulbrook and UWM never explained that in achieving a lower interest rate by paying for "points," Schelble would end up with a loan that was significantly more expensive overall than substantially similar alternatives available in the market.

231. Publicly available data shows the mortgage loan Bulbrook procured for Schelble was not, in fact, anywhere close to the most affordable option on the market. Multiple lenders in May and June 2021 were offering substantially similar loans, for a borrower of Schelble's profile, at the same 2.750% interest rate, for significantly lower upfront charges.

232. Specifically, when considering the universe of loans originated by the top 25 wholesale lenders in 2021, the median upfront costs charged for a loan with the same characteristics, with the same 2.750% interest rate, at the same time (in May and June 2021), for a borrower with substantially the same characteristics as Schelble, was lower for at least 13 of them, including Everett Financial, Fairway Independent Mortgage, Flagstar Bank, Freedom Mortgage, Home Point Financial, LoanDepot, New American Funding, OCMBC (LoanStream Mortgage), Pennymac

Loan Services, Plains Commerce Bank, Provident Funding Associates, Rocket Mortgage, and Stearns Lending.

233. Indeed, both Fairway Independent Mortgage and Rocket Mortgage—the two wholesale lenders that UWM contractually barred Bulbrook from considering in connection with originating a loan for Schelble—were offering less expensive loans with substantially the same characteristics and the same interest rate.

234. As a direct and proximate result of UWM's scheme, Schelble paid at least $850 more in upfront costs than the median comparable loan available from other non-UWM wholesale lenders, at least $1,000 more than the median comparable loan from Fairway Independent Mortgage, and at least $870 more than the median comparable loan from Rocket Mortgage, which were available for similar borrowers in May through June 2021.

235. In 2021, the year Bulbrook originated Schelble's loan, Bulbrook's loans were, on average, 74 basis points more expensive than non-UWM loans available in North Carolina with origination costs at the twentieth percentile, controlling for loan type and interest rate. In other words, on average, Bulbrook's borrowers paid thousands more for their loans than they would have if she shopped around to non-UWM lenders.

236. Between 2021 and 2023, Bulbrook was involved in at least 985 loan transactions, 982 of which went to UWM. For originating those loans, Bulbrook

earned approximately $7 million in commissions as compensation for the services she provided her borrowers. But over that time period, her borrowers paid, in the aggregate, at least $3.3 million more in origination fees and costs than they otherwise would have if Bulbrook had found them the most affordable loan available. Nearly all of those additional fees went directly to UWM.

237. This result is precisely what UWM's scheme is designed to produce. UWM ensured that Bulbrook would put the financial interests of UWM and herself above the borrower's interests by contractually restricting Bulbrook's ability to independently shop while offering benefits in exchange for steering.

238. Schelble is among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

### C. Plaintiff Brian Weatherill's UWM Mortgage

239. Plaintiff Brian Weatherill purchased his home located in Bushnell, Florida in or around June 2021.

240. Weatherill hired Toni Raulerson as his mortgage broker.

241. Raulerson is affiliated with the Plant City Mortgage Corporation, which also does business as Florida Mortgage Firm.

242. Florida Mortgage Firm, which operates the website "BestFloridaRate.com," markets itself as an independent mortgage brokerage firm. On its social media, it tells prospective clients: "Since a second opinion is never a

bad idea when it comes to a large transaction, think outside the box and talk to an independent brokerage when buying a house. Never BLINDLY use an "in-house" lender. In fact, the lender you choose can have a greater impact on your interest rate than your actual credit score, in many cases."[130] It also emphasizes, in its marketing, that an independent mortgage broker, unlike a retail lender, "Provides consumers multiple loan options."[131]

*Figure 34*

243. Raulerson is among the top mortgage brokers affiliated with Florida Mortgage Firm. For six years in a row, from 2016 through 2022, Raulerson was

_____

[130] Florida Mortgage Firm's Facebook Page, Jan. 15, 2019, https://www.facebook.com/FloridaMortgageFirm.

[131] Figure 34, Florida Mortgage Firm's Facebook Page, Jul. 18, 2022, https://www.facebook.com/FloridaMortgageFirm.

ranked among the top 1% of mortgage brokers in the country in terms of loan volume originated. From 2021 through 2023, she originated 818 mortgages, accounting for more than $219.2 million in loan volume.

244. On her website, she represents to her prospective clients: "Whether purchasing your first home, refinancing your existing home or investing in a second home, I will ensure you get the loan program and rates that fit your individual mortgage needs, all with service that is unsurpassed."[132]

245. Weatherill hired Raulerson to serve as his independent mortgage broker, believing she would advise him as to the best and most affordable mortgage loan options available, regardless of which entity would act as the lender.

246. As a result of the confidential relationship of trust and reliance between Weatherill, on the one hand, and Raulerson, on the other, under Florida and federal law, Raulerson owed fiduciary duties to Weatherill in connection with obtaining a mortgage for his Bushnell, Florida home. In her capacity a fiduciary, Raulerson had a duty, among other things, to (i) put Weatherill's interests before her own, (ii) diligently survey the wholesale market on Weatherill's behalf; (iii) make an effort to present Weatherill with the best and most affordable loan options available to him; and (iv) disclose to Weatherill all material facts that might affect her ability to perform her responsibilities in a diligent and unconflicted manner.

---

[132] https://flamortgagefirm.com/getting-started-with-toni/.

247. Despite her representations to the contrary, however, Raulerson is not, in fact, an "independent" mortgage broker under any definition. Instead, she is a corrupt UWM loyalist.

248. According to publicly available data, in 2021, Raulerson sent 80.5% of her loan volume to UWM. In 2022, she sent 86.2%. In 2023, she sent 90.3%.

249. Raulerson does not independently shop for the most competitively priced mortgage loans for her borrowers. Rather, she intentionally funnels her borrowers to UWM.

250. Raulerson signed UWM's Wholesale Broker Agreement and, at all relevant times, has been bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits her from sending any loans to Rocket Mortgage. Raulerson has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021. Raulerson participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs. She has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and to participate in UWM-organized training sessions.

251. When Weatherill first approached Raulerson about searching for a mortgage for his home, Raulerson knew she would refer him to UWM regardless of UWM's pricing vis-à-vis other available options.

252. Despite that knowledge, Raulerson advised Weatherill that she would diligently survey the loan options available from numerous other wholesale mortgage lenders and find the option that was most affordable and best aligned with Weatherill's financing needs. Weatherill believed and relied upon Raulerson's representations, which she parroted from UWM and amplified through marketing materials and assistance received from UWM, that she would diligently and independently shop for a loan in his best financial interests. Indeed, the expectation that Raulerson would shop for the most affordable loan on his behalf was the entire reason why Weatherill hired Raulerson in the first place.

253. Notwithstanding Raulerson's representations to Weatherill, Raulerson never in fact conducted any meaningful search of loan options from non-UWM lenders at all. Instead, Raulerson searched for and recommended only loan options from UWM. Raulerson never seriously considered sending Weatherill to any lender other than UWM.

254. Neither Raulerson nor UWM ever disclosed to Weatherill that Raulerson had signed an agreement—UWM's Wholesale Broker Agreement— which meaningfully restricted his ability to shop for mortgage loans in their best

interest.  Raulerson and UWM also never disclosed to Weatherill that Raulerson sent the vast majority of her clients to UWM, and that she received valuable benefits from UWM in exchange.

255.  At all relevant times, UWM was aware of Raulerson's fiduciary relationship and responsibilities with respect to her clients, including Weatherill. However, in pursuit of attaining and sustaining ever increasing market share, UWM induced and substantially assisted Raulerson's breach of her fiduciary responsibilities vis-à-vis Weatherill through its aggressive tactics of restricting Raulerson's ability to shop multiple lenders and to exercise independent judgment while simultaneously providing them value in exchange for steering.  UWM was fully aware that in steering the vast majority of her loans to a single lender— UWM—Raulerson was breaching the fiduciary duties she owed to her clients, including Weatherill.

256.  Ultimately, on June 8, 2021, Raulerson originated Weatherill's mortgage loan.  Weatherill's UWM loan was a conventional 30-year mortgage loan at a fixed interest rate of 2.999% for a principal amount of $343,200.

257.  Weatherill paid $10,682.50 in closing costs, which included an origination fee of $3,071.64 (0.895% of the loan amount) paid to UWM.

258.  As a fee for her services, Raulerson earned a commission of $9,438.00 (2.75% of the loan amount), which was paid by UWM.

259. According to publicly available data, the mortgage loan Raulerson procured for Weatherill was not the most affordable option on the market. In the same month that Raulerson originated Weatherill's loan, multiple other wholesale lenders, in the same geographic location, were offering loans with the same parameters in all material respects—same type of loans, at the same or similar interest rates—while charging significantly lower origination fees.

260. However, because Raulerson only presented Weatherill with options from UWM and no other lender, Weatherill overpaid significantly for his mortgage loan.

261. As a direct and proximate result of UWM's scheme, Weatherill paid at least $2,800 more in upfront costs than the median comparable loan available from other non-UWM wholesale lenders in May and June 2021.

262. Hundreds of other borrowers are in the exact same position as Weatherill. During 2021, the same year Weatherill got his UWM loan, Raulerson was involved in 446 other loan transactions, 359 of which went to UWM. Between 2021 and 2023, Raulerson was involved in 818 loan transactions, 686 of which went to UWM. In the aggregate, UWM borrowers who used Raulerson over the last three years paid millions more in origination fees and costs than they otherwise would have if Raulerson had found them the most affordable loan available.

263. UWM ensured that Raulerson would put the financial interests of UWM, her brokerage firm, and herself above the borrower's interests by contractually restricting her ability to independently shop and offering valuable benefits in exchange for referrals.

264. Weatherill is among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

### D. Plaintiff Kenneth Morandi's UWM Mortgage

265. Plaintiff Kenneth C. Morandi bought his home located in Long Beach, California in or around July 2005.

266. In or around June 2022, Morandi decided to hire a mortgage broker to refinance his home rather than approaching a retail lender, believing that a mortgage broker would serve Morandi's best interests in shopping for a competitively priced loan. Morandi hired a mortgage broker—Garrett Bradley Todd, a senior loan officer at National Trust Lending ("National Trust" aka "Katzman Enterprises").

267. Todd has worked as a mortgage broker for over 20 years. According to information available through the Nationwide Multistate Licensing System ("NMLS"), Todd is licensed to originate mortgages in California, and heads a branch which operates the website www.gtmortgage.co.

268. Todd's brokerage firm, National Trust, is a large residential mortgage brokerage firm headquartered in Van Nuys, California. The firm is licensed to do

business in California. From 2020 to 2023, National Trust originated 658 mortgage loans totaling over $374 million in loan volume.

269. Todd and National Trust market themselves as "independent" mortgage brokers. For example, on NationalTrustLending.com, the firm represents to the public: "[National Trust Lending's] clients receive the best and most customized service possible."[133] Indeed, Todd regales the benefits of working with a broker that takes the time to shop for their clients, saying on his website, "Garrett Todd will analyze your financial position to find the appropriate loan product. Many brokers and loan officers in the industry do not spend the extra time comparing loan products prior to issuing. That additional research time can make the difference down the road of your mortgage."[134] Indeed, Todd represents that he considers "hundreds of financing options" and that he is "constantly researching and staying on top of the mortgage market to ensure I obtain the best financing options for you and your family."[135]

---

[133] https://nationaltrustlending.com/index.php/first-home/.

[134] https://www.gtmortgage.co/.

[135] Figure 35, https://www.gtmortgage.co/gt-philosophy/.

*Figure 35*



270. Morandi hired Todd to serve as his agent in the refinance process and advise him as to the best and most affordable mortgage loan options available, regardless of which entity would act as the lender. Morandi would not have hired Todd had he known Todd was not shopping around for Morandi's benefit.

271. As a result of the confidential relationship of trust and reliance between Morandi, on the one hand, and Todd, on the other, and the fact that Morandi hired Todd to serve as his mortgage broker and agent in connection with the refinance of his home, under California and federal law, Todd owed fiduciary duties to Morandi. In his capacity as a fiduciary, Todd had a duty, among other things, to (i) put Morandi's interests before his own, (ii) diligently survey the wholesale market on Morandi's behalf; (iii) present Morandi with the best and most affordable loan

options available to him; and (iv) disclose to Morandi all material facts that might affect his ability to perform his responsibilities in a diligent and unconflicted manner.

272.   Despite his representations to the contrary, Todd is not, in fact, an "independent" mortgage broker under any definition.  Instead, he is a UWM loyalist.

273.   According to publicly available data, in 2020, Todd sent 90% of his loan volume to UWM. In 2021, he sent 91% and in 2022 (the year Morandi received his loan), he sent 96%.  Similarly, during the same years National Trust funneled 87%, 86%, and 88% of its loans, respectively, to UWM. Between 2020 and 2022, Todd originated more than $221,515,000 in mortgage loans, making him the third largest loan officer in California and a top 10 loan officer nationally.

274.   Todd does not independently shop for the most competitively priced mortgage loans for his borrowers.  Rather, he intentionally funnels his borrowers to UWM.

275.   Todd signed UWM's Wholesale Broker Agreement and, at all relevant times, has been bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits Todd from sending any loans to Rocket Mortgage. Todd has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021.  Todd participates in UWM's loyalty

rewards programs, including the PRO Rankings and LO Partner Points programs. He has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and/or to participate in UWM-organized training sessions.

276. When Morandi first approached Todd about his desire to refinance his home, Todd knew he would refer them to UWM regardless of UWM's pricing vis-à-vis other available options.

277. Despite that knowledge, Todd advised Morandi that he intended to diligently survey the loan options available from numerous other wholesale mortgage lenders and find the option that was most affordable and best aligned with Morandi's financing needs. Morandi believed and relied upon Todd's express and implied representations, which he parroted from UWM and amplified through marketing materials and assistance received from UWM, that he would diligently and independently shop for a loan in his best interests. Indeed, the expectation that Todd would shop for the best loan on his behalf was the entire reason why Morandi hired Todd in the first place.

278. Notwithstanding Todd's representations to Morandi and in his borrower-facing advertising, Todd never in fact conducted any meaningful search of loan options from non-UWM lenders at all. Instead, Todd searched for and

recommended only loan options from UWM. Todd never seriously considered sending Morandi to any lender other than UWM.

279. Neither Todd nor UWM ever disclosed to Morandi that Todd had signed an agreement—UWM's Wholesale Broker Agreement—which meaningfully restricted his ability to shop for mortgage loans in his best interest. Todd and UWM also never disclosed to Morandi that Todd sent the vast majority of his clients to UWM, and that he received valuable benefits from UWM in exchange for Todd's steering of referrals to UWM.

280. At all relevant times, UWM was aware of Todd's and National Trust's fiduciary relationship and responsibilities with respect to their clients, including Morandi. However, in pursuit of attaining and sustaining ever increasing market share, UWM induced and substantially assisted Todd's and National Trust's breach of their fiduciary responsibilities vis-à-vis Morandi through its aggressive tactics of restricting Todd's and National Trust's ability to shop multiple lenders and to exercise independent judgment, while simultaneously providing them value in exchange for steering. UWM was fully aware that Todd was breaching the fiduciary duties he owed to his clients, including Morandi, by sending the vast majority of his loans to UWM without performing the services that Todd was paid to perform.

281.   Ultimately, on June 16, 2022, Todd originated Morandi's refinancing loan from UWM.  Morandi's UWM loan was a 30-year conventional loan at a fixed interest rate of 4.625% for a principal amount of $310,000.

282.   One of Morandi's top priorities for financing his home was securing the most competitive interest rate.  The 4.625% interest rate Todd secured from UWM met Morandi's expectations.  Morandi did not realize, at any point prior to closing, that he would be paying $4,348.31 in "discount points" as a condition of securing the 4.625% interest rate.  Neither Todd nor UWM ever discussed "points" with Morandi or explained that his interest rate was conditioned on his purchase of "points."  As importantly, Todd and UWM never explained that in achieving a lower interest rate by paying for "points," Morandi would end up with a loan that was significantly more expensive overall than substantially similar alternatives available in the market.

283.   As a fee for his services, Todd earned a commission of $7,250 (2.33% of the loan amount), which was paid by Morandi to UWM and then sent from UWM to Todd.

284.   Morandi paid $14,824.46 in closing costs, which included an origination fee of $11,598.31 (3.741% of the loan amount) paid to UWM, including the points origination charges and fee to Todd described above.

285. According to publicly available data, the mortgage loan Todd procured for Morandi was not the most affordable option on the market. In the same month that Todd originated Morandi's loan, multiple other wholesale lenders, in the same geographic location, were offering loans with the same parameters in all material respects—same type of loans, at the same or similar interest rates—while charging significantly lower origination fees.

286. However, because Todd only presented Morandi with options from UWM and no other lender, Morandi overpaid significantly for his mortgage loan.

287. As a direct and proximate result of UWM's scheme, Morandi paid at least $1,800 more than the median market loan and at least $2,100 more than Rocket loans for similar borrowers with similar loan terms in June and July 2022

288. Morandi's story is just one among many. Between 2021 and 2022, Todd was involved in 475 loan transactions, 448 of which went to UWM. In the aggregate, UWM borrowers who used Todd over the last three years paid at least hundreds of thousands more in origination fees and costs than they otherwise would have if Todd had found them the most affordable loan available.

289. This result is precisely what UWM's scheme and enterprise is designed to produce. UWM ensured that Todd would put the financial interests of UWM and himself above the borrower's interests by contractually restricting Todd's ability to independently shop while offering valuable benefits in exchange for referrals.

290. Morandi is among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

**E.  Plaintiffs Jill Jeffries's and Daniel Singh's UWM Mortgage**

291. Plaintiffs Jill Jeffries and her husband, Daniel Singh, bought their home in North Port, Florida on October 3, 2023.

292. Jeffries and Singh sought to finance over 90% of the purchase price and sought to find a competitively priced mortgage.

293. Jeffries and Singh hired Josh McCombs as their mortgage broker.

294. McCombs, or "The Mortgage Man" as he brands himself, is a loan officer at Core Financial, Inc. ("Core Financial"), a mortgage brokerage firm formed and licensed in Florida with 34 sponsored loan officers. McCombs first became licensed as a mortgage loan originator in April 2011 and has worked in the mortgage industry since that time.

295. For the last several years, McCombs has been a top producing mortgage broker in Florida. From 2020 through 2023, McCombs originated over $81 million in mortgages. Core Financial is likewise among the top producing firms in the state.

296. Indeed, in 2022, UWM ranked McCombs as one of their top 1% "partners".[136]

_____

[136] Figure 36, Josh McCombs' Facebook Page, Jan. 9, 2023, https://www.facebook.com/ people/Josh-McCombs-The-Mortgage-Man/.

*Figure 36*



297.    In borrower-facing marketing materials and social media, McCombs holds himself out as a broker with "rates lower than anyone else's"[137] and his brokerage firm, Core Financial, "guarantees you the lowest rates in Florida."[138] On his social media accounts, McCombs invites borrowers who want to shop around to call him to get the best rates.

---

[137] Figure 37, Josh McCombs' Facebook Page, Feb. 24, 2024, https://www.facebook.com/ people/Josh-McCombs-The-Mortgage-Man/.

[138] Core Financial Website - "Mortgage Lending Services", https://corefinancialmortgage.com/mortgage-lending-services/.

*Figure 37*



298. Many of McCombs's borrower-facing marketing materials are developed using UWM's "Brand 360" suite of marketing resources, including its "Brand Builder" tool which enables individual brokers or loan officers to customize UWM-produced social media posts, fliers, and other marketing materials and to pass them off as their own without any indication that UWM prepared them.

299. Under Florida and federal law, McCombs was a fiduciary who owed a duty of loyalty to his clients, Jeffries and Singh. In his capacity as a fiduciary, it was McCombs's responsibility, among other things, to (i) put Jeffries's and Singh's interests before his own, (ii) diligently survey the wholesale market on Jeffries and Singh's behalf; (iii) present Jeffries and Singh with the best and most affordable loan options available to them; and (iv) disclose to Jeffries and Singh all material facts that might affect his ability to discharge his duties in a diligent and unconflicted manner.

300. Despite his representations to the contrary, however, McCombs is not, in fact, an "independent" mortgage broker under any reasonable definition. Instead, he is a corrupt UWM loyalist. McCombs does not independently shop for the most competitively priced mortgage loans for his borrowers. Rather, he intentionally funnels his borrowers to UWM.

301. According to publicly available data, from 2022 to 2023, McCombs sent *90.3%* of his business to UWM. In other words, McCombs sent $29,777,683 of loan volume to UWM and only $3,167,035 to all other wholesale lenders.

302. McCombs has signed UWM's Wholesale Broker Agreement and is bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits McCombs from sending any loans to Rocket Mortgage. McCombs has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021. McCombs also participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs. McCombs has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and to participate in UWM-organized training sessions. McCombs was

even invited on an all-expenses paid VIP trip to the New York Stock Exchange for

National Mortgage Broker Day.[139]

*Figure 38*



---

[139] Figure 38, Josh McCombs' Facebook Page, July 18, 2024,
https://www.facebook.com/ people/Josh-McCombs-The-Mortgage-Man

303.  McCombs's conduct is especially egregious considering in 2020 he only sent 28% of his loan volume to UWM.  After signing UWM's Wholesale Broker Agreement in 2021, McCombs went from being an independent broker to a corrupt UWM loyalist sending nearly all his loans to UWM.

304.  More importantly, UWM has rewarded McCombs with top placement on its broker directory website.  When Jeffries's and Singh 's ZIP code is typed into MortgageMatchup.com—UWM's online broker directory—McCombs appears among the top ten results.

305.  After Jeffries and Singh first approached McCombs about their need for a loan to purchase his home, they visited his Facebook page to understand more about his business.

306.  McCombs knew all along, including right after Jeffries and Singh first approached him, that he intended to place Jeffries and Singh in a UWM loan.

307.  Despite that intention, McCombs advised Jeffries and Singh that he intended to diligently survey the loan options available from numerous other wholesale mortgage lenders, and find the option that was most affordable and best aligned with Jeffries and Singh 's financing needs.  Jeffries and Singh believed and relied upon McCombs's representations, which he parroted from UWM and amplified through marketing materials and assistance that UWM provided to him, that he would diligently and independently shop for a loan in their best interests.

146

Indeed, the expectation that McCombs would shop for the best loan on their behalf was the entire reason why Jeffries and Singh hired McCombs in the first place.

308.  Notwithstanding McCombs's representations, McCombs never in fact conducted any meaningful search of loan options from non-UWM lenders at all. Instead, McCombs searched for and recommended only loan options from UWM. McCombs never seriously considered sending Jeffries and Singh to any lender other than UWM.

309.  Neither McCombs nor UWM ever disclosed to Jeffries and Singh that McCombs had signed an agreement—UWM's Wholesale Broker Agreement— which meaningfully restricted his ability to shop for mortgage loans in their best interest.  McCombs and UWM also never disclosed to Jeffries and Singh that McCombs sent virtually all of his clients to UWM, or that he received valuable benefits and perquisites from UWM.  Indeed, prior to closing, McCombs never discussed UWM in any respect with Jeffries and Singh.

310.  At all relevant times, UWM was aware of McCombs's fiduciary relationship and responsibilities with respect to his clients, including Jeffries and Singh.  However, in pursuit of attaining and sustaining increasing market share, UWM induced and substantially assisted McCombs's breach of his fiduciary responsibilities vis-à-vis Jeffries and Singh through its aggressive tactics of restricting McCombs's ability to shop multiple lenders and to exercise independent

judgment while simultaneously providing McCombs things of value in exchange for steering. UWM was fully aware that in steering the vast majority of his loans to a single lender—UWM—McCombs was breaching the fiduciary duties he owed to his clients, including Jeffries and Singh.

311. Ultimately, on October 3, 2023, McCombs originated Jeffries and Singh's loan from UWM. Jeffries and Singh's UWM loan was a conventional 30-year mortgage loan at a fixed interest rate of 7.5% for a principal amount of $320,100.

312. As a fee for his services, McCombs earned a commission on the principal amount of the loan, totaling $4,302.40, which UWM paid to Core Financial.

313. Jeffries and Singh paid closing costs totaling $14,497.15, of which $8,933.85 was categorized as loan costs.

314. Publicly available data shows the mortgage loan McCombs procured for Jeffries and Singh was not, in fact, anywhere close to the most affordable option on the market. Multiple lenders in September and October 2023 were offering substantially similar loans, for a borrower of Jeffries and Singh's profile, at the same 7.5% interest rate, for significantly lower upfront charges.

315. Specifically, when considering the universe of loans originated by the top 25 wholesale lenders in 2023, the median upfront costs charged for a loan with

the same characteristics, with the same 7.5% interest rate, at the same time (in September and October 2023), for a borrower with substantially the same characteristics as Jeffries and Singh, was lower for many of them, including A&D Mortgage, NewRez, Paramount Residential Mortgage Group, FannyMac Loan Services, and Rocket Mortgage.

316. Indeed, Rocket Mortgage—the wholesale lender that UWM contractually barred McCombs from considering in connection with originating a loan for Jeffries and Singh—was offering a less expensive loan with substantially the same characteristics and the same interest rate.

317. As a direct and proximate result of UWM's scheme, Jeffries and Singh paid at least $1,505 more in upfront costs than the median comparable loan available from other non-UWM wholesale lenders, at least $1,590 more than the median comparable loan from Rocket Mortgage, which were available for similar borrowers in September and October 2023.

318. This result is precisely what UWM's scheme is designed to produce. UWM ensured that McCombs would put the financial interests of UWM and himself above the borrower's interests by contractually restricting McCombs's ability to independently shop while offering benefits in exchange for steering.

319. Jeffries and Singh are among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

## TOLLING ALLEGATIONS

320.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

321.    To the extent any limitations periods potentially apply to bar Plaintiffs' and Class Members' claims, those limitations periods have not run because the Defendants have engaged in conduct that justifies application of the doctrines of equitable tolling, equitable estoppel, and/or fraudulent concealment.

322.    No Plaintiff knew or reasonably could have known about his or her claims prior to 2024.  UWM took affirmative steps to conceal the Plaintiffs' causes of action, and Plaintiffs could not have discovered the causes of action even by exercising due diligence.  UWM's affirmative acts of concealment and Plaintiffs' diligence are also discussed in detail in Section VI, *supra*, and in Counts 1 and 3, *infra*.

323.    UWM's concealing conduct included: (1) making repeated affirmative misrepresentations through its public statements and marketing materials in 2021, 2022, and 2023 about the independence of brokers; (2) taking measures to prevent brokers from disclosing better priced loan options from UWM's competitors; (3) interfering with the fiduciary duties of mortgage brokers; and (4) the other fraudulent conduct alleged in this complaint.

324. Plaintiffs' and Class Members' corrupted brokers also took affirmative steps to conceal the Plaintiffs' causes of action.[140]

325. All of these actions, and inactions where UWM and corrupted brokers had a duty to act, were intended to deter Plaintiffs from discovering the factual basis of the claims. Additionally, UWM also provided benefits, inducements, and things of value to Plaintiffs' brokers without disclosing them on loan documentation.

326. Plaintiffs had no practical way to determine their brokers were not shopping for the best price loans. Uncovering these facts would require analyzing data for which ordinary individuals lack reasonable access. Moreover, it would be unreasonable for Plaintiffs to independently analyze whether their mortgage brokers were properly assessing loan options because Plaintiffs were specifically paying brokers to undertake that function. Information and evidence bearing on Plaintiffs' causes of action was not in their possession and was not reasonably obtainable, for the reasons alleged in this complaint.

---

[140] Non-exhaustive examples of corrupted brokers' concealing misrepresentations are detailed in Section II, *supra*, and Appendix A.

# CLASS ACTION ALLEGATIONS

327.   The classes' claims all derive directly from a single course of conduct by the UWM Defendants.  Defendants have engaged in uniform and standardized conduct toward the classes.  They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual class members.  Within each claim for relief asserted by the respective classes, the same legal standards govern.  Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all claims.  Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.   Class Definitions

### A.   The Nationwide Class

328.   Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Class defined as follows:

> All persons in the United States with claims arising within the applicable statute of limitations, as tolled, who obtained a UWM mortgage from March 15, 2021 through

the present ("the Class Period") that was originated by a mortgage broker who (a) at the time the mortgage was originated, was subject to UWM's Wholesale Broker Agreement, and (b) who during the Class Period both: (i) referred 75% or more of his or her mortgage loans to UWM; and (ii) originated at least 5 separate loans with UWM, or if not, is employed by a brokerage firm that refers at least 75% of its mortgage loans to UWM.

## B. The Statewide/Multi-State Subclasses

### 1. Aiding and Abetting Breach of Fiduciary Duty Subclasses

329. In the event that Plaintiffs fail to state a claim of aiding and abetting breach of fiduciary duty on behalf of a nationwide class, Plaintiffs alternatively bring claims of aiding and abetting breach of fiduciary duty and seek an order from this Court certifying the subclasses pursuant to Rule 23(a); (b)(2); and/or (b)(3); and/or (c)(4); and/or (c)(5) of the Federal Rules of Civil Procedure as defined as follows:

*Aiding and Abetting Breach of Fiduciary Duty Subclass One*

All persons who fall into the definition of the Nationwide Class (defined *supra* ¶ 328) and who purchased a UWM mortgage in any of the states set forth in Table A, which permit a cause of action for aiding and abetting breach of fiduciary duty based on a showing of: (1) a breach of fiduciary duty; (2) knowledge of the breach; (3) substantial assistance or encouragement in the commission of the breach; (4) damages or harm.

**Table A**

| Arkansas | Nevada |
|----------|--------|
| Colorado | New Hampshire |
| Delaware | New Jersey |
| Florida | New Mexico |
| Hawaii | New York |

153

| Illinois | Oklahoma |
|---|---|
| Kentucky | Oregon |
| Maryland | Pennsylvania |
| Massachusetts | South Carolina |
| Michigan | South Dakota |
| Minnesota | Tennessee |
| Mississippi | Utah |
| Montana | Vermont |

### *Aiding and Abetting Breach of Fiduciary Duty Subclass Two*

All persons who fall into the definition of the Nationwide Class (defined *supra ¶* 328) and who purchased a UWM mortgage in any of the states set forth in Table B, which permit a cause of action for aiding and abetting breach of fiduciary duty based on a showing of: (1) a breach of fiduciary duty; (2) knowledge of the breach; (3) substantial assistance or encouragement in the commission of the breach; (4) a causal relationship between the assistance or encouragement and the breach; and (5) damages or harm.

**Table B**

| Arizona | Georgia |
|---|---|
| California | |

### 2. Civil Conspiracy Subclasses

330. In the event that Plaintiffs fail to state a claim of civil conspiracy on behalf of a nationwide class, Plaintiffs alternatively bring claims of civil conspiracy and seek an order from this Court certifying the subclasses pursuant to Rule 23(a); (b)(2); and/or (b)(3); and/or (c)(4); and/or (c)(5) of the Federal Rules of Civil Procedure as defined as follows:

## Civil Conspiracy Subclass One

All persons who fall into the definition of the Nationwide Class (defined *supra* ¶ 328) and who purchased a UWM mortgage in any of the states set forth in Table C, which permit a cause of action for civil conspiracy where the underlying tort is a breach of fiduciary duty upon a showing of the following: (1) two or more persons; (2) a wrongful or unlawful purpose; (3) an act in furtherance of the purpose; and (4) damages or harm.

**Table C**

| | |
|---|---|
| Arkansas | Maryland |
| Connecticut | Michigan |
| Florida | Minnesota |
| Georgia | Mississippi |
| Hawaii | Nebraska |
| Illinois | Pennsylvania |
| Indiana | Tennessee |
| Kentucky | Virginia |
| Louisiana | |

## Civil Conspiracy Subclass Two

All persons who fall into the definition of the Nationwide Class (defined *supra* ¶ 328) and who purchased a UWM mortgage in any of the states set forth in Table D, which permit a cause of action for civil conspiracy where the underlying tort is a breach of fiduciary duty upon a showing of the following: (1) two or more persons; (2) an object to be accomplished; (3) an agreement between the parties; (4) an unlawful or wrongful act in furtherance; (5) damages or harm.

**Table D**

| | |
|---|---|
| Arizona | New Jersey |
| Colorado | New York |
| Delaware | North Dakota |
| Kansas | Oregon |

| | |
|---|---|
| Maine | South Dakota |
| Missouri | Texas |
| Montana | Utah |
| Nevada | Wyoming |
| New Hampshire | |

### 3. Unjust Enrichment Subclass

331. In the event that Plaintiffs fail to state a claim of unjust enrichment on behalf of a nationwide class, Plaintiffs alternatively bring claims of unjust enrichment and seek an order from this Court certifying the subclasses pursuant to Rule 23(a); (b)(2); and/or (b)(3); and/or (c)(4); and/or (c)(5) of the Federal Rules of Civil Procedure as defined as follows:

> All persons who fall into the definition of the Nationwide Class (defined *supra ¶* 328) and who purchased a UWM mortgage in any of the states set forth in Table E.

**Table E**

| | |
|---|---|
| Alaska | Nebraska |
| Arizona | Nevada |
| California | New Mexico |
| Colorado | New York |
| Connecticut | North Dakota |
| District of Columbia | Ohio |
| Delaware | Oklahoma |
| Florida | Oregon |
| Hawaii | Pennsylvania |
| Idaho | Rhode Island |
| Iowa | South Carolina |
| Kansas | South Dakota |
| Kentucky | Tennessee |
| Louisiana | Utah |
| Maine | Vermont |
| Maryland | Virginia |

| Michigan | Washington |
|----------|------------|
| Missouri | Wisconsin |
| Montana | |

### 4. State Consumer Protection Law Subclasses

332. Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4); and/or (c)(5) of the Federal Rules of Civil Procedure on behalf of themselves and statewide and multi-state subclasses defined as:

> All persons in the states set forth in Table F below who obtained a UWM mortgage loan in the State(s) of _____ (e.g., Tennessee) from March 15, 2021 through the present ("the Class Period") that was originated by a mortgage broker who (a) at the time the mortgage was originated, was subject to UWM's Wholesale Broker Agreement, and (b) who during the Class Period both: (i) referred 75% or more of his or her mortgage loans to UWM; and (ii) originated at least 5 separate loans with UWM, or if not, is employed by a brokerage firm that refers at least 75% of its mortgage loans to UWM.

**Table F**

| Alaska | Montana |
|--------|---------|
| Arizona | Nebraska |
| Arkansas | Nevada |
| California | New Jersey |
| Colorado | New Mexico |
| Connecticut | New York |
| Delaware | North Carolina |
| District of Columbia | North Dakota |
| Florida | Oklahoma |
| Georgia | Oregon |
| Hawaii | Pennsylvania |

| | |
|---|---|
| Idaho | South Carolina |
| Indiana | South Dakota |
| Illinois | Tennessee |
| Kansas | Utah |
| Kentucky | Vermont |
| Maine | Washington |
| Maryland | West Virginia |
| Massachusetts | Wisconsin |
| Minnesota | Wyoming |
| Missouri | |

333. The Nationwide Class and State/Multi-State Subclasses and their members are sometimes referred to herein as the "class" or "classes."

334. Plaintiffs reserve the right to revise the definition of the classes based upon subsequently discovered information and reserve the right to establish subclasses where appropriate.

335. Excluded from any class are Defendants, its employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates; class counsel and their employees; and judicial officers and their immediate family members and associated court staff assigned to this case.

## II.    Rule 23 Allegations

### *Numerosity and Ascertainability*

336. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are hundreds of thousands of at-issue mortgage loans nationwide. Individual joinder of all class members is impracticable.

337.	Each of the classes is ascertainable because its members can be readily identified using records kept by UWM or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

### *Predominance of Common Issues*

338.	This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective classes predominate over questions affecting only individual class members. These include, without limitation, the following:

  a. Whether Defendants knew or should have known about fiduciary duties that brokers owed to class members;

  b. Whether Defendants engaged in conduct to influence the affairs of brokers in relation to their carrying out fiduciary duties to class members;

  c. Whether representations concerning the independence of brokers constitutes a material fact that reasonable borrowers would have considered in deciding whether to hire brokers who had agreed to UWM's "ultimatum" and its Wholesale Broker Agreement;

d. Whether UWM provides things of value to brokers with the intent to influence brokers to steer business to UWM;

e. Whether UWM induces brokers to steer customers to UWM even when it is not the best priced option;

f. Whether Defendants and class members' respective brokers wrongfully concealed Defendants' violations of 12 U.S.C. § 2607 and other statutory violations through April 1, 2023, notwithstanding the class members reasonable diligence in discovering such violations;

g. Whether Defendants omitted and failed to disclose material facts about the mortgage products sold to class Members;

h. Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce;

i. Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

j. Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

k. Whether Defendants' statements, concealments and omissions regarding its relationship with brokers were material, in that a

reasonable consumer could consider them important in making financial decisions;

l.   Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

m.   Whether Defendants have been unjustly enriched by their conduct;

n.   Whether the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

o.   What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

p.   Whether certain Defendants conspired together to violate RICO; and

q.   Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

### *Typicality*

339.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the class members and arise

from the same course of conduct by UWM. The relief Plaintiffs seek is typical of the relief sought for the absent class members.

<u>*Adequate Representation*</u>

340. Plaintiffs will fairly and adequately represent and protect the interests of the classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and financial misconduct.

<u>*Superiority*</u>

341. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

342. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding UWM's conduct and responsibility predominate over any questions affecting only individual class members.

343. Because the damages suffered by each individual class member may be relatively small compared to the cost of prosecuting his or her individual claims, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them

individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

344. The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

345. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions;

163

utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into subclasses.

## CLAIMS FOR RELIEF[141]

### I.      Claims of the Nationwide Class

### COUNT 1
### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)

### (All Plaintiffs Against UWM and Mat Ishbia)

346.   Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

347.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

348.   UWM and Mat Ishbia ("Ishbia") are each a "person" under 18 U.S.C. § 1961(3).

349.   UWM and Ishbia each violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an Enterprise through a pattern of racketeering activity.

---

[141] Unless otherwise indicated, references to "brokers" or "mortgage brokers" in these Counts refers to the brokers hired by Plaintiffs and the class.

350.   Plaintiffs and class members are "person[s] injured in his or her business or property" by reason of the UWM's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

## The RICO Enterprise

351.   The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the "Steering Enterprise" or "Enterprise":

352.   <u>UWM</u>, which orchestrated the fraudulent scheme and engaged in a pattern of conduct that involved misrepresenting material facts, causing or conspiring with brokers to withhold information from homebuyers about affordable lenders, offering inducements and things of value to brokers to corrupt their independence and to prevent them from providing honest services.

353.   <u>UWM officers and executives</u>, including Defendant Ishbia, who collaborated and colluded with each other and with other associates in fact in the Steering Enterprise by disseminating intentionally misleading information to conceal the relationship between UWM and brokers, funding and influencing the affairs of trade associations that published information that facilitated the deceptive scheme, and employing fraudulent tactics to cause Plaintiffs to purchase UWM loans

under false pretenses and without the benefit of disclosures and services that Plaintiffs were entitled to receive.

354. Mortgage brokers and brokerage firms, which breached their fiduciary duties by not acting in Plaintiffs' best interests, made misrepresentations and material omissions, colluded with UWM to withhold information, accepted things of value from UWM to influence the affairs of the Plaintiffs, and otherwise engaged in the conduct alleged in this complaint.

355. Decisions about buying and financing a home are among the most consequential investment decisions most Americans make in their lifetimes. Plaintiffs hired mortgage brokers to provide honest and candid services in this process, and the mortgage brokers were paid for the represented services. The price of a mortgage broker includes the assurance that the broker is acting as a fiduciary and with undivided loyalty toward his or her principal, free from conflict, influence, or unauthorized influence from another party.

356. Plaintiffs' mortgage brokers breached their fiduciary duties by colluding with UWM to withhold information about more affordable loan options, accepting things of value from UWM to influence the affairs of the Plaintiffs, entering agreements with UWM that created conflicts of interest and prevented them from providing honest services, and otherwise participating in the Steering Enterprise to deceive the plaintiffs.

357. The Steering Enterprise is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Enterprise, which acted within and affected interstate commerce, had an ongoing organization with an ascertainable structure, and it functioned as a continuing unit with separate roles and responsibilities.

358. While UWM participated in the conduct of the Steering Enterprise, it had an existence separate and distinct from the Enterprise. Further, the Enterprise was separate and distinct from the pattern of racketeering in which UWM engaged.

359. At all relevant times, UWM operated, controlled, or managed the Steering Enterprise, through a variety of actions. UWM's participation in the Enterprise was necessary for the successful operation of its scheme to defraud because UWM sold the mortgages, coordinated with brokers, disseminated false information to conceal the corruption, purchased and maintained valuable advertising platforms that it offered to brokers as inducements, and profited from such concealment.

360. The members of the Steering Enterprise all served a common purpose: to sell as many mortgages as possible, and thereby maximize the revenue and profitability of the Enterprise's members. The members of the Steering Enterprise shared the bounty generated by the enterprise, i.e., by sharing in the economics

derived from increased sales revenue generated by the scheme. Each member of the Steering Enterprise benefited from the common purpose: UWM sold more loans and received more profit that it would have otherwise had and gained market share which allowed it to impose restrictions on brokers; Ishbia and the UWM officers and executives generated more pecuniary gain for themselves; and the brokers generated more commissions and tangible and intangible value, and were able to obtain valuable advertising and promotion from UWM of their brokerage services, thereby generating more commissions and business, which, in turn, they funneled to UWM.

### Pattern of Racketeering Activity

361. UWM conducted and participated in the conduct of the affairs of the Steering Enterprise through a pattern of racketeering activity that has lasted years, and continues to this day, and that consisted of numerous and repeated violations of:

> a. The federal mail and wire fraud statutes,18 U.S.C. §§ 1341, 1343, and 1346, which prohibit the use of any interstate mail or wire facility for the purpose of executing a scheme or artifice to deprive another of money, property, and/or "the intangible right of honest services" under 18 U.S.C. § 1346, violation of which constitutes racketeering under 18 U.S.C. § 1961(1)(B);

> b. The Travel Act, 18 U.S.C. § 1952, which prohibits "unlawful activity" in interstate commerce, including "bribery . . . in violation

of the laws of the State in which committed," which the U.S. Supreme Court has held includes commercial bribery. Many states' commercial bribery statutes punish anyone who offers things of value to influence a fiduciary's performance of his or her duties.

c. State bribery laws, the violation of which constitutes racketeering under 18 U.S.C. § 1961(1)(A) ("racketeering activity" means (A) any act or threat involving . . . bribery").

362. For UWM, the purpose of the scheme was to deceive homebuyers about the relationship between UWM and brokers, while preventing homebuyers from being presented with affordable mortgage options from other lenders. By infiltrating and corrupting the fiduciary relationship that existed between homebuyers and their hired agents, UWM was able to charge non-competitive prices, impose over-market closing costs, increase sales, and avoid competition, knowing that the brokers had been influenced to withhold information about available loan options. UWM also maintained and boosted consumer confidence in the UWM brand and the value and independence of brokers by publishing false and deceptive information about UWM brokers and funding organizations to amplify UWM's false information, all of which furthered the scheme to defraud and helped UWM sell more loans at higher prices than they would have sold otherwise.

363. To further the scheme to defraud, UWM repeatedly misrepresented and concealed the relationship between itself and brokers, disseminated false information about the independence of brokers, funded trade associations to amplify UWM's deceptive public messages, offered and provided things of value to induce brokers to funnel business to UWM, conspired and agreed with brokers for them to withhold from their clients material information, and infiltrated the fiduciary relationship between brokers and homebuyers to corrupt their independence, which UWM repeatedly represented was essential to the integrity of the wholesale mortgage market.

364. UWM conducted or participated in the affairs of the Steering Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1346 (honest services fraud):

      a. UWM devised and furthered the scheme to defraud by use of the mail, telephone, wires, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate commerce, writing(s) and/or signal(s), including the UWM website and websites funded and maintained by UWM, communications with and through brokers, statements to the press,

advertisements targeted at consumers, and communications with other members of the Enterprise; and

b. UWM utilized the interstate mail and wires for the purpose of obtaining money or property, or depriving class members of the intangible right of honest services from their brokers.

365. Having devised or intending to devise a scheme to defraud, UWM engaged in or substantially participated in following acts, among others, using interstate mails or wires in furtherance of the scheme:

a. On approximately July 7, 2021, a trade association funded by UWM represented in its publicity materials that Plaintiffs' brokers were defined by their unrestricted "ability to work with a variety of lenders," which would "allow the brokers to shop for the best price and process for their clients." During all or part of the Class Period, however, Plaintiffs' brokers were restricted from shopping from some of the largest and most affordable wholesale lenders in America. Additionally, brokers were categorically restricted from shopping for better prices from any lenders once Plaintiffs received price quotes from UWM—even though Plaintiffs were not yet bound to UWM and were entitled to learn about better prices from their brokers.

b. Continuously during all or part of the Class Period, UWM represented and advertised on its website MortgageMatchup.com under the title "5 Facts about Your Local Mortgage Broker" that Plaintiffs' brokers would "work[]s on your behalf" to "present the best loan options available," which UWM knew to be materially false, including because (a) UWM actively took measures to prevent Plaintiffs from being presented with loan options; and (b) UWM had access to information demonstrating to a degree of statistical certainty that UWM had successfully induced brokers to regularly withhold the best loan options available, because, for example, UWM brokers frequently referred upwards of 95% or even 99% of their business to UWM even though UWM offered the best overall prices only a small percentage of the time.

c. During all or part of the Class Period, UWM's website advertisements deceptively implied that Plaintiffs' brokers were the opposite of "the type of shopper who always buys at the first store" and would instead "shop loans . . . on your behalf to find you the best rate." This was materially false, as UWM took measures to restrict Plaintiffs' ability to obtain the best rates and knew their brokers were not shopping on behalf of their clients.

d. During all or part of the Class Period, UWM enabled, instructed, encouraged, and incentivized Plaintiffs' brokers and others to use marketing tools that were designed and/or approved UWM's in house marketing team for the purpose of standardizing and coordinating the promotional appeals that brokers make to prospective borrowers, including Plaintiffs. These tools, including website templates and UWM's "Brand Builder" platform, embed UWM's preferred marketing messages, emphasizing, among other things, brokers' "independence," creating a false and misleading impression, through affirmative misrepresentations and omissions, that the particular broker or loan officer has no allegiance to any single lender, and instead shops around to numerous lenders to find borrowers the most competitive, affordable, and/or suitable deals. UWM further designs these marketing materials to conceal its own involvement in creating them, and instructs brokers that "there is nothing UWM" on them, and that they should "not change" any of the verbiage in the templates.

e. On February 15, 2019, UWM's CEO publicly represented in the media that "Mortgage brokers are completely independent. They are not captive or connected to my company or any company. They are

independently shopping. . . ." On information and belief, the substance of UWM's marketing and advertisements has been materially consistent with this statement during the relevant time period.

f. On March 13, 2019, UWM's CEO stated "brokers have access to all lenders" and access to all unique products offered by lenders. On information and belief, UWM disseminated this representation on other occasions.

g. On December 4, 2020, UWM's CEO publicly represented the brokers listed on FindaMortgageBroker.com would shop for "cheaper" mortgages and present whichever has the "lower rate," even though the undisclosed purpose and effect of the website was, in fact, to funnel customers to brokers who UWM knew were least likely to shop for the lowest rate on behalf of their clients. On information and belief, UWM repeated this representation, in substance, multiple times during the relevant time period.

h. During all or part of the Class Period, UWM published and maintained its FindaMortgageBroker.com and/or MortgageMatchup.com websites that published false and misleading advertisements and information about the relationship

between UWM and brokers, as well as about the brokers' purported duty to shop for the best prices on behalf of Plaintiffs. These advertisements were intentionally deceptive.

i. Constantly throughout the Class Period, UWM transmitted through interstate mail or wires its Wholesale Broker Agreement, which contained provisions that, in substance, required brokers to perpetrate honest services fraud on Plaintiffs and make fraudulent omissions of material fact. Those Agreements imposed penalties on brokers who recommended loan options from UWM's competitors (even when such competitors offered substantially lower prices or costs for mortgage services), and did not permit brokers to present any loan options to Plaintiffs after they had received a price quote from UWM (even though Plaintiffs themselves never agreed to such a condition and were legally entitled to price shop). As a result of this, UWM participated in the brokers' breach of fiduciary duty, deprived consumers the benefit of honest services, and caused them to pay for mortgages or mortgage-related services under false pretenses and with incomplete disclosures.

j. Prior to and on all the dates Plaintiffs hired their brokers and closed their loans as alleged above, UWM caused and conspired with

Plaintiffs' brokers to deceive Plaintiffs into believing the brokers were independent brokers who were acting on Plaintiffs' behalf to search multiple loan offerings for the most competitively priced loans, and caused the brokers to deceive Plaintiffs by, among other things, prohibiting the brokers from disclosing material facts about the true nature of their relationship with UWM and their pledge not to originate loans with UWM's main competitor. UWM engaged in these acts with the specific intent to defraud Plaintiffs so that UWM would increase their profits and market share by obtaining business they would not otherwise have obtained but for the scheme to defraud.

k. Prior to and on all the dates Plaintiffs hired their brokers and closed their loans as alleged above, UWM caused and conspired with Plaintiffs' brokers to systematically conceal material information from Plaintiffs to ensure that Plaintiffs would be uniformly and materially underinformed or misinformed when they reached the closing table. Among other things, UWM caused and conspired with Plaintiffs' brokers to conceal and fail to disclose: (i) the fact that Plaintiffs' brokers are bound, under UWM's Wholesale Broker Agreement, to not shop for or present loans from Rocket Mortgage

or Fairway Independent Mortgage; (ii) the fact that Plaintiffs' brokers are bound, under UWM's Wholesale Broker Agreement, to not shop for or present loan options from any other lender once the borrower's interest rate has been locked; (iii) the fact that Plaintiffs' brokers face penalties and/or legal exposure for violating any terms in UWM's Wholesale Broker Agreement that restrict their ability to independently shop; (iv) the fact that, in exchange for originating a larger proportion of their loans with UWM, Plaintiffs' brokers are eligible to receive valuable perks and benefits from UWM, including meals, trips, gifts, apparel, entertainment, awards, referrals, access to preferential loan products and discounts, and/or access to preferential placement on UWM's broker search engine; (v) the fact that Plaintiffs' brokers use marketing materials that were produced, created, or otherwise reviewed and approved by UWM; (vi) the fact that UWM's loans are often more expensive than substantially similar alternatives from other lenders in the wholesale market; (vii) the fact that, as a result of UWM's system of contractual restrictions and incentives, Plaintiffs' brokers have conflicts of interest that can impact their performance of services on behalf of their clients; (viii) the fact that Plaintiffs' brokers are not

independently shopping for loans in the borrower's best interest; and/or (ix) the fact that Plaintiffs' brokers originate the vast majority, or in some cases virtually all, of their loans with UWM.

366. In addition, to carry out or attempt to carry out the scheme, UWM conducted or participated in the affairs of the Steering Enterprise through a pattern of predicate acts constituting: (i) bribery, which is racketeering under 18 U.S.C. § 1961(1)(A); and/or (ii) violations of 18 U.S.C. § 1952, the Travel Act, which prohibits carrying on "unlawful activity" in interstate commerce, defined as "bribery . . . in violation of the laws of the State in which committed," and which constitute racketeering under 18 U.S.C. § 1961(1)(B). Specifically, Plaintiffs and the class allege:

a. Constantly throughout the relevant period, UWM committed acts constituting bribery under the laws of the State of North Carolina. A person commits commercial bribery under North Carolina law by giving gifts, discounts, bonuses, gratuity, or other consideration to an agent in return for the agent's efforts to further that person's interests in business dealings with the principal. Specifically, North Carolina's bribery statute states:

> Any person who gives, offers or promises to an agent, employee or servant any gift or gratuity whatever with intent to influence his action in relation to his principal's, employer's or master's

business . . . [and] any agent, employee or servant who, being authorized to procure materials, supplies or other articles either by purchase or contract for his principal, employer or master, or to employ service or labor for his principal, employer or master, receives, directly or indirectly, for himself or for another, a commission, discount or bonus from the person who makes such sale or contract, or furnishes such materials, supplies or other articles, or from a person who renders such service or labor; and any person who gives or offers such an agent, employee or servant such commission, discount or bonus, shall be guilty of a Class 2 misdemeanor.

N.C.G.S.A. § 14-353.

b. In violation of § 14-353, UWM conferred things of value to brokers (including Plaintiff Kim Schelble's broker Whitney Bulbrook at the time Schelble closed his loan), including advertising, promotion, gifts, templates of marketing materials and related services, discounts, and benefits provided at various loyalty or funneling benchmarks.[142] UWM provides these incentives, gifts, and

---

[142] Between 2020 and 2021, UWM spent over $10 million to publicize its broker referral website during consecutive Super Bowls, making it one of the most valuable and high-profile advertising opportunities for brokers. UWM continues to spend considerable money for MortgageMatchup.com to occupy the top "sponsored" search result from Google for queries related to finding a mortgage broker. Having established its website as a uniquely valuable advertising platform—one with more consumer traffic than most brokers could afford to purchase on their own—UWM confers lucrative advertising opportunities and high visibility placement on the website to brokers who compromise their duties of loyalty and candor to Plaintiffs and the class—i.e., either because the brokers

consideration to influence brokers in the scope of their agency for Plaintiffs, to exploit their position of trust and confidence, and to steer Plaintiffs to UWM. UWM used mail and wire facilities in interstate commerce to intentionally promote, carry on, and facilitate the unlawful activity of bribery, as defined by 18 U.S.C. § 1952(b)(2).

c. Constantly throughout the relevant period, UWM committed acts constituting bribery under the laws of the State of Florida. Specifically, Florida's bribery statute states:

> Commercial bribery.
>
> (1) A person commits the crime of commercial bribery if, knowing that another is subject to a duty described in s. 838.15(1) and with intent to influence the other person to violate that duty, the person confers, offers to confer, or agrees to confer a benefit on the other.
>
> (2) Commercial bribery is a third degree felony, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
>
> Fla. Stat. Ann. § 838.16

---

agreed to the pro-UWM provisions in the Wholesale Broker Agreement, and/or because their referral rates demonstrate they funnel to UWM without shopping for the best price. The advertising is conditioned on brokers maintaining a high degree of fidelity to UWM.

d. In violation of § 838.16, UWM conferred, offered to confer, or agreed to confer benefits on brokers (including Plaintiff Weatherill's broker Toni Raulerson at the time Weatherill closed his loan, and Plaintiffs Jeffries's and Singh's broker Josh McCombs at the time Jeffries and Singh closed on their loan), including advertising, promotion, gifts, discounts, and benefits provided at various loyalty or funneling benchmarks, knowing the brokers were subject to fiduciary duties. UWM offered this benefit to influence brokers in the scope of their agency for Plaintiffs, to exploit their position of trust and confidence, and to steer Plaintiffs to UWM. UWM used mail and wire facilities in interstate commerce to intentionally promote, carry on, and facilitate unlawful activity of bribery, as defined by 18 U.S.C. § 1952(b)(2).

e. Constantly throughout the relevant period, UWM committed acts constituting a violation of the bribery laws of the State of California, including aiding and abetting bribery and conspiracy to commit bribery. Specifically, California's bribery statute states:

Cal. Penal Code § 641.3

Commercial bribery; monetary value; punishment; definitions.

(a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery.

(b) This section does not apply where the amount of money or monetary worth of the thing of value is two hundred fifty dollars ($250) or less.

(c) Commercial bribery is punishable by imprisonment in the county jail for not more than one year if the amount of the bribe is one thousand dollars ($1,000) or less, or by imprisonment in the county jail, or in the state prison for 16 months, or two or three years if the amount of the bribe exceeds one thousand dollars ($1,000).

(d) For purposes of this section:

(1) "Employee" means an officer, director, agent, trustee, partner, or employee.

(2) "Employer" means a corporation, association, organization, trust, partnership, or sole proprietorship.

(3) "Corruptly" means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer.

f. In violation of § 641.3, UWM conferred, offered to confer, or agreed to confer benefit on brokers (including Plaintiff Morandi's broker Garrett Todd at the time Morandi closed his loan), including advertising, promotion, gifts, discounts, and benefits provided at various loyalty or funneling benchmarks, knowing the brokers were subject to fiduciary duties. UWM offered this benefit to influence brokers in the scope of their agency for Plaintiffs, to exploit their position of trust and confidence, and to steer Plaintiffs to UWM. UWM used mail and wire facilities in interstate commerce to intentionally promote, carry on, and facilitate unlawful activity of bribery, as defined by 18 U.S.C. § 1952(b)(2).

367. UWM's conduct in furtherance of this scheme was intentional. Plaintiffs and class members were directly harmed as a result of UWM's conduct.

368. As described throughout this Complaint, UWM engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, conducted with the common purpose of obtaining from Plaintiffs and the class money, revenue, and market share that UWM otherwise would not have received. The common purpose involved avoiding competition from lenders who offered affordable loans and closing costs, by propagating material misrepresentations and omissions, and infiltrating the fiduciary relationship between

homebuyers and brokers. The predicate acts had the same or similar results, participants, victims, and methods of commission. The predicate acts were committed or caused to be committed by UWM through their participation in the Steering Enterprise and in furtherance of its fraudulent scheme. The predicate acts were interrelated and not isolated events. The predicate acts of fraud or attempt to defraud were committed each time UWM published or transmitted false information about the independence of brokers (as alleged above in this Complaint); each time conspiring brokers published or transmitted false information about the nature of the services provided or their relationship with UWM in furtherance of the scheme, each time UWM's website FindABroker.com generated search results for "independent" brokers who were, in fact, beholden to UWM and obtained their placement in the search results by, among other things, funneling loans to UWM and agreeing with UWM not to refer any business to UWM's largest competitor; each time UWM transmitted the Wholesale Broker Agreement to Plaintiffs' brokers in furtherance of the scheme to defraud; each time UWM offered things of value to Plaintiffs' brokers to influence them to refer business to UWM; each time UWM and Plaintiffs' brokers concealed and failed to disclose the material facts surrounding the true nature of the relationship between UWM and Plaintiffs' brokers, among other times.

369. By reason of and as a result of the conduct of UWM its substantial participation in the steering scheme in violation of 18 U.S.C. § 1962(c), Plaintiffs

184

and the class were injured in their business and/or property in multiple ways, including paying the prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers. Alternatively, Plaintiffs and the class suffered the economic harms of overpaying for mortgages and for broker services, including excess prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers.

370. Plaintiffs and the class were also injured in their business and/or property and suffered the economic harms associated with being deprived of their rights to:

      a. Hire a loyal, honest, and non-conflicted broker;

      b. Receive complete and candid disclosures and information;

      c. Not be exposed to materially deceptive and false advertising;

      d. Obtain a mortgage with the lowest costs, fees, or pricing;

      e. Obtain a mortgage from a restricted lender;

      f. Make an informed decision based on complete information; and

      g. Receive the services that they paid for.

371. As a result of the racketeering activity and conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs and the class suffered economic injury by paying prices, rates, closing costs, commissions, and fees they would not have otherwise paid, and for services they did not receive.

372.   Defendants' misconduct is the direct cause of the alleged harms. There are no intermediate causes, nor any difficulty determining which damages can be attributed to the Defendants' misconduct. UWM has engaged in a scheme to defraud that involved making and causing to be made material misstatements or omissions, and making inducements in violation of state bribery laws, with the specific intent to obtain money from Plaintiffs that UWM otherwise would not have obtained. Plaintiffs were the direct targets and victims of UWM's scheme.

373.   UWM's actions alleged herein were reasonably calculated to deceive persons of ordinary prudence and comprehension, and they were committed with reckless indifference to the truth if not the outright intent to deceive, and with the intent to deprive Plaintiffs and the class from receiving the disclosures and loyalty required by law from independent brokers.

374.   The violations of 18 U.S.C. § 1962(c) were committed with the specific intent to defraud, thereby entitling Plaintiffs and the class to treble damages under 18 U.S.C. § 1964(c), as well as injunctive/equitable relief and costs and reasonable attorneys' fees.

## COUNT 2
### Violation of RICO, 18 U.S.C. § 1962(d)
### By Conspiring to Violate 18 U.S.C. § 1962(c) ("RICO Conspiracy")

### (All Plaintiffs Against UWM and Mat Ishbia)

375.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

376.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

377.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

378.    UWM, Mat Ishbia, and the mortgage brokers (collectively, "Coconspirators") who were hired by Plaintiffs and the class have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of the conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Steering Enterprise described previously through a pattern of racketeering activity.

379.    As set forth in detail above, the Coconspirators have engaged in numerous overt and predicate unlawful and fraudulent acts, constituting a pattern of racketeering activity, in furtherance of the conspiracy.

380. Coconspirators intended to engage in the scheme causing Plaintiffs and the class to incur costs, commissions, fees, and other expenses associated with their mortgages and to pay for the honest services of their brokers that they would not have paid but for the conspiracies to violate 18 U.S.C. § 1962(c).

381. Coconspirators knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes outlined herein.

382. The nature of the deceptive conduct, material misrepresentations and omissions, and concerted actions to steer Plaintiffs in furtherance of the conspiracy, as set forth in detail above, demonstrates or gives rise to an inference that Coconspirators not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but that they were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of racketeering activity.

383. Coconspirators have engaged (and continue to engage) in the commission of overt acts in furtherance of the Steering Enterprise scheme, including the following unlawful racketeering predicate acts (as outlined in detail above):

      a. Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

      b. Multiple instances of wire fraud in violations of 18 U.S.C. § 1343.

c. Multiple instances of honest services fraud under 18 U.S.C. § 1346; and

d. Multiple instances of unlawful bribery in violation of 18 U.S.C. § 1952 and various state laws comprising racketeering activity under 18 U.S.C. § 1961.

384. Coconspirators shared information, concealed information, acted in concert to steer borrowers, entered written agreements, provided and received things of value between each other in furtherance of the conspiracy, shared in the spoils, and consistently maintained a false or deceptive public posture regarding the relationship between UWM and brokers. Their close cooperation surrounding the steering scheme and joint participation in predicate acts is evidence of the conspiracy.

385. Had Coconspirators not concealed or misrepresented these material facts, not conspired to violate fiduciary duties, and not engaged in concerted conduct in support of the steering scheme in violation of 18 U.S.C. § 1962(c) and (d), Plaintiffs would not have suffered economic harms of paying for mortgages and for broker services as a result of the unlawful scheme, including prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers. Alternatively, Plaintiffs would not have suffered the economic harms of overpaying for mortgages and for broker services, including excess prices, rates,

closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers.

386. Plaintiffs also suffered the harms associated with being deprived of their rights to:

      a. Hire a loyal, honest, and non-conflicted broker;

      b. Receive complete and candid disclosures and information;

      c. Not be exposed to materially deceptive and false advertising;

      d. Obtain a mortgage with the lowest costs, fees, or pricing;

      e. Obtain a mortgage from a lender that the Coconspirators agreed to restrict;

      f. Make an informed decision based on complete information;

      g. Receive the services that they paid for.

387. As a result of the racketeering activity and conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs suffered economic injury by paying prices, rates, closing costs, commissions, and fees that Plaintiffs would not have otherwise paid, and for services Plaintiffs did not receive.

388. Defendants' misconduct is the direct cause of the alleged harms. There are no other intermediate causes, nor any difficulty determining which damages can be attributed to the Defendants' misconduct. UWM was engaged in scheme to defraud that involved making and causing to be made material misstatements or

omissions, and making inducements in violation of state bribery laws, with the specific intent to obtain money from Plaintiffs that UWM otherwise would not have obtained. Plaintiffs were the direct targets and victims of UWM's scheme.

389. Coconspirators' actions alleged herein were reasonably calculated to deceive persons of ordinary prudence and comprehension, and were committed with the intent to deceive and deprive Plaintiffs from receiving the disclosures and loyalty required by law from independent brokers.

390. The violations of 18 U.S.C. § 1962(c) were committed with the specific intent to defraud, thereby entitling Plaintiffs and the class to treble damages under 18 U.S.C. § 1964(c), as well as injunctive/equitable relief and costs and reasonable attorneys' fees.

## COUNT 3
### Violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607

### (All Plaintiffs Against UWM)

391. Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

392. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

393. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

394. Throughout the Class Period, UWM and the mortgage brokers provided "settlement services" and/or engaged in business incident to real estate settlement services in respect of "federally-related mortgage loans," as such terms are defined by RESPA Sections 2602(1) and (3).

395. Throughout the Class Period, the mortgage brokers were paid for certain settlement services they did not actually perform, including surveying the wholesale market to determine what loan products and rates are available to Plaintiffs and class members and counseling Plaintiffs and class members in evaluating the options to select the loan with the best pricing.

396. Plaintiffs and the class obtained federally-related residential mortgage loans through UWM. All loans referred to UWM under the steering scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by UWM and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

397. The Coconspirators' conspiracy extends to violations of 12 U.S.C. § 2607.

398.   12 U.S.C. § 2607 prohibits referrals and splitting charges in the performance of real estate settlement services:

> (a) Business referrals
>
> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
>
> (b) Splitting charges
>
> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

399.   In connection with transactions involving federally-related mortgage loans, UWM made payments and/or gave things of value to brokers, pursuant to an agreement or understanding, in exchange for the assignment and referral of business incident to or part of a real estate settlement service, in violation 12 U.S.C. § 2607(a), which prohibits the payment of referral fees in connection with the origination or brokering of federally related mortgage loans.

400.   Additionally, in connection with transactions involving federally-related mortgage loans, UWM gave, and brokers accepted, a portion, split or percentage of charges received by Plaintiffs and the class for the rendering of real estate settlement services and/or business incident to real estate settlement services

other than for services actually performed, in violation of RESPA, 12 U.S.C. § 2607(b).

401. The Coconspirators created a self-concealing controlled business arrangement based on fraud. The controlled business arrangement facilitated the steering scheme fueled by kickbacks and unearned fees provided in exchange for referrals.

402. The Coconspirators engaged in tricks and contrivances intended to exclude suspicion and inquiry regarding the steering scheme.

403. The steering scheme was designed to avoid a paper trail of segregated kickback and unearned payments. The self-concealing controlled business arrangement based in fraud utilized undisclosed marketing contributions and unearned compensation hidden in closing fees.

404. Specifically, throughout the Class Period UWM has spent millions of dollars to promote its consumer-facing broker website. The foundation of such marketing efforts is the misrepresentation that brokers found on the website are independent, will shop for products from competing lenders, and will counsel the borrower in evaluating the competing loan products.

405. For example, beginning no later than May 2021, the front pages of the website stated: "Connecting with an independent mortgage broker means having a local expert by your side for one of life's biggest financial decisions. ***Because they***

194

*are independent, licensed professionals, mortgage brokers can shop multiple lenders — giving them access to more home loan options than what a bank or online lender can offer.* The result is a cheaper, faster and easier mortgage for you. . . ."[143]

406. During the same time, information on the website represented that "When you work with an independent mortgage broker, you have a local mortgage expert on your side to personally advise you throughout the process, and who has your best interest in mind. *They'll shop dozens of lenders to find the right home loan for your needs*. . . ."[144]

407. Other "Guides" and articles on the website likewise describe a mortgage broker as "a home loan expert that connects prospective homeowners with willing mortgage lenders" and who "shop[s] around to find the best interest rates, terms, and loan products" that meet the borrower's needs.[145]

---

[143] Figure 11, *supra*, https://findamortgagebroker.com, Retrieved from *Internet Archive*, (archived on May 18, 2021), https://web.archive.org/web/20210518114811/https://findamortgagebroker.com/.

[144] Figure 12, *supra*, https://findamortgagebroker.com, Retrieved from *Internet Archive* (archived on May 18, 2021), https://web.archive.org/web/20210518114811/https://findamortgagebroker.com/.

[145] *5 Facts About Your Local Mortgage Broker*, Jan. 22, 2021, https://findamortgagebroker.com/resources/guides/all-guides/guides/2021/01/23/5-facts-about-working-with-a-local-mortgage-broker, Retrieved from *Internet Archive* (archived on May 18, 2021), https://web.archive.org/web/20210518100649/https://findamortgagebroker.com/

408. In January 2024, UWM rebranded FindAMortgageBroker.com, changing its name to MortgageMatchup.com.[146] The rebranded website contains much of the same content, including the broker search directory and UWM's representations that mortgage brokers "shop around to find the best interest rates, terms, and loan products that meet your needs."[147]

409. Notwithstanding such misrepresentations, the website is designed to facilitate a controlled business arrangement. While consumers expect to engage independent mortgage brokers, they are instead funneled to corrupted brokers. Moreover, when consumers search for brokers in a given geographic area, the brokers who are most loyal to UWM and who place the highest proportions of their loans with UWM appear at the forefront of the search results. Naturally, the corrupted brokers operating under the understanding with UWM that they will steer loans to UWM without performing the basic duties of a mortgage broker are placed at the forefront of search results.

---

resources/guides/all-guides/guides/2021/01/23/5-facts-about-working-with-a-local-mortgage-broker.

[146] Press Release, *UWM Rebrands FindAMortgageBroker.com to Mortgage Matchup*, UWM.com, Jan. 17, 2024, https://www.uwm.com/about-us/media-resources/press-releases/2024/january-17-2024.

[147] *See Facts About Your Local Mortgage Broker*, https://mortgagematchup.com/resources/blog/facts-about-your-local-mortgage-broker.

410.    To illustrate, if a borrower enters a ZIP code in Chapel Hill, North Carolina into the search bar, the top six brokers that appear in the results are Patrick Roman (NMLS #204441), Whitney Bulbrook (NMLS #48522), Stephen Fitzpatrick (NMLS #92185), Teante Gray (NMLS #2080243), Erica Sanders (NMLS #390083), and Robert Bajakian (NMLS #77324).[148]  Each of those brokers funnel nearly all of her or his loans to UWM.  Roman sends upwards of 80% of his loans to UWM. Bulbrook sends 99%.  Fitzpatrick sends 100%.  Gray sends 89%.  Sanders sends 86%.  Bajakian sends 92%.  Accordingly, none of these brokers is actually shopping across multiple lenders for the best loans available for their clients.  Instead, they are sending the vast majority of their clients to one lender: UWM.

411.    Raulerson, McCombs, and Todd—who routinely sent over 90% of their loan volume to UWM—similarly appear near the forefront of the website's search results if a borrower enters a ZIP code in Plant City, Florida, North Port, Florida, and Van Nuys, California, respectively.

412.    The value of the preferential treatment can hardly be overstated. When a corrupted broker performs on the common understanding that he will steer loans to UWM, the broker is the direct beneficiary of UWM's marketing efforts that cost millions of dollars. In adhering to the steering scheme, the corrupt broker can free ride on UWM's costly marketing efforts and reap the benefits of steady customers

---

[148] Figure 17, https://mortgagematchup.com/search?query=27514.

funneled in his direction in exchange for his continued referrals of such customers back to UWM. The in-kind marketing contribution made to loyalist brokers in exchange for continued referrals is not disclosed to borrowers.

413.   UWM provides additional things of value in exchange for corrupted brokers' continued referrals. UWM provides its corrupted brokers with template advertising materials for no cost that UWM has produced.  These benefits are not disclosed to borrowers.  Among other things, UWM provides its corrupted brokers tools called "Brand 360" and "Brand Builder," which it describes as "like having your own team of marketing professionals without the expense."  These tools enable corrupted brokers to take UWM-produced social media and video content, strip it of any reference to UWM, insert the broker's own branding, and present it as their own.[149]

414.   UWM also frequently flies corrupted brokers to its campus in Pontiac, Michigan for days-long conventions, training courses, and events, which often feature lavish meals and live entertainment, all at UWM's expense.  Numerous brokers who have attended UWM's live events and trainings describe them as raucous parties, heavy on free perks for attendees. In exchange for personal incentives, corrupted brokers continue to steer loans to UWM.

---

[149] *Brand 360 Brand Builder*, https://www.uwm.com/grow-your-business/brand-builder.

415. Once consumers are funneled towards corrupted brokers, the brokers continue the same set of misrepresentations, claiming they are independent brokers that will provide shopping and counseling services for consumers. Such statements are made with the intent of concealing the nature of their corrupted relationship with UWM.

416. For instance, Elkins and NEXA market themselves as "independent" mortgage brokers and represent that they "work with multiple lenders and we can provide our clients with extremely competitive pricing. Now you can do all your comparison shopping with one company without wasting time with several banks or brokers."[150]

417. Similarly, Bulbrook holds herself out as a "trusted guide" for her clients whose independence from any particular lender allows her to pursue her clients' "best interest."[151] The homepage of the website for Bulbrook's brokerage firm, Carolina Ventures, also features a video stating Bulbrook is a borrower's "advocate" that "shops for great deals on mortgages," providing "choices. Lot's of choices" that "set up competition between lenders."[152] Marketing the services borrowers come to

---

[150] https://lendnationwide.com/index.php.

[151] Figure 28, *supra*, Carolina Ventures's Facebook Page, Sep. 27, 2023 at 2:00 PM & Mar. 28, 2024 at 2:00 PM, https://www.facebook.com/CarolinaVenturesMortgage/.

[152] Figure 29, *supra*, https://www.carolinaventures.com/

expect and subsequently pay for, Bulbrook's website states "a broker compares deals from hundreds of banks and lenders of all sizes across the U.S., then organizes and presents those choices based on your location, financial situation, timeline and other factors."

418. Likewise, Florida Mortgage Firm, which operates the website "BestFloridaRate.com," markets itself as an independent mortgage brokerage firm.

419. Todd and National Trust similarly market themselves as "independent" mortgage brokers. Todd promotes the benefits of working with a broker that takes the time to shop for their clients, saying on his website, "Garrett Todd will analyze your financial position to find the appropriate loan product. Many brokers and loan officers in the industry do not spend the extra time comparing loan products prior to issuing. That additional research time can make the difference down the road of your mortgage."[153] Indeed, Todd represents that he considers "hundreds of financing options" and that he is "constantly researching and staying on top of the mortgage market to ensure I obtain the best financing options for you and your family."[154]

420. McCombs and his firm, Core Financial, claim to be independent as well. In borrower-facing marketing materials and social media, McCombs holds

---

[153] https://www.gtmortgage.co/.

[154] Figure 35, *supra*, https://www.gtmortgage.co/gt-philosophy/.

himself out as broker with rates "lower than anyone else's!"[155]  On Facebook, he represents that the top reason why he doesn't work for a retail mortgage lender is "I want to get my customers the best possible deal!"[156]

421.  Corrupted brokers, including Elkins, Bulbrook, Raulerson, Todd, and McCombs made such misrepresentations throughout the Class Period.

422.  Relying on the ubiquitous misrepresentations, some consumers—including Plaintiffs—hire corrupted brokers to provide the represented services.

423.  Once retained, corrupted brokers shirk their represented independence. The brokers do not independently shop for competitively priced mortgage loans nor counsel their borrowers as to such options.  Rather, they intentionally funnel borrowers to UWM.

424.  Because of corrupted brokers' steering, borrowers pay extra charges, fees, or commissions in connection with the closing of their loans, including the money paid directly or indirectly to brokers for services they did not provide.

425.  Meanwhile, kickbacks and unearned compensation are paid in proportion to the broker's level of corruption. The more steering the broker provides

---

[155] Figure 37, Josh McCombs's Facebook Page, Feb. 24, 2024, https://www.facebook.com/ people/Josh-McCombs-The-Mortgage-Man/.

[156] Josh McCombs's Facebook Page, July 28, 2022, https://www.facebook.com/ people/Josh-McCombs-The-Mortgage-Man/.

to UWM, the more undisclosed in-kind marketing contributions, personal incentives, and unearned fees the broker receives.

426. There is no industry-wide practice of agreeing to provide brokers undisclosed in-kind marketing contributions, personal incentives, and unearned fees in exchange for brokers shirking of basic broker services and referring borrowers to a single lender regardless of whether the lender's products are competitive.

427. Plaintiffs' loans are instances of referrals made in exchange for things of value and unearned compensation. When serving as the Escue's broker, Elkins searched for and recommended only loan options from UWM. Elkins never seriously considered sending the Escues to any lender other than UWM. Because Elkins only presented the Escues with options from UWM and no other lender, the Escues overpaid significantly for their mortgage. In addition to undisclosed things of value provided to Elkins in exchange for referring the Escues, Elkins received $2,324.00 in connection with the Escue's loan. Elkins' compensation included amounts paid for services Elkins did not actually provide, including the basic brokerage services of surveying the wholesale market to determine what loan products and rates are available to the Escues and counseling the Escues in evaluating the options to select the loan with the best pricing.

428. When serving as Schelble's broker, Bulbrook searched for and recommended only loan options from UWM. Bulbrook never seriously considered

sending Schelble to any lender other than UWM. Because Bulbrook only presented Schelble with options from UWM and no other lender, Schelble overpaid significantly for his mortgage. In addition to undisclosed things of value provided to Bulbrook in exchange for referring Schelble, Bulbrook received $10,720.00 in connection with Schelble's loan. Bulbrook's compensation included amounts paid for services Bulbrook did not actually provide, including the basic brokerage services of surveying the wholesale market to determine what loan products and rates are available to Schelble and counseling Schelble in evaluating the options to select the loan with the best pricing.

429. When serving as Weatherill's broker, Raulerson searched for and recommended only loan options from UWM. Raulerson never seriously considered sending Weatherill to any lender other than UWM. Because Raulerson only presented Weatherill with options from UWM and no other lender, Weatherill overpaid significantly for his mortgage. In addition to undisclosed things of value provided to Raulerson in exchange for the referring Weatherill, Raulerson received $9,438.00 in connection with Weatherill's loan. Raulerson's compensation included amounts paid for services Raulerson did not actually provide, including the basic brokerage services of surveying the wholesale market to determine what loan products and rates are available to Weatherill and counseling Weatherill in evaluating the options to select the loan with the best pricing.

430. When serving as Morandi's broker, Todd searched for and recommended only loan options from UWM. Todd never seriously considered sending Morandi to any lender other than UWM. Because Todd only presented Morandi with options from UWM and no other lender, Morandi overpaid significantly for his mortgage. In addition to undisclosed things of value provided to Todd in exchange for referring Morandi, Todd received $7,250.00 in connection with Morandi's loan. Todd's compensation included amounts paid for services Todd did not actually provide, including the basic brokerage services of surveying the wholesale market to determine what loan products and rates are available to Morandi and counseling Morandi in evaluating the options to select the loan with the best pricing.

431. When serving as Jeffries's and Singh's broker, McCombs searched for and recommended only loan options from UWM. McCombs never seriously considered sending Jeffries and Singh to any lender other than UWM. Because McCombs only presented Jeffries and Singh with options from UWM and no other lender, Jeffries and Singh overpaid significantly for their mortgage. In addition to undisclosed things of value provided to McCombs in exchange for referring Jeffries and Singh, McCombs received $4,302.40 in connection with their loan. McCombs's compensation included amounts paid for services McCombs did not actually provide, including the basic brokerage services of surveying the wholesale market

to determine what loan products and rates are available to Jeffries and Singh and counseling Jeffries and Singh in evaluating the options to select the loan with the best pricing.

432. Ishbia engages in affirmative acts to contribute to and further conceal the steering scheme.

433. For instance, on or around July 16, 2021, Ishbia joined Bloomberg's "Masters in Business" podcast where he stated "we're wholesale, which means we offer lower rates. And you have to get our rates through an *independent* mortgage broker. ***Mortgage brokers offer lower rates and fees to consumers. It's not my opinion. It's fact***. It's backed up by data after data, the data point that ***if you go alone to, uh, you know, mortgage broker, findamortgagebroker.com or wherever you may go to find a local mortgage broker, you will get lower rates***."[157]

434. When misrepresenting the relationship between UWM and the corrupted brokers appearing on findamortgagebroker.com, Ishbia made such statements with the purpose and intent of influencing consumers and funneling them towards corrupted brokers. On or around October 14, 2021, Ishbia stated "the biggest

---

[157] Masters in Business, *Mat Ishbia on Leadership and Mortgage Lending*, BLOOMBERG, at 17:00, July 16, 2021, https://www.bloomberg.com/news/audio/2021-07-16/mat-ishbia-on-leadership-and-mortgage-lending-podcast. (emphasis added).

challenge is education in the market," but that "I have a bigger stage. I'm able to educate more people, move the needle. And that's what we're focused on."[158]

435. When engaged in that "education" of consumers unfamiliar with the mortgage market, Ishbia represented consumers should "go to findamortgagebroker.com. They will find the right place for you. They are the expert to solve it for you. It's cheaper, faster and easier. And I'm not saying every time, but it's like 99.99% time. It's almost every time. There's no reason to ever look elsewhere."[159]

436. On or around November 4, 2021, Ishbia joined "The Casey Adams Show," where he stated "*What excites me is the impact we can make on consumers because consumers don't know how to get a mortgage*. They still think you call a bank or you ask your parents and you put 20 percent down. It's just the wrong way. *You got to go to findamortgagebroker.com. You find a local person that's an expert and they will shop on your behalf*."[160]  Ishbia and UWM were making an

---

[158] From At The Podium with Manuel Amezcua, *How Greater Success Comes from Failing Faster | Mat Ishbia*, at 24:00, Oct 14, 2021, https://podcasts.apple.com/us/podcast/how-greater-success-comes-from-failing-faster-mat-ishbia/id1536826139?i=1000538559215.

[159] *Id*.

[160] The Casey Adams Show, *Mat Ishbia – CEO of United Wholesale Mortgage Speaks on Company Culture and Leadership*, at 20:30, Nov. 4, 2021, https://www.caseyadams.com/the-casey-adams-show-1/episode/30da327d/mat-ishbia-ceo-of-united-wholesale-mortgage-speaks-on-company-culture-and-leadership. (emphasis added).

"impact on consumers." That impact was excessive fees and costs to consumers' detriment because Ishbia represented brokers at findamortgagebroker.com "will shop on your behalf." In fact, the most visible brokers on the platform directly steer the consumer back to UWM.

437. On March 24, 2022, Ishbia joined the "Power House" podcast, where he stated within the first minute of the recording that "***Brokers are independent*** loan officers that are not captive to one lender, ***not captive to me***, not captive to anyone. ***They're independent***. And if I'm a loan officer, why would I want to be captive? I'd rather be independent. And so it's happening."[161] In fact—as Ishbia knew—nearly half of the brokers UWM conducted business with were captive, funneling more than 75% of their loans to UWM, while a fifth of its brokers funneled over 99% of their loans to UWM.

438. On September 9, 2022, Ishbia joined the "BiggerPockets Real Estate Podcast," where he stated "our job is to empower mortgage brokers. . . ***They are the fastest, easiest, and cheapest way to get a mortgage. And that's not my opinion is supported by data and facts***. And so what my job is, is to make sure. That they stay fastest and easiest. We already know they're cheaper. So if, if you earn nothing from

---

[161] Power House, *Mat Ishbia on how UWM is prepared for the 2022 market*, HousingWire, at 0:20, Mar. 24, 2022, https://podcasts.apple.com/us/podcast/mat-ishbia-on-how-uwm-is-prepared-for-the-2022-market/id1426081802?i=1000555098554. (emphasis added).

me or nothing, like ***the cheapest way to get a mortgage is through a mortgage broker and that's findamortgagebroker.com***."[162] Ishbia went on to state "Finding a mortgage broker, ***someone that's shopping on your behalf*** and has options, has different lenders because every lender interprets it differently too."

439. Ishbia made such statements with the intent of reaching consumers and concealing the nature of UWM's relationships with corrupted brokers.

440. Similarly, UWM made additional misrepresentations with the intent of concealing the nature of UWM's relationships with corrupted brokers. On March 1, 2023, UWM represented "In the wholesale channel, the interests of the Independent Mortgage Broker and the borrower are aligned to achieve the best outcome for the borrower . . . ."[163]

441. Because of the Co-conspirators' misstatements and the design of the self-concealing controlled business arrangement, Plaintiffs had no knowledge of the

---

[162] BiggerPockets Real Estate Podcast, *Mortgage Rate Predictions from the Nation's #1 Lender w/Mat Ishbia*, at 14:00 (September 9, 2022) https://podcasts.apple.com/na/podcast/biggernews-september-mortgage-rate-predictions-from/id594419649?i=1000578498263. (emphasis added).

[163] UWM Holdings Corporation, Annual Report (Form 10-K) ("UWM 2022 Form 10-K") at 5 (Mar. 1, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783398/000178339823000008/uwmc-20221231.htm. Notably, UWM removed this language from its 2023 Annual Report.

referral and fee-splitting scheme until 2024 following Hunterbrook Media LLC's analysis of the Co-conspirators' practices.

442.   Because Plaintiffs—consisting of consumers seeking assistance in the residential mortgage process—had no practical way to independently detect the steering scheme, Plaintiffs did not possess information sufficient to alert a reasonable person of the possibility of wrongdoing, notwithstanding Plaintiffs' reasonable diligence.

443.   Plaintiffs reviewed the disclosures and documents provided to them, but given the self-concealing nature of the scheme, such documents did not suggest wrongdoing.

444.   Moreover, Plaintiffs relied on UWM's, Ishbia's, and the corrupted brokers' pervasive fraudulent representations regarding the broker' independence and commitment to shopping on Plaintiffs' behalf. Indeed, Plaintiffs' reliance on such misrepresentations, and their expectation that the corrupted brokers would independently shop on Plaintiffs' behalf and counsel Plaintiffs on their options, is the whole reason Plaintiffs hired their respective brokers. Accordingly, Plaintiffs had no reason to investigate for information contradicting the brokers' represented independence.

445.   The terms of the Wholesale Broker Agreement were not disclosed to Plaintiffs and Plaintiffs were not aware of such terms.

446. In any event, only Hunterbrook Media LLC's complex analysis could provide information sufficient to place Plaintiffs on notice of the steering scheme.

447. Hunterbrook Media LLC's analysis is well beyond the scope of a reasonable residential mortgage consumer's ability to investigate wrongdoing. Hunterbrook Media LLC spent over a thousand hours in-taking publicly available data, designing the database behind its investigation, and building out the analytics that run on top of it. The investigative team included a certified fraud examiner; a machine learning data scientist; and a former mortgage-backed securities trader.

448. Accordingly, notwithstanding Plaintiffs' reasonable diligence, because of the Co-conspirators' wrongful concealment of the steering scheme, Plaintiffs were not on notice of the RESPA violations until Plaintiffs learned of the steering scheme in 2024 following Hunterbrook Media LLC's analysis

449. Although concealed prior to Hunterbrook Media LLC's analysis, Plaintiffs and the class were subjected to settlement services and/or business incident to real estate settlement services tainted by kickbacks or referrals of business inherently tainted and biased by UWM's unlawful steering scheme. UWM's arrangements with brokers harmed borrowers' ability to obtain affordable mortgages by placing inherent limits on settlement service choice and competition.

450. Plaintiffs and the class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate

in unlawful steering, referral, and/or fee-splitting schemes. Congress bestowed upon Plaintiffs and the class a right to real estate settlement procedures that are free from corruption, unearned commissions, and collusion, and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties. *See* 12 U.S.C. §§ 2601, 2607(d)(2).

451.  As a result of UWM's steering scheme and the misconduct alleged in this complaint, brokers funneled business to UWM out of consideration for their own pecuniary interests, and because UWM provided things of value (including promotions, free advertising, gifts, valuable access to services after reaching certain benchmarks of loyalty and referrals, etc.). Their decisions were not based upon an independent evaluation of the overall price and costs that Plaintiffs would pay for their home mortgages.

452.  Payment from UWM to the brokers were not associated with any goods or services actually provided by the brokers, or in the alternative, the value of any goods or services claimed to be provided by the brokers to UWM is not reasonably related to the payment from UWM such that the payment is not "bona fide" or within the protection of 12 U.S.C. § 2607(c)(2).

453.  UWM did not disclose the true nature of its relationship with brokers. To the contrary, UWM intended to actively mislead consumers that brokers were "completely independent" and shopped for the lowest price without restriction. The

reduction in healthy competition was itself a harm to Plaintiffs and the class. The scheme and unearned fees unnecessarily and artificially inflated the price Plaintiffs and the class paid for settlement services.

454. The RESPA violations resulted in Plaintiffs and the class paying extra charges, fees, or commissions in connection with the closing of their loans, including the money paid directly or indirectly to brokers for services they did not provide.

455. For the reasons set forth above, UWM violated RESPA, 12 U.S.C. §§ 2607(a) and (b). Pursuant 12 U.S.C. § 2607(d), UWM is liable to Plaintiffs and the class members charged for the settlement services involved in UWM's violation in an amount equal to three times the amount of any charge paid for such settlement service. In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

## II. Claims of the Nationwide Class, or, in the Alternative, the Statewide/Multi-State Subclasses

### COUNT 4
### Aiding and Abetting Breach of Fiduciary Duty

### (All Plaintiffs Against All Defendants)

456. Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

457. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of aiding and abetting breach of fiduciary duty, as there are no true conflicts (case-dispositive differences) among various states' laws.

212

Specifically, Plaintiffs bring this aiding and abetting breach of fiduciary duty claim on behalf of themselves and the Nationwide Class or, alternatively, State/Multi-State Subclasses as defined in Paragraph 329 and Tables A and B.

458. In the alternative, Plaintiffs each bring this claim under the respective laws of the states where they purchased mortgages from UWM on behalf of a subclass comprised of (a) all class members who purchased UWM mortgages in those states, and (b) all class members who purchased UWM mortgages in states with substantially similar common law of aiding and abetting breach of fiduciary duty.

459. A fiduciary relationship existed between Plaintiffs' mortgage brokers and Plaintiffs.

460. Plaintiffs' mortgage brokers established a special relationship with Plaintiffs whereby the brokers caused Plaintiffs to repose confidence and trust in them by, *inter alia*, participating in the steering scheme, holding themselves out as "independent" mortgage brokers, and causing Plaintiffs to believe, through their affirmative misrepresentations and omissions, that they would act without allegiance to any particular lender and undertake a responsibility to provide unconflicted, good faith advice to Plaintiffs and to find the most affordable and/or most suitable deals on Plaintiffs' behalf.

461. Mortgage brokers, including Plaintiffs' mortgage brokers, have knowledge and expertise superior to the average borrower such that borrowers are in an unequal bargaining position as to their broker, who can exercise overmastering or dominant influence over borrowers

462. Plaintiffs' mortgage brokers exercised such overmastering or dominant influence over Plaintiffs when wrongfully recommending and executing the loans at issue.

463. The brokers owed fiduciary duties to Plaintiffs and the class and were required to act in their best interests, with a duty of utmost good faith, trust, confidence, and candor, and a duty to act with the highest degree of honesty and loyalty.

464. The decisions surrounding the purchase and financing of a home are among the most consequential financial decisions most Americans make in their lifetimes. Plaintiffs and the class hired mortgage brokers to provide honest and candid services in this process, and the mortgage brokers were paid commissions for their services. The price of a mortgage broker includes the assurance that the broker is acting as a fiduciary and with undivided loyalty toward his or her principal, free from conflict, influence, or inducement from another party.

465. The brokers breached their fiduciary duties by not acting in the best interests of Plaintiffs and the class, demonstrating divided loyalties, failing to

214

disclose material facts, colluding with UWM to withhold information about more affordable loan options, accepting things of value from UWM to influence the affairs of their principals, entering agreements with UWM that created conflicts of interest and prevented them from providing honest services, and otherwise participating in the scheme alleged in this complaint.

466. The brokers consented to and benefitted from being falsely advertised by UWM as having characteristics they did not possess and/or as performing services they could not perform in good faith as advertised.

467. UWM knew that mortgage brokers owed a fiduciary duty to Plaintiffs, and UWM had actual knowledge of breaches of fiduciary duties owed to Plaintiffs by their brokers.

468. UWM knowingly and substantially assisted, enabled, and facilitated, without authorization from Plaintiffs, systematic breaches of fiduciary duties owed to Plaintiffs. UWM enacted company policies and procedures whose purpose and effect was to achieve this result, including UWM's Wholesale Broker Agreement, which was intended to prevent brokers from using their independent judgment on behalf of Plaintiffs and to categorically restrict brokers from providing lender options even when they were more affordable. Plaintiffs' brokers were prevented by UWM from providing unconflicted recommendations about lenders and pricing.

469.   As a direct and proximate result of UWM's actions, substantial participation, and aiding and abetting brokers' breach of fiduciary duty, Plaintiffs and the class were damaged.

470.   Because UWM's acts of aiding and abetting breach of fiduciary duty were malicious, willful, and wanton, Plaintiffs and the class are entitled to punitive damages.

## COUNT 5
### Civil Conspiracy

### (All Plaintiffs Against All Defendants)

471.   Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

472.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of civil conspiracy to breach a fiduciary duty, as there are no true conflicts (case-dispositive differences) among various states' laws. Specifically, Plaintiffs bring this civil conspiracy to breach of fiduciary duty claim on behalf of themselves and the Nationwide Class or, alternatively, State/Multi-State Subclasses as defined in Paragraphs 330 and Tables C and D.

473.   In the alternative, Plaintiffs each bring this claim under the respective laws of the states where they purchased mortgages from UWM on behalf of a subclass comprised of (a) all class members who purchased UWM mortgages in

those states, and (b) all class members who purchased UWM mortgages in states with substantially similar common law of civil conspiracy.

474. A fiduciary relationship existed between Plaintiffs and their mortgage brokers.

475. Plaintiffs' mortgage brokers established a special relationship with Plaintiffs whereby the brokers caused Plaintiffs to repose confidence and trust in them by, *inter alia*, participating in the steering scheme, holding themselves out as "independent" mortgage brokers, and causing Plaintiffs to believe, through their affirmative misrepresentations and omissions, that they would act without allegiance to any particular lender and undertake a responsibility to provide unconflicted, good faith advice to Plaintiffs and to find the most affordable and/or most suitable deals on Plaintiffs' behalf.

476. Mortgage brokers, including Plaintiffs' mortgage brokers, have knowledge and expertise superior to the average borrower such that borrowers are in an unequal bargaining position as to their broker and can exercise overmastering or dominant influence over borrowers

477. Plaintiffs' mortgage brokers exercised such overmastering or dominant influence over Plaintiffs when wrongfully recommending and executing the loans at issue.

478.  The Plaintiffs' mortgage brokers owed fiduciary duties to Plaintiffs and were only permitted to act in the best interests of Plaintiffs.

479.  Plaintiffs' mortgage brokers breached their fiduciary duties by not acting in Plaintiffs' best interests, demonstrating divided loyalties, failing to disclose material facts and conflicts of interest, colluding with UWM to withhold information about affordable loan options, accepting things of value from UWM to influence the affairs of the Plaintiffs and the class, entering agreements with UWM that created conflicts of interest and prevented brokers from providing honest services, and otherwise participating in the scheme alleged in this complaint.

480.  The brokers consented to and benefitted from being deceptively advertised by UWM as having characteristics they did not possess and/or as performing services they could not perform in good faith as advertised. These advertisements were designed to influence reasonable homebuyers based on false or misleading premises.

481.  UWM entered into one or more express or implied agreements with mortgage brokers with the purpose of breaching fiduciary duties owed to Plaintiffs and the class.

482.  UWM engaged in unlawful acts with mortgage brokers in furtherance of the conspiracy, including publishing false and deceptive advertising, colluding to deprive class members of honest services, entering agreements to prevent class

members from being informed about affordable loan options from UWM's competitors, providing things of value to influence brokers to steer business to UWM, causing brokers to make fraudulent omissions or misrepresentations, and otherwise engaging in the conduct alleged in this complaint.

483. UWM's conspiracy substantially assisted or encouraged the wrongdoing conducted by the mortgage brokers; further, UWM had knowledge of this wrongdoing, and UWM's actions taken in furtherance of the conspiracy were committed pursuant to a common scheme.

484. As a direct and proximate result of UWM's actions and participation in the conspiracy, Plaintiffs and the class were damaged in an amount to be proven at trial. Because UWM's acts were malicious, willful, and wanton, Plaintiffs and the class are entitled to punitive damages.

## COUNT 6
## Unjust Enrichment

### (All Plaintiffs Against All Defendants)

485. Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

486. In the event that no adequate legal remedy is available, Plaintiffs bring this unjust-enrichment claim on behalf of themselves and the Nationwide Class or, alternatively, a State/Multi-State Subclass as defined in Paragraph 331, *supra*.

487. Plaintiffs bring this claim on behalf of the Nationwide Class under the common law of unjust enrichment, as there are no material conflicts (case-dispositive differences) among the various states' laws of unjust enrichment.[164]

488. In the alternative, Plaintiffs, on behalf of the Nationwide Class, each bring this unjust-enrichment claim under the respective common law of the states where they purchased mortgages from UWM on behalf of a subclass comprised of (a) all class members who purchased UWM mortgages in those states, and (b) all class members who purchased UWM mortgages in states[165] with substantially similar common law of unjust enrichment divided into three groups for manageability as follows: (i) California, Colorado, Connecticut, Washington D.C.,

---

[164] *See Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D.Pa.2007) ("Although there are numerous permutations of the elements of the [unjust enrichment] cause of action in the various states, there are few real differences."); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998) (affirming nationwide certification of class for state common law claims including unjust enrichment); *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998) (granting certification of a nationwide class and holding that unjust enrichment is a "universally recognized cause[] of action that [is] materially the same throughout the United States."); *In re Abbott Laboratories Norvir Anti–Trust Litig.*, Nos. C 04–1511 CW, C 04–4203 CW, 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007) ("The idiosyncratic differences between state unjust enrichment laws are not sufficiently substantive to predominate over the shared claims." (cleaned up)).

[165] For purposes of this Amended Complaint, "states" includes Washington D.C. and Puerto Rico.

Hawaii, Illinois, Indiana, Iowa, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New York, Oklahoma, and Vermont; (ii) Arizona, Delaware, Louisiana, North Dakota, and Puerto Rico; and (iii) Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, North Carolina, New Mexico, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

489.    In the event that Plaintiffs fail to state a claim of unjust enrichment on behalf of a Nationwide Class, Plaintiffs alternatively bring this claim of unjust enrichment on behalf of the Statewide/Multi-State Subclasses as defined in Paragraph 331, *supra*.

490.    Plaintiffs and the class have conferred direct benefits on and enriched Defendants in the form of significant payments for closing costs, interest, and other fees in relation to the mortgage loans UWM sold to them as a result of Defendants' illicit steering scheme and enterprise.

491.    The benefits that Plaintiffs and the class conferred to Defendants were conferred neither officiously nor gratuitously.

492.    Plaintiffs and the class experienced an impoverishment, detriment, and loss by conferring more money to Defendants for a mortgage loan than Plaintiffs and

the class otherwise would have paid for a comparable wholesale mortgage loan but for Defendants' illicit steering scheme.

493. Defendants' benefit is directly related and connected to Plaintiffs' and the class's loss because Plaintiffs and the class would not have experienced their loss apart from conferring upon Defendants the significant payments for closing costs, interest, and other fees as a result of Defendants' illicit steering scheme.

494. Defendants appreciate and have knowledge of the conferred benefits vis-à-vis the hundreds of millions of dollars reaped through their scheme.

495. Defendants voluntarily and consciously accepted and retained the benefits conferred by Plaintiffs and the class.

496. Plaintiffs and the class reasonably expected their brokers to operate independent of UWM.

497. Because Defendants devoted substantial marketing efforts to convey the falsity that brokers who work with them are independent, Defendants appreciated and had knowledge of Plaintiffs' and the class's reasonable expectations that their brokers operated independently from UWM and were therefore providing the most competitive wholesale mortgage loan offers to Plaintiffs and the class.

498. Defendants acted with conscious disregard of the rights of Plaintiffs and the class.

499. If Plaintiffs' and the class's other claims herein should fail, Plaintiffs and the class have no adequate remedy at law and equitable relief is necessary.

500. No express contract, including Plaintiffs' and the class's mortgage loan agreements with UWM, covers the subject matter of Defendant's inequitable acceptance and retention of Plaintiffs' and the class's money as a result of Defendant's illicit steering scheme.

501. No express contract, including Plaintiffs' and the class's mortgage loan agreements with UWM, provides a remedy for Defendant's inequitable acceptance and retention of Plaintiffs' and the class's money as a result of Defendant's illicit steering scheme.

502. It is inequitable for Defendants to retain the conferred benefits from Plaintiffs and the class without restitution because Defendants engaged in unconscionable conduct; namely, Defendants induced the conferred benefits through deception and a steering scheme that would have been impossible but for Defendants' intentional infiltration and corruption of the fiduciary relationships between brokers and homebuyers who were making one of the most consequential financial decisions in their lives.

503. Defendants received money and value from their promotion and sale of mortgage loans that are traceable to the conduct alleged herein; these benefits have

been improperly retained and in good conscience should be returned to Plaintiffs and the class.

504.     In addition, Defendants parlayed hundreds of millions of dollars in gains from unscrupulously selling mortgages into dominant market share in the wholesale mortgage channel, with an economic value to be determined at trial, and for which disgorgement should be ordered.

505.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the class.     The Court should compel Defendants to disgorge all inequitable proceeds received by them in a common fund for the benefit of Plaintiffs and the class.     A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants.

### III.     Claims of the State/Multi-State Subclasses

**COUNT 7**
**Violation of the North Carolina Unfair and Deceptive Practices Act ("NCUDPA"),**
**N.C. Code §§ 75-1.1 *et seq.***

**(Plaintiff Kim Schelble Against All Defendants)**

506.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

507.     Plaintiff Kim Schelble brings this claim under laws of North Carolina on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) North Carolina, and (b) all states with substantially similar

consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiff brings this claim on behalf of a subclass of only those whose claims arise under North Carolina law.

508. NCUDPA provides civil liability for "unfair or deceptive acts or practices in or affecting commerce . . . ." § 75-1.1. Defendants are liable for committing an unfair or deceptive act or practice, in or affecting commerce, that proximately caused injury to Plaintiffs and the class.

509. Defendants' steering scheme constitutes an unfair or deceptive act or practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers. Defendants unfair or deceptive conduct, all of which was affecting commerce, offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

510. Decisions about financing a home are among the most consequential financial decisions most Americans make, and they involve the most significant financial asset most Americans own. Defendants knew that most people have little experience surveying loan options for the best overall pricing (including interest rates, closing costs, commissions, fees, etc.), since most people have relatively few opportunities to purchase homes in their lifetimes. Defendants scheme depended on exploiting this fact.

511. While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

512. Indeed, through Defendants' systematic funding, promotion, and supporting of its brokers' efforts to market themselves as "independent," borrowers believed and relied on the supposed independence of these brokers.

513. Defendants' representations, omissions, and scheming were unfair, deceptive, and designed to mislead reasonable consumers. As the intended and inevitable result of Defendants' conduct, Plaintiff and the class were subject to material omissions and non-disclosures from Defendants and their agents.

514. Defendants owed Plaintiff and the class a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) intentionally concealed the foregoing from Plaintiff and the class; and (c) made incomplete representations while purposefully withholding material facts that contradicted these representations.

515. Defendants' also provided things of value to brokers for the purpose of influencing them in their dealings with Plaintiff and the class, in violation of North

Carolina's commercial bribery statute, § 14-353, a violation of which is also a violation of G.S. 75-1.1 as an unfair and deceptive trade practice.[166]

516. But for the misrepresentations and unscrupulous conduct causing Plaintiff and the class to believe and rely on the so-called "independent" broker, Plaintiff and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. The injury to Plaintiff and the class is not outweighed by any off-setting consumer or competitive benefits, and the injury is one which consumers could not reasonably have avoided.

517. Plaintiff and the class suffered ascertainable loss caused by the Defendants' misrepresentations, false advertising, and failure to disclose material information. But for these violations of the NCUDPA, Plaintiff and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. Plaintiff and the class did not receive the benefit of their bargain as a result of the Defendants' misconduct.

518. As a direct and proximate result of its acts and omissions as set forth herein, Plaintiff and the class suffered actual damages in an amount to be determined

---

[166] *Kewaunee Scientific Corp*., 130 N.C. App. at 581, 503 S.E.2d at 420; *Media Network, Inc. v. Long Haymes Carr, Inc*., 678 S.E.2d 671, 684 (N.C. App. 2009) ("if a UDTP claimant can establish that [defendant] committed commercial bribery, that is sufficient to make the UDTP claim").

at trial. When a party is injured by a violation of the NCUDPA, treble damages must be awarded under N.C.G.S.A. § 75-16, in addition to attorneys' fees.

## COUNT 8
### Violation of the Tennessee Consumer Protection Act (TCPA), Tenn. Code Ann. §§ 47–18–101 *et seq.*

### (Plaintiffs Therisa and Billy Escue Against All Defendants)

519.   Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

520.   Plaintiffs Therisa D. Escue and Billy R. Escue, Jr. bring this claim under laws of Tennessee on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) Tennessee, and (b) all states with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiffs bring this claim on behalf of a subclass of only those whose claims arise under Tennessee.

521.   Plaintiffs and the class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. §§ 47-18-103(6), (18).

522.   Defendants are "natural persons" within the meaning of Tenn. Code Ann. § 47-18-103(18).

523.   Defendants' conduct complained of herein involved "[s]ervices and a "consumer transaction" within the meaning of Tenn. Code Ann. §§ 47-18-103(23), (24).

524. Defendants' conduct complained of herein affected "trade" or "commerce" within the meaning of Tenn. Code Ann. § 47-18-103(24).

525. The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "[r]epresenting that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have . . .;" "[r]epresenting that . . . services are of a particular standard, quality or grade . . . if they are of another;" "[a]dvertising goods or services with intent not to sell them as advertised;" "[c]ausing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction;" and "[u]sing statements . . . in any advertisement which create a false impression of . . . quality . . . value . . . [or] usability [of] services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services." Tenn. Code Ann. § 47-18-104.

526. Defendants' steering scheme constitutes an unfair and fraudulent act or practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers, in the purchase of products or services. Defendants conduct offends established

public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

527. Decisions about financing a home are among the most consequential financial decisions most Americans make, and they involve the most significant financial asset most Americans own. Defendants knew that most people have little experience surveying loan options for the best overall pricing (including interest rates, closing costs, commissions, fees, etc.), since most people have relatively few opportunities to purchase homes in their lifetimes. Defendants' scheme depended on exploiting this fact, and counted on Plaintiff and the class to be susceptible to misrepresentations and omissions that Defendants made or caused to be made.

528. While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

529. Indeed, through Defendants' systematic funding, promotion, and supporting of its brokers' efforts to market themselves as "independent," borrowers believed and relied on the supposed independence of these brokers.

530. Defendants violated the TCPA by engaging in unfair or deceptive acts, including representing that "independent" brokers had characteristics or benefits that they did not have; representing the brokers listed on UWM website have value or

functions that they did not have; misrepresenting the authority of brokers subject to UWM's "Lock-In" policy to shop for better rates; and advertising with intent that Plaintiff and the class did not receive what was advertised.

531. In the course of their business, Defendants failed to disclose and actively concealed the corrupt relationship between UWM and brokers, including UWM's funding, promotion, and support of the brokers' careers and marketing efforts to proclaim the brokers' supposed independence to borrowers.

532. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon concealment, suppression or omission, in connection with marketing and promoting "independent" brokers to Plaintiff and the class.

533. At all relevant times, Defendants have known their steering scheme, deceptive advertising, and misrepresentations or omissions caused homebuyers to pay more for the costs associated with home loans because their brokers were not providing "completely independent" services and were not shopping for loans to find the lowest prices, as Defendants falsely asserted.

534. Defendants' deceptive practices had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and the class, about the relationship

between UWM and brokers, and the brokers intent and ability to provide loyal and independent services to present the most affordable loan options.

535. Defendants knew or should have known their conduct violated the TCPA.

536. Defendants owed Plaintiff and the class a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) intentionally concealed the foregoing from Plaintiff and the class; and (c) made incomplete representations while purposefully withholding material facts that contradicted these representations.

537. Plaintiffs and the class suffered ascertainable loss caused by the Defendants' misrepresentations, false advertising, and failure to disclose material information. But for these violations of the TCPA, Plaintiffs and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. Plaintiffs and the class did not receive the benefit of their bargain as a result of the Defendants' misconduct.

538. Defendants' violations present a continuing risk to Plaintiffs and the class, and the general public. Defendants' unlawful acts and practices complained of here affect the public interest.

539.   As a direct and proximate result of Defendants' violations of the TCPA, Plaintiffs and the class have suffered injury-in-fact and/or actual damage. Pursuant to Tenn. Code Ann. § 74-18-109(a), they seek monetary relief against the Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of the Defendants' willful or knowing violations, and any other just and proper relief available under the TCPA, including injunctive relief.

### COUNT 9
### Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*

### (Plaintiffs Brian P. Weatherill, Jill Jeffries, and Daniel Singh Against All Defendants)

540.   Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

541.   Plaintiffs Weatherill, Jeffries, and Singh bring this claim under laws of Florida on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) Florida, and (b) all states with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiff brings this claim on behalf of a subclass of only those whose claims arise under Florida law.  Plaintiffs and the class are "[c]onsumers" within the meaning of Fla. Stat. § 501.203(7).

542. Defendants' conduct complained of herein affects "[t]rade" or "commerce" within the meaning of Fla. Stat. § 501.203(8).

543. Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204, et seq., by engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

544. Defendants' steering scheme constitutes both an unfair act or practice, and a deceptive act or practice, which offends established public policy and is substantially injurious to consumers. Defendants made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiffs and the class, exploiting UWM's power and position, and causing Plaintiffs and the class to be deceived by their brokers.

545. While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

546. Indeed, through Defendants' systematic funding, promotion, and supporting of its brokers' efforts to market themselves as "independent," borrowers believed and relied on the supposed independence of these brokers.

547.   As the intended and inevitable result of Defendants' conduct, Plaintiffs and the class were subjected to material omissions and non-disclosures from their agents, who received unauthorized things of value from UWM for the purpose of influencing them in their dealings with Plaintiffs and the class.

548.   Defendants failed to disclose, actively concealed, and affirmatively misled Plaintiffs and the class about the corrupt relationship between UWM and brokers. Defendants falsely represented and advertised the brokers listed on UWM website as having value or functions that they did not have, with intent that Plaintiffs and the class would pay for products or services they did not receive.

549.   Defendants' misrepresentations and material omissions were likely to deceive a reasonable person under the circumstances, and Defendants knew this. Defendants owed a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) concealed the foregoing from Plaintiffs and the class; and (c) made incomplete representations while purposefully withholding material facts that contradicted these representations.

550.   But for the misrepresentations and unscrupulous conduct causing Plaintiffs and the class to believe and rely on the so-called "independent" broker, Plaintiffs and the class would not have paid to hire a conflicted broker and would

not have paid as much for a home mortgage. The injury to Plaintiffs and the class is not outweighed by any off-setting consumer or competitive benefits, and the injury is one which consumers could not reasonably have avoided.

551.    Defendants' violations present a continuing risk to Plaintiffs and the class, and the general public. Defendants' unlawful acts and practices complained of here affect the public interest. Plaintiffs and the class seek monetary relief against the Defendants measured as actual damages in an amount to be determined at trial and any other just and proper relief under Florida law.

## COUNT 10
### Violation of the California Unfair Competition Law ("CUCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*

### (Plaintiff Kenneth C. Morandi Against All Defendants)

552.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

553.    Plaintiff brings this claim under the laws of California on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) California, and (b) all states with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiff brings this claim on behalf of a subclass of only those whose claims arise under California law.

554. Plaintiff and the class are "persons" within the meaning of Cal. Bus. & Prof. Code § 17201.

555. Defendants are "persons" within the meaning of Cal. Bus. & Prof. Code § 17201.

556. The CUCL provides civil liability for "any unlawful, unfair or fraudulent business practice." Cal. Bus. & Prof. Code § 17200. Defendants are liable for committing an unlawful, unfair, or fraudulent act or practice, in or affecting commerce, that proximately caused injury to Plaintiff and the class.

557. Defendants' steering scheme constitutes an unlawful, unfair, or fraudulent business practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers. Defendants' unfair or deceptive conduct, all of which was affecting commerce, offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

558. Decisions about financing a home are among the most consequential financial decisions most Americans make, and they involve the most significant financial asset most Americans own. Defendants knew that most people have little experience surveying loan options for the best overall pricing (including interest rates, closing costs, commissions, fees, etc.), since most people have relatively few

opportunities to purchase homes in their lifetimes. Defendants scheme depended on exploiting this fact.

559.   While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

560.   Indeed, through Defendants' systematic funding, promotion, and supporting of its brokers' efforts to market themselves as "independent," borrowers believed and relied on the supposed independence of these brokers.

561.   Defendants owed Plaintiff and the class a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) intentionally concealed the foregoing from Plaintiff and the class; and (c) made incomplete representations while purposefully withholding material facts that contradicted these representations.

562.   In the course of their business, Defendants failed to disclose and actively concealed the corrupt relationship between UWM and brokers, including UWM's funding, promotion, and support of the brokers' careers and marketing efforts to proclaim the brokers' supposed independence to borrowers.

563.    Defendants' scheme also disseminated or caused to be disseminated before the public untrue or misleading representations, which Defendants knew or should have known were misleading, in violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, a violation of which is also an unfair trade practice in violation of § 17200 as an unlawful or unfair business practice.

564.    But for the misrepresentations and unscrupulous conduct causing Plaintiff and the class to believe and rely on the so-called "independent" broker, Plaintiff and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. The injury to Plaintiff and the class is not outweighed by any off-setting consumer or competitive benefits, and the injury is one which consumers could not reasonably have avoided.

565.    Plaintiffs and the class suffered ascertainable loss caused by the Defendants' misrepresentations, false advertising, and failure to disclose material information. But for these violations of the UCL, Plaintiffs and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. Plaintiffs and the class did not receive the benefit of their bargain as a result of the Defendants' misconduct.

566.    As a direct and proximate result of Defendants' violations of the CUCL, Plaintiff and the class suffered injury-in-fact and are entitled to restitution.

**Violation of the California Legal Remedies Act (CLRA),**
**Cal. Civ. Code §§ 1750 *et seq.***

567.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

568.    Plaintiff brings this claim under the laws of California on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) California, and (b) all states with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiff brings this claim on behalf of a subclass of only those whose claims arise under California law.

569.    Plaintiff and the class are "[p]erson[s]" and "[c]onsumer[s]" within the meaning of Cal. Civ. Code §§ 1761(c), (d).

570.    Defendants are "[p]erson[s]" within the meaning of Cal. Civ. Code § 1761(c).

571.    Defendants' conduct complained of herein involved a "transaction" and "[g]oods" or "[s]ervices" within the meaning of Cal. Civ. Code §§ 1761(a), (b), (e).

572.    The CLRA provides civil liability for "unfair or deceptive acts or practices." Cal. Civ. Code § 1770(a). Defendants are liable for committing an unfair or deceptive act or practice, in or affecting commerce, that proximately caused injury to Plaintiff and the class.

573. The CLRA prohibits: "[m]isrepresenting the source, sponsorship, approval or certification of goods or services;" "[m]isrepresenting the affiliation, connection, or association with . . . another;" " [r]epresenting that goods or services have . . . characteristics . . . benefits . . . that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "[r]epresenting that goods or services are of a particular . . . quality . . . if they are of another;" " [a]dvertising goods or services with intent not to sell them as advertised;" and "[m]isrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer."

574. Defendants' steering scheme constitutes an unfair or deceptive act or practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers. Defendants' unfair or deceptive conduct, all of which was affecting commerce, offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

575. Decisions about financing a home are among the most consequential financial decisions most Americans make, and they involve the most significant financial asset most Americans own. Defendants knew that most people have little experience surveying loan options for the best overall pricing (including interest rates, closing costs, commissions, fees, etc.), since most people have relatively few

opportunities to purchase homes in their lifetimes. Defendants scheme depended on exploiting this fact.

576. While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

577. Indeed, through Defendants' systematic funding, promotion, and supporting of its brokers' efforts to market themselves as "independent," borrowers believed and relied on the supposed independence of these brokers.

578. Defendants violated the CLRA by engaging in unfair or deceptive acts, including representing that "independent" brokers had characteristics or benefits that they did not have; representing the brokers listed on UWM website have value or functions that they did not have; advertising with the intent that Plaintiff and the class would not receive what was advertised; misrepresenting the authority of brokers subject to UWM's "Lock-In" policy to shop for better rates; and making misrepresentations and omissions of material facts relating to brokers' independence that tend to deceive borrowers and the public.

579. Defendants' representations, omissions, and scheming were unfair, deceptive, and designed to mislead reasonable consumers. As the intended and

inevitable result of Defendants' conduct, Plaintiff and the class were subject to material omissions and non-disclosures from Defendants and their agents.

580. But for the misrepresentations and unscrupulous conduct causing Plaintiff and the class to believe and rely on the so-called "independent" broker, Plaintiff and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. The injury to Plaintiff and the class is not outweighed by any off-setting consumer or competitive benefits, and the injury is one which consumers could not reasonably have avoided.

581. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon concealment, suppression or omission, in connection with selling home mortgages to Plaintiff and the class.

582. Plaintiff and the class suffered ascertainable loss caused by the Defendants' misrepresentations, false advertising, and failure to disclose material information. But for these violations of the CLRA, Plaintiff and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. Plaintiff and the class did not receive the benefit of their bargain as a result of the Defendants' misconduct.

583.    As a direct and proximate result of its acts and omissions as set forth herein, Plaintiff and the class suffered injury-in-fact and/or actual damages in an amount to be determined at trial. When a party is injured by a violation of the CLRA, punitive damages may be awarded under Cal. Civ. Code § 1780, in addition to attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, both individually and on behalf of the Nationwide Class and State/Mutli-State Subclasses, demand a trial by jury on all claims so triable, and respectfully request that the Court (i) certify the proposed Nationwide and State Classes, (ii) designate the named Plaintiffs as representatives of the Nationwide Class and their respective State/Multi-State Subclasses, (iii) appoint the undersigned as Class Counsel, (iv) designate any appropriate issue classes under the applicable provisions of Federal Rule of Civil Procedure 23, and (v) enter judgment in Plaintiffs' favor against Defendants including the following relief:

A. Compensatory damages and costs for economic loss;

B. Restitution and disgorgement of all profits, direct or indirect, illegally obtained;

C. Equitable and injunctive relief, as permitted by law or equity;

D. Statutory damages, treble damages, and penalties;

E. Punitive and exemplary damages as permitted by law;

F. A determination that Defendants are jointly and severally liable for all monetary damages awarded;

G. A determination that Defendants are financially responsible for all Class notices and the administration of Class relief;

H. An award of Plaintiffs' attorneys' fees, costs, and expenses in this action to the maximum extent permitted by law;

I. An award of pre-judgment and post-judgment interest to the maximum extent permitted by law; and

J. Such other and further relief as the Court deems just and proper.

Dated: August 30, 2024
      Detroit, Michigan

By:  */s/ Brandon C. Hubbard*

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

John T. Zach
Marc Ayala
David L. Simons
Andrew P. Steinmetz
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300

Tyler Ulrich
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street, Suite 2800
Miami, Florida 33131
Tel.: (305) 357-8422

Mark C. Mao
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Tel.: (415) 293-6800

*Attorneys for Plaintiffs*