## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| STATE OF OHIO *ex rel.* DAVE YOST<br>Ohio Attorney General,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED WHOLESALE MORTGAGE,<br>LLC,<br><br>        Defendant. | Case No. 3:25-cv-00160-TMR-CHG<br><br>Hon. Thomas M. Rose,<br>United States District Judge<br><br>Hon. Caroline H. Gentry,<br>Magistrate Judge |

### DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b)(1) and 12(b)(6), Defendant United Wholesale Mortgage, LLC moves to dismiss Plaintiff's Complaint.  The reasons for this Motion are set forth in the attached Memorandum in Support.

Dated: July 7, 2025

Respectfully submitted,

*/s/ Jeffrey J. Jones*
Jeffrey J. Jones* (Bar No. 30059)
    *Trial Attorney*
Michael R. Gladman (Bar No. 59797)
Brandy Hutton Ranjan (Bar No. 86984)
JONES DAY
325 John H McConnell Blvd #600,
Columbus, OH 43215
(614) 469-3939
jjjones@jonesday.com
mrgladman@jonesday.com
branjan@jonesday.com

*Counsel for United Wholesale Mortgage, LLC*

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Stephen J. Cowen
Amanda K. Rice
Andrew J. Clopton
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Pro hac vice* applications forthcoming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

STATE OF OHIO *ex rel.* DAVE YOST
Ohio Attorney General,

        Plaintiff,

    v.

UNITED WHOLESALE MORTGAGE,
LLC,

        Defendant.

Case No. 3:25-cv-00160-TMR-CHG

Hon. Thomas M. Rose,
United States District Judge

Hon. Caroline H. Gentry,
Magistrate Judge

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.    UWM's Wholesale Mortgage Business ............................................... 3

    B.    UWM's Broker Relationships.............................................................. 4

    C.    The History of this Litigation............................................................... 6

ARGUMENT ......................................................................................................... 7

I.     THE ATTORNEY GENERAL LACKS AUTHORITY TO BRING THE MAJORITY OF THESE CLAIMS.............................................................. 8

The Attorney General lacks power to bring almost all of the claims here. To pursue claims on behalf of the public, the Attorney General must have power under the common law or a statute. *State ex rel. Cordray v. Marshall*, 915 N.E.2d 633, 638 (Ohio 2009); *State ex rel. Little v. Dayton & S. E. R. Co.*, 36 Ohio St. 434, 440 (1881). As explained in more detail below, the Attorney General lacks authority under common law or statute to pursue these claims in this way.

    A.    The Attorney General has no common law authority to bring any of these claims. ................................................................................... 8

The Attorney General's common-law power to institute suits is limited by established common-law principles at the time of the Ohio Constitution. *State ex rel. Cordray v. Marshall*, 915 N.E.2d 633, 638 (Ohio 2009); *Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.*, 382 N.E.2d 1155, 1158 (Ohio 1978). Those established powers do not extend to co-opting the claims of competent private citizens. Myers & Ross, *State Attorneys General, Powers and Responsibilities* at 42-43 (2 Ed. 2007); Miller & Miller, *The Constitutional Charter of Ohio's Attorney General*, 37 Ohio St. L.J. 801, 802 n.6 (1976). The doctrine of *parens patriae* does not change this, as that doctrine is a legislative prerogative under Ohio law, and the doctrine does not allow the Attorney General to pursue private interests like consumer damages. *State ex rel. Fortini v. Hoffman*, 12 Ohio App. 341, 344 (1920); *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982); *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019).

    B.    The Attorney General has no statutory authority to bring most of these claims in this way. ............................................................. 12

Without common-law authority, the Attorney General must be given express statutory authority to sue. *O'Neill ex rel. Weir v. Mut. Tool & Die, Inc.*, 138 N.E.2d 681, 682-83 (Ohio Com. Pl. 1956); *State ex rel. Brown v. Rockside Reclamation, Inc.*, 351 N.E.2d 448, 449 (Ohio 1976).

        1.    The Attorney General has no statutory authority under the Consumer Sales Practices Act to seek civil penalties or actual damages in this way (Counts 1, 2, and 3). .................... 13

Civil penalties are not available to the Attorney General here because the CSPA requires prior notice in the form of a rule or Ohio caselaw that has been put into the Public Inspection File. R.C. 1345.07(D). Neither form of notice is present here. The Ohio Supreme Court has found the only "rule" cited in the Complaint to be insufficient to provide notice, and the Complaint's supposed case support lacks the requisite substantial similarity to the industry and conduct at issue here. *Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 34 (Ohio 2006); *Volbers-Klarich v. Middletown Mgmt., Inc.*, 929 N.E.2d 434, 441 (Ohio 2010); *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 648-49 (N.D. Ohio 2012).

The CSPA requires that Attorney General suits seeking actual damages for Ohio citizens must be brought as a class action under Civil Rule 23. R.C. 1345.07(A)(3). The Complaint fails to adequately allege the requirements of a class action under that Rule.

**2.     The Attorney General has no statutory authority to seek damages under the Residential Mortgage Lending Act (Count 4).** ................................................................................... **20**

The RMLA does not grant the Attorney General power to pursue damages, so to the extent he seeks damages under this Count, those claims should be dismissed. *Compare* R.C. 1322.52(A)(1), *with id.* 1322.52(B)(1)-(2).

**3.     The Attorney General has no statutory authority to initiate a civil suit under the Ohio Corrupt Practices Act without an injury to the State (Count 5).** ................................. **20**

Only injured parties can bring civil suits under the OCPA, and the Attorney General may intervene in such suits under the statute. R.C. 2923.34(A), (C). But the Attorney General cannot institute an OCPA civil suit without plausibly alleging an injury to the State itself, which he has failed to do here. *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *9 (Ohio Ct. App. Mar. 21, 2013); *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 104 (2d Cir. 1990).

**4.     The Attorney General has no statutory authority to bring common-law tort claims on behalf of individual citizens (Counts 6 through 8).** ................................................................. **21**

The Attorney General has never been given the statutory power to bring common-law torts on behalf of competent citizens as he tries to do here. *Compare* R.C. 109.81.

**II.    IN ANY EVENT, THE STATE'S CLAIMS FAIL ON THE MERITS.** ................... **22**

**A.    The Consumer Sales Practices Act Claims Fail.** ............................................. **23**

**1.     The Complaint fails to plead the CSPA claims with particularity under Rule 9(b).** ................................................... **23**

The CSPA claim—along with the rest of the Complaint—sounds in fraud, and the Complaint fails to meet the heightened particularity standard under Rule 9(b) because, among other things, the Complaint does not identify any particular statement that any Ohio particular resident heard or relied upon. *Detrick v. KCS Int'l. Inc.*, 2025 WL 1133516, at

*18-20 & n.16 (N.D. Ohio Apr. 17, 2025); *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 & n.1 (6th Cir. 2024); *Kolominsky v. Root, Inc.*, 100 F.4th 675, 684 (6th Cir. 2024).

    **2.    The Complaint fails to allege actionable, deceptive conduct. ........................................................................................ 25**

Counts 1 to 3, all alleging violations of the CSPA, fail to state a claim. The alleged misstatements and improper conduct do not make out a CSPA violation, including because the statements were: **(1)** outside of the statute of limitations, R.C. 1345.07(E); **(2)** not false according to the Complaint's own terms, *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017); **(3)** not "actionable" under the CSPA as mere puffery or as omissions, *Davis v. Byers Volvo*, 2012 WL 691757, at *8 (Ohio Ct. App. Feb. 24, 2012); *McCoy v. Samsung Elecs. Am., Inc.*, 2023 WL 6140641, at *11 (D.N.J. Sept. 20, 2023); *Radford v. Daimler Chrysler Corp.*, 168 F. Supp. 2d 751, 754 (N.D. Ohio 2001); *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 296-97 (N.D. Ohio 2020); **(4)** made by third-party brokers and not attributable to UWM, *Charvat v. Farmers Ins. Columbus, Inc.*, 897 N.E.2d 167, 177-78 (Ohio Ct. App. 2008); *Pilgrim v. Universal Health Card, LLC*, 2010 WL 447249, at *3 (N.D. Ohio Feb. 3, 2010); or **(5)** did not proximately cause any harm to any particular consumer, *Reeves v. PharmaJet, Inc.,* 846 F. Supp. 2d 791, 798 (N.D. Ohio 2012); *Cleveland Bakers & Teamsters Health & Welfare Fund v. Publicis Health, LLC*, 768 F. Supp. 3d 898, 908-10 (N.D. Ohio 2025).

**B.    The Residential Mortgage Lending Act Claim Fails. ...................................... 30**

The RMLA claim does not satisfy the applicable heightened pleading standard under Rule 9(b). *See* Part. II.A.1. Moreover, R.C. 1332.45(B)'s "Additional Responsibilities" provision does not apply to "wholesale lenders" like UWM, who works with unaffiliated brokers. Ohio Admin. Code 1301:8-3-03, -2-01. And, claims under R.C. 1322.40(B), (C), & (I) must be dismissed because the Complaint fails to allege actionable misrepresentations, and because the Complaint relies on the same allegations that support the CSPA claims and thus fail for the same reasons. *Hanover v. Real Time Resols., Inc.*, 2024 WL 4626196, at *5 (S.D. Ohio Oct. 30, 2024).

**C.    The Corrupt Practices Act Claim Fails. ......................................................... 31**

The Corrupt Practices Act claim does not satisfy the heightened pleading standard under Rule 9(b). *Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 853 (N.D. Ohio 2010); *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125-26 (2d Cir. 2018). Count 5 also fails to state a claim. The Complaint fails to allege an "enterprise" under R.C. 2923.31(C) because the association alleged here is a non-actionable rimless hub-and-spoke conspiracy. *D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018); *In re Countrywide Fin. Corp. Mortg.-Backed Securities Litig.*, 2012 WL 10731957, at *11 (C.D. Cal. June 29, 2012). The Complaint also fails to adequately allege proximate cause. *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010); *GM LLC v. FCA US LLC*, 2020 WL 3833058, at *10 (E.D. Mich. July 8, 2020); *Herakovic v. Cath. Diocese of Cleveland*, 2005 WL 3007145, at *5 (Ohio Ct. App. 2005). Finally, the Complaint fails to allege any valid predicate acts. The Travel Act predicates fail because there is no commercial bribery statute in Ohio. *See* R.C. 2923.31(I)(3). The mail and wire fraud violations fail for lack of materiality, *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025); the lack of actionable

omissions absent a duty to disclose, *United States v. Skeddle*, 940 F.Supp. 1146, 1149 (N.D. Ohio 1996); and lack of intent to defraud, *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 703-04 (E.D. Mich. 2020). And the honest services fraud predicates fail for lack of any federal duty for mortgage brokers. *Skilling v. United States*, 561 U.S. 358, 408 & n.41 (2010); *United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997).

**D.      The Civil Conspiracy Claim Fails. .....................................................................** **39**

The civil conspiracy claim does not satisfy the applicable heightened pleading standard under Rule 9(b). *See* Part II.A.1. It is also a mislabeled claim for inducing a breach of fiduciary duty, and such a claim is not cognizable under Ohio law. *Cohen v. Dulay*, 94 N.E.3d 1167, 1176 (Ohio Ct. App. 2017); *Noblee Bottling, LLC v. Gora LLC*, 2023 WL 4750124, at *2-3 (W.D.N.C. July 25, 2023). Nor does the Attorney General plausibly allege a malicious combination or any underlying unlawful act. *Parlin Fund LLC v. Citibank N.A.*, 2013 WL 3934997, at *10 (S.D. Ohio July 30, 2013); *Childress v. City of Cincinnati*, 765 F. Supp. 3d 662, 696 (S.D. Ohio 2025); *FV 1 Inc. v. Goodspeed*, 974 N.E.2d 664, 672 (Ohio Ct. App. 2012); 12 C.F.R. § 1026.36(e).

**E.      The Unjust Enrichment Claim Fails. .................................................................** **42**

The unjust enrichment claim does not satisfy the applicable heightened pleading standard under Rule 9(b). *See* Part II.A.1. It also fails on the merits. The Attorney General does not plausibly allege UWM had actual knowledge of any benefit. *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 299 (N.D. Ohio 2020). The underlying consumers' express mortgage contracts cover the same subject matter, barring such claims. *Aurora Hill, Ltd. v. Bremner*, 226 N.E.3d 555, 564 (Ohio Ct. App. 2023). And the claim is duplicative of the other causes of action. *Banks v. Nationwide Mut. Fire Ins. Co.*, 2000 WL 1742064, at *5 (Ohio Ct. App. Nov. 28, 2000).

**F.      The Common-Law Fraud Claim Fails. ..............................................................** **44**

The common-law fraud claim does not satisfy the heightened pleading standard under Rule 9(b). *See* Part II.A.1. Further, it does not plausibly allege any actionable misstatement or omission, intent to mislead, or justifiable reliance. *See Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000).

**CONCLUSION    ...........................................................................................................** **45**

# TABLE OF AUTHORITIES

**Page**

CASES

*A.S. v. J.W.*,
   131 N.E.3d 44 (Ohio 2019)..................................................................................12, 18

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*,
   219 F.3d 519 (6th Cir. 2000) .............................................................................40

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982)...................................................................................10, 11, 22

*Aurora Hill, Ltd. v. Bremner*,
   226 N.E.3d 555 (Ohio Ct. App. 2023) ................................................................43

*Bailey v. City of Ann Arbor*,
   860 F.3d 382 (6th Cir. 2017) .............................................................................26

*Banks v. Nationwide Mut. Fire Ins. Co.*,
   2000 WL 1742064 (Ohio Ct. App. Nov. 28, 2000) ............................................43

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................41

*Bennett v. MIS Corp.*,
   607 F.3d 1076 (6th Cir. 2010) ...........................................................................24

*Blackstone v. Moore*,
   122 N.E.3d 132 (Ohio 2018)..............................................................................12

*Blon v. Bank One, Akron, N.A.*,
   519 N.E.2d 363 (Ohio 1988)..............................................................................44

*Boyle v. United States*,
   556 U.S. 938 (2009)......................................................................................32, 33

*Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.*,
   382 N.E.2d 1155 (Ohio 1978)..............................................................................9

*Brown v. Hughes*,
   No. 82-159 (Ohio Ct. Common Pleas, Montgomery Cnty. Jan. 20, 1982).............18

*Busch Truck Leasing, Inc. v. Cummins, Inc.*,
  2020 WL 3871322 (S.D. Ohio July 9, 2020) .................................................................42, 43

*CACH, LLC v. Young*,
  2021 WL 6276314 (Ohio Ct. App. Dec. 17, 2021) ................................................................15

*Celebrezze v. Hughes*,
  479 N.E.2d 886 (Ohio 1985) ............................................................................................18, 19

*Chapman v. Tristar Prods., Inc.*,
  940 F.3d 299 (6th Cir. 2019) ...................................................................................10, 11, 22

*Charvat v. Farmers Ins. Columbus, Inc.*,
  897 N.E.2d 167 (Ohio Ct. App. 2008) ..............................................................................28, 29

*Chiarella v. United States*,
  445 U.S. 222 (1980) ................................................................................................................38

*Childress v. City of Cincinnati*,
  765 F. Supp. 3d 662 (S.D. Ohio 2025) .............................................................................34, 41

*Cleveland Bakers & Teamsters Health & Welfare Fund v. Publicis Health, LLC*,
  768 F. Supp. 3d 898 (N.D. Ohio 2025) .............................................................................29, 35

*Cleveland v. JP Morgan Chase Bank, N.A.*,
  2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ...............................................................21

*Cohen v. Dulay*,
  94 N.E.3d 1167 (Ohio Ct. App. 2017) ..............................................................................39, 40

*Collier v. LoGiudice*,
  818 Fed. Appx. 506 (6th Cir. 2020) .......................................................................................35

*D'Addario v. D'Addario*,
  901 F.3d 80 (2d Cir. 2018) .....................................................................................................33

*Dalrymple v. Westerville*,
  201 N.E.3d 382 (Ohio Ct. App. 2022) ...................................................................................45

*Davis v. Byers Volvo*,
  2012 WL 691757 (Ohio Ct. App. Feb. 24, 2012) .............................................................26, 27

*De Los Angeles Aurora Gomez v. Bank of America*,
  2013 WL 12165673 (C.D. Cal. Aug. 21, 2013) .....................................................................35

*Detrick v. KCS Intl. Inc.*,
   2025 WL 1133516 (N.D. Ohio Apr. 17, 2025)................................................................23, 24

*Die-Mension Corp. v. Dun & Bradstreet Credibility Corp.*,
   2015 WL 5307472 (W.D. Wash. Sept. 10, 2015)................................................................27

*Felix v. Ganey Chevrolet*,
   2013 WL 4238945 (Rocco, J., dissenting)................................................................19

*Felix v. Ganley Chevrolet, Inc.*,
   49 N.E.3d 1224 (Ohio 2015)................................................................14, 19

*FV 1 Inc. v. Goodspeed*,
   974 N.E.2d 664 (Ohio Ct. App. 2012)................................................................41, 42

*Gascho v. Glob. Fitness Holdings, LLC*,
   863 F. Supp. 2d 677 (S.D. Ohio 2012) ................................................................16

*GE v. U.A.W.-C.I.O.*,
   108 N.E.2d 211 (Ohio Ct. App. 1952)................................................................20

*Girgis v. Countrywide Home Loans, Inc.*,
   733 F. Supp. 2d 835 (N.D. Ohio 2010)................................................................32

*Glassner v. R.J. Reynolds Tobacco Co.*,
   223 F.3d 343 (6th Cir. 2000) ................................................................44, 45

*GM LLC v. FCA US LLC*,
   2020 WL 3833058 (E.D. Mich. July 8, 2020) ................................................................36

*Greer v. Strange Honey Farm, LLC*,
   114 F.4th 605 (6th Cir. 2024) ................................................................23

*Grgat v. Giant Eagle*,
   135 N.E.3d 846 (Ohio Ct. App. 2019)................................................................28

*Hanover v. Real Time Resols., Inc.*,
   2024 WL 4626196 (S.D. Ohio Oct. 30, 2024)................................................................31

*Harris v. Synovus Bank*,
   646 F. Supp. 3d 935 (N.D. Ohio 2022)................................................................38

*Heidtman v. City of Shaker Heights*,
   119 N.E.2d 644 (Ohio Ct. App. 1954)................................................................13

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010) ............................................................................34, 35

*Herakovic v. Cath. Diocese of Cleveland*,
    2005 WL 3007145 (Ohio Ct. App. 2005) ......................................34, 35

*HMV Properties, LLC v. IDC Ohio Mgt., LLC*,
    2011 WL 53166 (S.D. Ohio Jan. 6, 2011) ...........................................33

*In re Countrywide Fin. Corp. Mortg.-Backed Securities Litig.*,
    2012 WL 10731957 (C.D. Cal. June 29, 2012) ...................................33

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) ...............................................................27

*In re TransDigm Grp., Inc. Sec. Litig.*,
    440 F. Supp. 3d 7406 (N.D. Ohio 2020) ..............................................27

*Janus Capital Grp. v. First Derivative Traders*,
    564 U.S. 135 (2011) .............................................................................31

*Kolominsky v. Root, Inc.*,
    100 F.4th 675 (6th Cir. 2024) ...............................................23, 24, 30

*Kousisis v. United States*,
    145 S. Ct. 1382 (2025) .........................................................................37

*Lardakis v. Martin*,
    No. CV 94-01-0234 (Ct. Com. Pl., Summit Cnty. 1994) ......................15

*Long v. State Farm Ins.*,
    2014 WL 12654134 (S.D. Ohio June 3, 2014) ....................................43

*Lucas v. Telemarketer*,
    2019 WL 3021233 (6th Cir. May 29, 2019) ........................................29

*Luft v. Perry Cnty. Lumber & Supply Co.*,
    2003 WL 21027291 (Ohio Ct. App. May 8, 2003) ..............................25

*MacDonald v. Thomas M. Cooley L. Sch.*,
    724 F.3d 654 (6th Cir. 2023) ...............................................................45

*Marrone v. Philip Morris USA, Inc.*,
    850 N.E.2d 31 (Ohio 2006) .............................................13, 14, 15, 16

*McCoy v. Samsung Elecs. Am., Inc.*,
   2023 WL 6140641 (D.N.J. Sept. 20, 2023) ...................................................16, 27

*Mormon Church v. United States*,
   136 U.S. 1 (1890).......................................................................................10

*Moss v. BMO Harris Bank, N.A.*,
   258 F. Supp. 3d 289 (E.D.N.Y. 2017) ...........................................................33

*Neder v. United States*,
   527 U.S. 1 (1999)........................................................................................38

*Noblee Bottling, LLC v. Gora LLC*,
   2023 WL 4750124 (W.D.N.C. July 25, 2023)...................................................40

*Noe v. Housel*,
   153 N.E.3d 941 (Ohio Ct. App. 2020)...........................................................12

*O'Neill ex rel. Weir v. Mut. Tool & Die, Inc.*,
   138 N.E.2d 681 (Ohio Com. Pl. 1956) ..........................................................12

*Okavage Group, LLC v. UWM*,
   2024 WL 982380 (M.D. Fla. Feb. 6, 2024) ...........................................4, 5, 33, 34

*Parlin Fund LLC v. Citibank N.A.*,
   2013 WL 3934997 (S.D. Ohio July 30, 2013)...................................................40

*Pattie v. Coach, Inc.*,
   29 F. Supp. 3d 1051 (N.D. Ohio 2014)......................................................42, 43

*Pilgrim v. Universal Health Card, LLC*,
   2010 WL 447249 (N.D. Ohio Feb. 3, 2010) ....................................................29

*Radford v. Daimler Chrysler Corp.*,
   168 F. Supp. 2d 751 (N.D. Ohio 2001)..........................................................28

*Raymo v. FCA US LLC*,
   475 F. Supp. 3d 680 (E.D. Mich. 2020)..........................................................38

*Reeves v. PharmaJet, Inc.*,
   846 F. Supp. 2d 791 (N.D. Ohio 2012)..........................................................29

*Republic Bank & Tr. Co. v. Bear Stearns & Co.*,
   683 F.3d 239 (6th Cir. 2012) .......................................................................24

*Robins v. Glob. Fitness Holdings, LLC*,
  838 F. Supp. 2d 631 (N.D. Ohio 2012)........................................................................15

*Rorig v. Thiemann*,
  2007 WL 2071909 (S.D. Ohio July 17, 2007)..............................................................44

*Rupp v. Premier Health Partners*,
  2025 WL 880618 (Ohio Ct. App. 2025)........................................................................28

*Scheetz v. Consumer Rsch. Corp.*,
  2008 WL 11350242 (S.D. Ohio June 23, 2008)............................................................23

*Scott v. First Choice Auto Clinic, Inc.*,
  226 N.E.3d 1132 (Ohio Ct. App. 2023)........................................................................29

*Skilling v. United States*,
  561 U.S. 358 (2010).......................................................................................................39

*State ex rel. Attorney General v. Rojas*,
  No. CV-12-780588 (Ct. Com. Pl., Cuyahoga Cnty. 2008).........................................15

*State ex rel. Brown v. Rockside Reclamation, Inc.*,
  351 N.E.2d 448 (Ohio 1976).........................................................................................12

*State ex rel. Celebrezze v. Calautti*,
  1989 WL 101640 (Ohio Ct. App. Sept. 1, 1989)........................................................18

*State ex rel. Cordray v. Marshall*,
  915 N.E.2d 633 (Ohio 2009)..................................................................................8, 9, 22

*State ex rel. Fortini v. Hoffman*,
  12 Ohio App. 341 (1920)...............................................................................................11

*State ex rel. Little v. Dayton & S. E. R. Co.*,
  36 Ohio St. 434 (1881).....................................................................................................8

*State ex rel. Rogers v. Lavensky*,
  No. CV-07-632077 (Ct. Com. Pl., Cuyahoga Cnty. 2008).........................................15

*State v. Baker*,
  2013 WL 2635584 (Ohio Ct. App. 2013).....................................................................34

*State v. Beatty*,
  253 N.E.3d 73 (Ohio 2024)...........................................................................................17

*State v. Beverly*,
    37 N.E.3d 116 (Ohio 2015)...................................................................................33

*State v. Bodyk*e,
    933 N.E.2d 753 (Ohio 2010)....................................................................................8

*Stein v. HHGREGG, Inc.*,
    873 F.3d 523 (6th Cir. 2017) ...................................................................................4

*Szep v. Gen. Motors LLC*,
    491 F. Supp. 3d 280 (N.D. Ohio 2020)...........................................................28, 42

*Thermodyn Corp. v. 3M Co.*,
    593 F. Supp. 2d 972 (N.D. Ohio 2008).................................................................32

*Town of W. Hartford v. Operation Rescue*,
    915 F.2d 92 (2d Cir. 1990)....................................................................................21

*Tribble v. Kellogg Co.*,
    2012 WL 13435015 (N.D. Ohio June 19, 2012)...................................................16

*Trohoske v. Chi. Title Ins. Co.*,
    2011 WL 6012412 (N.D. Ohio Nov. 30, 2011) ....................................................44

*United States v. Frost*,
    125 F.3d 346 (6th Cir. 1997) ...........................................................................38, 39

*United States v. Jamieson*,
    427 F.3d 394 (6th Cir. 2005) .................................................................................37

*United States v. Skeddle*,
    940 F.Supp. 1146 (N.D. Ohio 1996)......................................................................37

*United States v. Wal-Mart Stores East, LP*,
    858 Fed. Appx. 879 (6th Cir. 2021).......................................................................37

*Universal Coach, Inc. v. New York City Transit Auth., Inc.*,
    629 N.E.2d 28 (Ohio Ct. App. 1993).....................................................................32

*Universal Health Services, Inc. v. United States*,
    579 U.S. 176 (2016)...............................................................................................37

*VanDenBroeck v. CommonPoint Mortg. Co.*,
    210 F.3d 696 (6th Cir. 2000) ...........................................................................33, 34

*Volbers-Klarich v. Middletown Mgmt., Inc.*,
    929 N.E.2d 434 (Ohio 2010)..............................................................14

*Williams v. Affinion Grp., LLC*,
    889 F.3d 116 (2d Cir. 2018)..............................................................32

*Wolfer Enters., Inc. v. Overbrook Dev. Corp.*,
    724 N.E.2d 1251 (Ohio Ct. App. 1999)............................................43

*Woodward Const., Inc. v. For 1031 Summit Woods, LLC*,
    30 N.E.3d 237 (Ohio Ct. App. 2015)................................................41

*Wysong Corp. v. APN, Inc.*,
    889 F.3d 267 (6th Cir. 2018) ............................................................27

**STATUTES**

15 U.S.C.
    § 1602..............................................................................................37
    § 1639..............................................................................................37

18 U.S.C.
    § 1341..............................................................................................36
    § 1343..............................................................................................36
    § 1346........................................................................................36, 38
    § 1952..............................................................................................36

Ohio R.C.
    109.81...............................................................................11, 12, 21
    1322.40...........................................................................................31
    1322.45.....................................................................................30, 31
    1322.52...........................................................................................20
    1345.07..................................................................................... passim
    1345.09...........................................................................................13
    1345.10.....................................................................................18, 19
    2111.50...........................................................................................11
    2743.711.........................................................................................13
    2921.02...........................................................................................36
    2923.24...........................................................................................20
    2923.31.....................................................................................32, 36
    2923.34.....................................................................................20, 32
    4549.49...........................................................................................18

5311.27 ..................................................................................................................... 13

**RULES**

Fed. R. Civ. P. 9 ........................................................................................................ passim

Fed. R. Civ. P. 23 ............................................................................................................ 17

Ohio R. Civ. P. 23 ........................................................................................................... 17

**REGULATIONS**

12 C.F.R.
    § 1026.23 ................................................................................................................. 37
    § 1026.36 ....................................................................................................... 38, 41, 42

Ohio Admin. Code
    109:4-3-10 ............................................................................................................ 14, 15
    1301:8-2-01 .................................................................................................................. 31
    1301:8-3-03 .................................................................................................................. 31

**OTHER AUTHORITIES**

Hunterbrook, *About Us*, at https://hntrbrk.com/about-us/ ............................................ 6

Kate Duguid, et al., *Inside Hunterbrook's plans for a 'news hedge fund,'*
    Financial Times (Nov. 5, 2023) ................................................................................ 6

Miller & Miller, *The Constitutional Charter of Ohio's Attorney General*, 37 OHIO
    ST. L.J. 801, 802 n.6 (1976) ............................................................................... 9, 13

Myers & Ross, *State Attorneys General, Powers and Responsibilities* (2 Ed. 2007) ............... 9, 10

Ohio Attorney General, *Required Mortgage Disclosures*, at , at
    https://www.ohioattorneygeneral.gov/Business/Services-for-
    Business/Required-Mortgage-Loan-Disclosures ................................................... 41

## INTRODUCTION

This lawsuit is unlike any other ever filed in Ohio's two-century history.  Through this suit, the Attorney General seeks to transform his Office into a free-ranging private class-action firm, but without any of the procedural safeguards—commandeering the private damages claims of thousands of competent Ohio borrowers without their knowledge or consent and far exceeding his statutory authorization.  In so doing, he seeks to exert common-law powers he does not have, and reads causes of action into statutes that provide him none.  Based on UWM's inquiries to date, it appears that no Ohio court has ever endorsed such sweeping assertions of executive power, and federal courts have already rejected other conspiracy theories aimed at the same wholesale lending practices challenged here.

To make matters worse, the Attorney General is aided in this suit by private, New York-based "special counsel"—the very same counsel that filed a putative class action in the Eastern District of Michigan based on substantively identical allegations.  *See Escue, et al., v. United Wholesale Mortgage, et al.*, No. 2:24-cv-10853 (E.D. Mich.).  "Special counsel" are subject to ongoing motions practice in the Eastern District under which Defendants have argued the suit was filed for an improper purpose in coordination with a New York hedge fund that shorted UWM's stock and sought financial gain from the lawsuit's publicity.  *See generally id.*, Dkt. No. 51, at 4-6 (detailing the scheme).  That the same law firm now represents the Ohio Attorney General raises even more questions—and underscores the impropriety of this lawsuit.

This case should be dismissed on multiple grounds.  Part I of this brief explains that the Attorney General lacks common-law or statutory authority to maintain the vast majority of his claims or to pursue the vast majority of the remedies he seeks here.  Ohio common law has never empowered attorneys general to step into the shoes of competent citizens and sue for their private damages in the manner claimed here.  Nor does the concept of "*parens patriae*" help the Attorney

General. As both the Supreme Court and Ohio courts have made clear, *parens patriae* authority belongs to the legislative branch—and the Ohio General Assembly has not delegated its *parens patriae* authority to the Attorney General for these sorts of claims. The Attorney General also lacks any statutory source of authority to support the damages claims sought in this suit. The Consumer Sales Practices Act (CSPA) does not authorize the Attorney General to seek actual damages unless he files a proper class action, nor does it allow civil penalties without prior notice that the relevant practices were prohibited. The Residential Mortgage Lending Act (RMLA) does not authorize him to seek damages. The Ohio Corrupt Practices Act (OCPA) allows him to *intervene* in an existing private civil action that meets Ohio's requirements but does not authorize him to *initiate* a civil action in the first instance without plausibly alleging an injury to the State. And no statute authorizes the Attorney General to assert common-law fraud, conspiracy, or unjust-enrichment claims on behalf of private parties. Of the entire Complaint, the only claims the Attorney General has asserted under proper authority are the requests for declaratory and injunctive relief under the CSPA and RMLA (and those claims fail on other grounds).

Part II establishes that, even setting aside the problem of authority, every claim fails on the merits. To start, every claim in the Complaint fails Rule 9(b)'s particularity requirement. Further, the three CSPA counts identify no actionable misrepresentation or omission: All of the alleged misstatements (1) fall outside of the statute of limitations, (2) were not false according to the Complaint itself, (3) are not "actionable" under the CSPA, (4) were made by third-party brokers, and/or (5) did not proximately cause any harm to any particular consumer. The RMLA count fails, among other reasons, because the "additional responsibilities" on which the State relies do not apply to wholesale lenders that transact exclusively through unaffiliated brokers. The OCPA count fails because rimless hub-and-spoke "enterprises" of the type alleged here are not actionable, the

allegations do not support proximate causation, and the Complaint pleads no valid predicate acts. Finally, the common-law conspiracy, unjust-enrichment, and fraud counts are barred by Ohio precedent and inadequately pled in any event.

Because the Attorney General lacks authority to bring this unprecedented action, and because each claim is legally deficient, the Court should dismiss the Complaint in full.

## BACKGROUND

### A.    UWM's Wholesale Mortgage Business

Homebuyers can get a mortgage in two ways.  Compl. ¶ 24.  They can pursue a "retail" loan, which requires them to approach banks and other retail lenders directly and fend for themselves during the mortgage process.  *See id.* ¶ 25.  Or they can seek out a "wholesale" loan, which means they work with an independent broker who helps guide them through the mortgage process and ultimately connects them with a wholesale lender.  *See id.* ¶¶ 26-27.  Wholesale mortgages often offer many advantages over retail mortgages—including lower costs, a quicker and simpler borrowing experience, and competitive rates.  Nevertheless, the retail market is much larger.  As of 2023, of the more than $40 billion in mortgages extended to Ohio borrowers, just $4 billion originated from the wholesale channel.  *See id.* ¶¶ 25-26.

UWM operates exclusively in the wholesale space.  Because brokers are UWM's connection to borrowers, supporting brokers in providing services is a keystone of UWM's business.  UWM does that by providing brokers and their customers not only with competitive rates and low fees, but also with many other things that are important to them, like quicker turnaround times, easier approval processes, fewer loan contingencies, and more streamlined appraisals.  Using state-of-the-art, in-house technologies, UWM loans close in just 17 business days on average, compared to the industry average of 41 business days.  UWM Holdings Corp.,

Annual      Report      (Form      10-K)      at      5      (Feb.      28,      2024),      at
https://www.sec.gov/edgar/browse/?CIK=1783398&owner=exclude.

UWM's commitment to brokers and borrowers has paid off.  Since 2012, it has grown from
the eighth largest wholesale lender to the largest, both in Ohio and nationwide.  Compl. ¶¶ 58-60.
UWM has achieved that growth because brokers and borrowers value UWM's services and so
return to UWM again and again.  While the State and its "special counsel" try to cast repeat
business as something nefarious, it is an essential part of growing any business and reflects the
value UWM provides to both brokers and consumers.

### B.  UWM's Broker Relationships

When a mortgage broker wants to offer loans from a wholesale lender, the parties enter
into a contract to govern their relationship.  The Complaint targets a few features of UWM's
Wholesale Broker Agreement.  *See* Ex. 1 (Copy of Wholesale Broker Agreement).[1]

***The All-In Initiative.***  In March 2021, UWM amended its Wholesale Broker Agreement to
provide that brokers who wished to continue working with UWM would refrain from originating
loans with Rocket Mortgage or Fairway Independent Mortgage (the so-called "All-In Initiative").
*Okavage Group, LLC v. UWM*, 2024 WL 982380 at *2 (M.D. Fla. Feb. 6, 2024), *R&R adopted*,
No. 3:21-cv-448, Dkt. 125 (Sept. 20, 2024), *aff'd*, 2025 WL 1513150 (11th Cir. May 28, 2025).
UWM singled out those lenders for a reason:  UWM determined that Rocket and Fairway operated
in *both* the retail and wholesale channels (Fairway has since exited the latter), and employed
practices designed to convert wholesale borrowers into their own retail customers—cutting brokers
out of future loans and refinancings.  *See id.*  Not only did those practices hurt brokers and

---

[1] UWM's Wholesale Broker Agreement is "referred to in the complaint and central to the
claims contained therein," so the Court may consider it.  *Stein v. HHGREGG, Inc.*, 873 F.3d 523,
528 (6th Cir. 2017); *see, e.g.*, Compl. ¶¶ 68, 72.

4

wholesale lenders, they also hurt borrowers by depriving them of the many services brokers and wholesale lenders provide. UWM adopted the "All-In Initiative" to protect the integrity of the wholesale channel and the brokers and borrowers it serves. *See id.*

*Three* federal courts have already considered challenges to and upheld the "All-In Initiative." *See UWM v. Am.'s Moneyline*, 2024 WL 1349301 (E.D. Mich. Mar. 29, 2024), *reconsideration denied*, 2025 WL 502743 (E.D. Mich. Feb. 14, 2025); *Okavage*, 2024 WL 982380 (M.D. Fla. Feb. 6, 2024), *aff'd*, 2025 WL 1513150 (11th Cir. May 28, 2025). As these courts rightly observed, the "All-In Initiative" does not meaningfully constrain consumers, including because UWM represents a small fraction of the mortgage lending market. *Am.'s Moneyline* 2024 WL 1349301, at *4 (citing *Okavage*, 2024 WL 982380, at *18). The Initiative also implicates just two of the more than seventy lenders in the wholesale mortgage channel. And if a broker does wish to work with those two lenders, that broker is free to exit their UWM contract at any time with seven days' notice and no penalties of any kind. Ex. 1, § 7.06.

**The Lock-In Provision.** The State also complains about what it calls UWM's "Lock In Policy." That provision, variations of which are common in the industry, offers temporary "price protection" to brokers who wish to avoid potential rate increases during the pre-closing period by locking in UWM's rate. Ex. 1, § 2.03; Compl. ¶ 81. In exchange for a rate-lock, which shifts the risk of a rate increase to UWM, brokers agree not to offer the same loan to another lender "during the lock-in period." *Id.* A rate-lock is purely "at Broker's option." *Id.* It does not prevent brokers from shopping loans to other lenders before or after the lock-in period. *Id.* And it never binds the borrower, who is free to choose another lender at any time before closing.

**UWM's Broker Programs.** Lastly, the State complains about UWM's broker-facing programs, which it says unduly influence brokers. That could not be further from the truth.

Through these programs, UWM helps brokers obtain customer leads and offers faster turn times to brokers who meet certain criteria. Compl. ¶ 113. Even a glance at those criteria shows why these programs offer no support for the "steering scheme" the State attempts to allege. *See id.* Fig. 13 (providing "points" to brokers for innocuous activities like "watching UWM videos," "communicating with your account executive," and ordering "Memory Maker[s]" like cutting boards and welcome mats as thank-you gifts for clients).

### C. The History of this Litigation

This lawsuit originated not with an Ohio Attorney General investigation. Not with state regulatory authorities. Not with the CFPB. And not, to UWM's knowledge, with any customer complaints. Rather, this lawsuit originated with a New York hedge fund's moneymaking scheme. On April 2, 2024, a "media" outfit under the name of Hunterbrook Media broke its debut story, "*The Lie That Helped Make UWM America's Largest Mortgage Lender*," which parrots many of the State's allegations and relies on many of the same sources, quotes, and figures as the Complaint. *See Escue*, No. 2:24-cv-10853-BRM-DRG (E.D. Mich.), Dkt. 30-3 at 3 ("Hunterbrook Report"). Hunterbrook Media is not an independent news source by any stretch; it is an affiliate of Hunterbrook Capital LP—a fund whose business model "combine[s] a newsroom and a hedge fund" into a profit-making machine, as Hunterbrook proudly proclaims on its website. Kate Duguid, et al., *Inside Hunterbrook's plans for a 'news hedge fund*,' Financial Times (Nov. 5, 2023), at https://www.ft.com/content/1401c36e-dee3-47a0-8e0e-c362ff7bd1dd; Hunterbrook, *About us*, at https://hntrbrk.com/about-us/ (explaining that Hunterbrook "generate[s] revenue" through litigation). Hunterbrook's UWM article discloses that Hunterbrook "entered [into] an agreement" with "Boies Schiller Flexner LLP" "in exploration of a class action lawsuit." Hunterbrook Report at 2. The article further discloses that Hunterbrook's hedge fund arm "shorted" UWM's stock (a bet that the stock value would drop) and took a "long" position on

Rocket Mortgage's stock (a bet that the stock value would rise) just prior to the article's publication. *Id.* at 3.

Mere hours after publication (and after Hunterbrook locked in its short position), Boies Schiller filed a class action lawsuit against UWM in Michigan. *Escue*, No. 2:24-cv-10853, Dkt. 1 (E.D. Mich. Apr. 2, 2024). That action accuses UWM of precisely the same wrongdoing the State alleges here. In fact, the State's Complaint copies large swaths of the Michigan complaint word-for-word. *Compare* Compl., *with Escue*, No. 2:24-cv-10853, Dkt. 1 (E.D. Mich. Apr. 2, 2024). That is no coincidence: The same Boies Schiller attorneys who filed the Michigan lawsuit in support of Hunterbrook's short-selling scheme now represent the Attorney General as "special counsel."

In this suit, the Attorney General, claiming authority to sue on behalf of Ohio borrowers, alleges violations of the CSPA (Counts 1-3), RMLA (Count 4), and OCPA (Count 5), as well as claims for civil conspiracy (Count 6), unjust enrichment (Count 7), and fraud (Count 8). These claims are built on two fundamental misunderstandings. First, the Attorney General overstates his authority, which is tightly circumscribed under both common law and statute. The Attorney General lacks authority to pursue nearly all of the relief he now seeks. Second, the Attorney General misunderstands the wholesale mortgage industry. Contrary to the Complaint's single-minded focus, when borrowers come to a mortgage broker, they do not just care about price. Compl. ¶ 15. They want quick approvals, efficient closings, reliable outcomes, and a stress-free process. Brokers, in turn, count on UWM's innovative technology and fast turn times to make that happen—with great rates to boot. As three courts have already found, UWM's continued success is no conspiracy; brokers return because "its services [are] superior." Order, *Okavage*, No. 3:21-cv-448, Dkt. 124, at 8 (M.D. Fla. Sept. 18, 2024); *Am.'s Moneyline*, 2025 WL 502743, at *10.

**ARGUMENT**

## I. THE ATTORNEY GENERAL LACKS AUTHORITY TO BRING THE MAJORITY OF THESE CLAIMS.

This lawsuit reflects a staggering view of the Attorney General's power under Ohio law. As the Attorney General apparently would have it, merely invoking terms like "public interest" and "*parens patriae*" authorizes him to bring whatever suit he pleases, without a cause of action grounded in common law or in statute. But that view of the world cannot stand under Ohio law. "[T]o institute suits," including "on behalf of the public," the Attorney General must have "common-law [or] statutory . . . authority" to do so. *State ex rel. Cordray v. Marshall*, 915 N.E.2d 633, 638 (Ohio 2009) (citing *State ex rel. Little v. Dayton & S. E. R. Co.*, 36 Ohio St. 434, 440 (1881)); *see also State ex rel. Rogers v. New Choices Cmty. Sch.,* 2009 WL 2857360 (Ohio Ct. App. Sep. 4, 2009), at ¶ 14 (upholding trial court's finding that the Attorney General lacked authority to bring suit "either by statute or at common law").[2] These important limiting principles are an expression of the separation of powers enshrined in the Ohio Constitution, which provides "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *State v. Bodyk*e, 933 N.E.2d 753, 765 (Ohio 2010) (quotation omitted). With the exception of two limited claims for declaratory and injunctive relief (both of which fail on other grounds), the Attorney General has no power—under either common law or statute—to pursue this lawsuit.

### A. The Attorney General has no common law authority to bring any of these claims.

There is no basis in common law to support the Attorney General's attempt to co-opt

---

[2] The Ohio Constitution creates the office of the Attorney General, but confers no specific powers on the Attorney General and instead merely incorporates "the attorney general's common-law powers." *Cordray*, 915 N.E.2d at 638; *see* Ohio Const. Art. III, § I. As will be explained below, those traditional common-law powers cannot support this action.

private common-law claims from competent citizens without their knowledge or consent.  Nor can *parens patriae* save the claims.  *Parens patriae* is the legislature's prerogative and does not authorize the Attorney General to bring private actions on behalf of competent citizens.

**1.** The Attorney General's common law authority is limited by the "established" and "contemporaneous common-law principles" at the time Ohio's Constitution was ratified.  *Cordray*, 915 N.E.2d at 638; *see Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.*, 382 N.E.2d 1155, 1158 (Ohio 1978) (looking to Blackstone's Commentaries and similar authorities to determine the bounds of the Attorney General's common-law powers).  Those established common-law principles of attorney general authority do not extend to commandeering citizens' private claims.

"The common-law attorney general's stewardship of the public interest," derived from the monarch's position as "*pater familias* of the kingdom," "centered upon the curtailment of public nuisances and the enforcement of charities."  Miller & Miller, *The Constitutional Charter of Ohio's Attorney General*, 37 OHIO ST. L.J. 801, 802 n.6 (1976) (citing 3 Blackstone, Commentaries on the Laws of England 220).[3]  "Public nuisance and the enforcement of charities" are telling examples because both were "public" rights in a particular sense:  Neither could be asserted by private individuals.  *See id.* at 802-03 n.6 (citing Blackstone Commentaries at 219-20).

The Ohio Supreme Court, in describing "the common-law powers of the majority of state attorneys general," *Cordray*, 915 N.E.2d at 638, endorsed an academic treatise that in turn collected the "most frequently cited listing of the Attorney General's common law powers, as transplanted from England."  Myers & Ross, *State Attorneys General, Powers and Responsibilities*

---

[3] This article was written by two sitting Ohio Assistant Attorneys General with the express purpose of arguing for "a greater range of powers" for the Attorney General than previously accepted.  *Id.* at 803.  Even those interested parties do not go nearly as far as this lawsuit hopes to.

at 42-43 (2 Ed. 2007) (cited favorably in *Cordray*). Those powers included prosecuting certain criminal matters, pursuing certain government rights, and various other patently public actions like writs of mandamus and quo warranto. Myers & Ross at 43-47.

Missing from that list is *any authority* to step into the shoes of a competent, adult private citizen and assert his or her private cause of action in the manner that the Attorney General seeks to do here. And here, theory and practice align: After extensive review, UWM is unaware of ***any case*** in Ohio's 222-year history where the Attorney General successfully brought claims of this nature on behalf of a class of competent, adult private citizens by invoking common-law powers without statutory authorization.

**2.** The Attorney General's only attempt at identifying common-law support is to gesture at the notion of "*parens patriae*" authority. "*Parens patriae* means literally 'parent of the country.'" *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982). At common law, the *parens patriae* doctrine allowed the king "to sue or defend suits" on behalf of those who were "legally incapable of protecting their own rights"—such as young children and the mentally incompetent. *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). The Attorney General's invocation of *parens patriae* authority fails both because that power belongs to the legislature (and so requires statutory delegation) and because no version of that doctrine has ever authorized States to sue to protect the private interests of a class of competent adults in this way.

In this country, where there is no monarch, *parens patriae* is "a legislative prerogative." *Alfred L. Snapp*, 458 U.S. at 600; *see also Mormon Church v. United States*, 136 U.S. 1, 56-57 (1890) (holding that "in this country," where "there is no royal person to act as *parens patriae*" "the legislature is the *parens patriae*"). Accordingly, Ohio courts have made clear that *parens patriae* is not an independent open-ended source of common-law power for the Attorney General

10

(or the courts). On the contrary, "the power of *parens patriae* belongs exclusively to the legislature." *State ex rel. Fortini v. Hoffman*, 12 Ohio App. 341, 344 (1920). Other branches of government can only exercise *parens patriae* power where there has been an express "delegation of the power of *parens patriae*" via "statutes." *Id.*

The Ohio legislature has delegated *parens patriae* power to the Attorney General in one delineated context: antitrust. *See, e.g.*, R.C. 109.81 ("The attorney general . . . may act as the attorney at law in any antitrust case . . . as *parens patriae*, for any natural person residing in the state."). Based on UWM's extensive review to date, no other provision in the Ohio Code confers *parens patriae* authority on the Attorney General.[4] As will be explained below, the Ohio legislature has created other limited mechanisms for the Attorney General to sue on behalf of citizens. But outside of the antitrust context, he cannot do so as *parens patriae*.

In any event, at "a fairly early date, American courts" rejected the ancient "common-law approach" to *parens patriae*. *Alfred L. Snapp*, 458 U.S. at 600. Under the new "American" approach, *parens patriae* "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Id.* at 600, 604-05. So States cannot bring *parens patriae* suits to vindicate private interests, like damages that "rightfully belong to Ohio borrowers." Compl. ¶ 337; *cf. Alfred L. Snapp*, 458 U.S. at 607 ("[T]he State must articulate an interest apart from the interests of particular private parties[.]"). Indeed, even the ancient common-law version of *parens patriae* authorized sovereigns to act only on behalf of those who were "legally incapable of protecting their own rights." *Chapman*, 940 F.3d at 305. The

---

[4] The Ohio legislature has also delegated some of its *parens patriae* power to Ohio *courts*. *See* R.C. 2111.50(F) (providing that "the probate court has full parens patriae powers" relating to medical or surgical care for "incompetents or minors subject to guardianship").

Ohio citizens on whose behalf the Attorney General purports to act here are not children or otherwise disabled. They are fully capable of "protecting their own rights" should they see fit. *Id.*

> **B.** **The Attorney General has no statutory authority to bring most of these claims in this way.**

Absent common-law authority, the Attorney General must identify a statute that permits him to bring these claims. But the Attorney General lacks statutory authority to bring almost all of these claims in the manner he has sought to do here.

"The right of an officer of the state to sue" under a statute "must be expressly authorized by [the] statute." *O'Neill ex rel. Weir v. Mut. Tool & Die, Inc.*, 138 N.E.2d 681, 682-83 (Ohio Com. Pl. 1956) (stating that "the right of the attorney general to sue in any capacity must be determined by the provisions of the . . . Act," and holding that the Attorney General did not have authority to bring suit); *State ex rel. Brown v. Rockside Reclamation, Inc.*, 351 N.E.2d 448, 449 (Ohio 1976) ("The Attorney General of Ohio must follow the administrative procedure provisions of [the statute] before bringing an action."). It goes without saying that the Court's "role is to apply statutes as they are written," *Blackstone v. Moore*, 122 N.E.3d 132, 137 (Ohio 2018), and "to give effect to the words used in a statute, not to delete words used or to insert words not used," *A.S. v. J.W.*, 131 N.E.3d 44, 48 (Ohio 2019). Courts are especially careful about inserting whole causes of action into statutes. "Courts will not infer that a statute grants a private right of action unless the language of the statute indicates a clear intent that the legislature intended such a remedy." *Noe v. Housel*, 153 N.E.3d 941, 947 (Ohio Ct. App. 2020).

The Ohio Legislature knows full well how to provide the Attorney General with statutory authorization to initiate civil suits and has done so in many ways. As explained above, it has authorized the Attorney General to bring antitrust suits as *parens patriae*. *See* R.C. 109.81. Other provisions of the Ohio Code authorize the Attorney General to serve as a "legal representative" of

a group of citizens in certain contexts.  *See, e.g.*, R.C. 2743.711, .193 (power to enforce repayment to a reparations fund for crime victims, which, among other things, covers "the expenses of sex offense-related examinations" and finances "victim assistance programs").  The legislature has conferred authority on the Attorney General to bring certain types of class actions that meet Ohio's requirements for bringing class actions.  *See, e.g.*, R.C. 5311.27 (power to bring class actions for damages against condominium developers).  There are many other examples.  *Cf.* Miller & Miller at 819 ("In view of the broad attorney general powers that have been statutorily recognized, invocation of inherent common-law power could occur in only a rather limited number of situations.").  Here, the Attorney General lacks statutory authority for the vast majority of the claims as he brings them here.

> **1.     The Attorney General has no statutory authority under the Consumer Sales Practices Act to seek civil penalties or actual damages in this way (Counts 1, 2, and 3).**

Counts 1 through 3 invoke the CSPA.  The CSPA prescribes a specific statutory enforcement regime that authorizes the Attorney General to seek declaratory and injunctive relief.  But he has no statutory authority to pursue civil penalties or damages in the manner that he seeks.

**Civil Penalties**.  Civil penalties are not available here because UWM had no prior notice that the challenged practices violated the CSPA.

In order to recover civil penalties under the CSPA, the plaintiff must prove not just a bare violation, but also that "a supplier acted in the face of prior notice that its conduct was deceptive or unconscionable."  *Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 34 (Ohio 2006).[5]  That

---

[5] *Marrone* dealt with the notice provisions for consumer-led class actions.  850 N.E.2d at 34.  But the language of that provision is the same as what appears in the civil penalties and Attorney General class action provisions.  *Compare* R.C. 1345.09(B), *with* R.C. 1345.07(A)(3)(b), (c), (D) (using identical language).  The same analysis applies.  *See Heidtman v. City of Shaker Heights*, 119 N.E.2d 644, 650 (Ohio Ct. App. 1954) (when "the same word or phrase is used more than once in the same act in relation to the same subject-matter" it should be interpreted the same way).

makes sense because civil penalties are effectively punitive. *Cf. Felix v. Ganley Chevrolet, Inc.*, 49 N.E.3d 1224, 1231 (Ohio 2015) ("[S]ome courts have suggested that the General Assembly limited damages for class-action suits under the OCSPA in order to protect defendants from being held liable for 'huge damage awards'").

Here, the State has failed to plead that UWM had the statutorily required notice. Notice exists under the CSPA only (1) "if the violation is an act or practice that was declared to be unfair, deceptive, or unconscionable by rule" promulgated by the Attorney General, or (2) where an act or practice "was determined by a court of this state to violate" the CSPA and that decision was "was made available for public inspection" in the Attorney General's Public Inspection File. *See* R.C. 1345.07(D) (imposing the notice requirement for civil penalties); *see also id.* 1345.07(A)(3)(b), (c) (imposing the notice requirement for class action damages). For both prongs, "generic or nonspecific rules or court decisions" are not sufficient; instead, "there must be substantial similarity between a defendant's alleged violation" and either the rule or Public Inspection File caselaw. *Marrone*, 850 N.E.2d at 34, 36. Neither prong is met here.

First, the State has failed to cite a rule that provides adequate notice. The State relies on Ohio Admin. Code 109:4-3-10, which prohibits "representations . . . which would cause a reasonable consumer to believe such statements are true," unless the speaker "relies upon a reasonable basis" to "substantiate[] such representations." *Id.*; *see* Compl. ¶ 232. But the Ohio Supreme Court has long held that Rule 109:4-3-10—a generic prohibition against lying—"is insufficient to provide prior notice" under the CSPA. *Marrone*, 850 N.E.2d at 36; *Volbers-Klarich v. Middletown Mgmt., Inc.*, 929 N.E.2d 434, 441 (Ohio 2010) (applying *Marrone* and dismissing CSPA claims because Rule 109:4-3-10 is "insufficient to provide prior notice").

Second, the cases cited by the State are likewise too far afield to provide notice because they "involve industries and conduct very different from" UWM's. *Marrone*, 805 N.E.2d at 36. The first three cases the State cites do not even involve lenders-brokers operating in the mortgage industry:

- In *Lardakis v. Martin*, No. CV 94-01-0234 (Ct. Com. Pl., Summit Cnty. 1994), a financial services company backdated documents to prove false financial transactions.

- In *State ex rel. Rogers v. Lavensky*, No. CV-07-632077 (Ct. Com. Pl., Cuyahoga Cnty. 2008), a company unaffiliated with the mortgage process solicited homeowners who were in foreclosure by offering fraudulent "foreclosure services," taking large upfront fees, and providing no work at all.

- In *State ex rel. Attorney General v. Rojas*, No. CV-12-780588 (Ct. Com. Pl., Cuyahoga Cnty. 2008), a legal services company unaffiliated with the mortgage process offered "loan modification services," took large upfront fees, and provided no services at all.

*See* Compl. ¶ 232.

Merely to describe these cases is to distinguish them.  To the extent any principles can be derived from these cases, they would be the kinds of "generic or nonspecific rules [that] do not provide notice," akin to the "don't lie" rule in Ohio Admin. Code 109:4-3-10. *See Marrone*, 850 N.E.2d at 34.  None of these cases are directed at lenders/brokers operating in the mortgage industry or at the conduct alleged here: *i.e.*, mortgage broker practices that were allegedly unfair because of the defendant company's influence on brokers who allegedly overstated the extent of their independence—even though consumers received precisely the loan terms that were disclosed to them. *See* Compl. ¶ 156; *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 648-49 (N.D. Ohio 2012) (dismissing CSPA claims against a fitness club for lack of prior notice, because none of the "prior decisions" plaintiff cited "involve conduct from the health spa or fitness industry or conduct relating to health spa or fitness contracts"); *CACH, LLC v. Young*, 2021 WL 6276314, at *24 (Ohio Ct. App. Dec. 17, 2021) (barring plaintiffs from proceeding with CSPA claims against

a debt collector because the prior decisions plaintiffs cited, including cases about "a window company" and a "health spa," did not provide adequate notice).

The final case cited in the Complaint at least involved a mortgage broker, but has nothing to do with the alleged practices in this case. In *Dann v. Bluegrass Mortgage Service*, the broker sent unsolicited mailings to homeowners, with "Corporate Office" on the return-address line, purporting to provide an "Account Summary" so the customer would think it was mail from their own mortgage company when it was not, and then soliciting them when they called. No. 07-10425 (Ct. Com. Pl., Montgomery Cnty. 2008). That case has no application here. Moreover, *Dann* was a "consent judgment," and courts "routinely find that such consent judgments are insufficient as a matter of law for the purposes of the OCSPA's prior notice requirement." *Tribble v. Kellogg Co*., 2012 WL 13435015, at *7 (N.D. Ohio June 19, 2012) (granting motion to dismiss and collecting 12(b)(6) cases holding that consent judgments are insufficient to provide prior notice under the CSPA); *see also, e.g.*, *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 694 (S.D. Ohio 2012) (holding at the 12(b)(6) stage that "consent judgments . . . do not constitute prior notice" under the CSPA).[6]

Because there was no prior notice by a specific rule or qualifying caselaw, civil penalties are not available. *Marrone*, 850 N.E.2d at 34, 36; *cf. McCoy v. Samsung Elecs. Am., Inc.*, 2023 WL 6140641, at *11 (D.N.J. Sept. 20, 2023) (granting a motion to dismiss Ohio CSPA class claims for lack of prior notice). That the Attorney General and his "special counsel" have nonetheless attempted to pursue civil penalties against UWM without any colorable basis exemplifies the aggressive overreach on display in this case.

---

[6] Two of the three non-mortgage-broker-related cases the State cites, *Lardakis* and *Rojas*, are likewise consent or default judgments—and are therefore insufficient to provide prior notice under CSPA for that reason as well.

16

**Consumer damages.** Nor does the Attorney General have authority to pursue consumer damages in this way. The Ohio Legislature has provided the Attorney General with authority to bring only three kinds of CSPA claims:

(1) "An action to obtain a declaratory judgment";

(2) "An action . . . to obtain a temporary restraining order, preliminary injunction, or permanent injunction to restrain the act or practice"; or

(3) "A class action under Civil Rule 23, as amended, on behalf of consumers . . . for damage caused by"

(a) specifically enumerated CSPA violations or

(b) violations that satisfy the *Marrone* prior notice regime described above.

R.C. 1345.07(A)(1)-(3). Thus, as UWM has already argued, *see* Dkt. No. 1 (Notice of Removal) at ¶¶ 80-81, the CSPA authorizes only one way for the Attorney General to pursue consumer damages: through a "class action under Civil Rule 23." R.C. 1345.07(A)(3). Count 1 seeks "actual damages," Compl. ¶ 236; and actually cross-references the CSPA's R.C. 1345.07(A)(3), Compl. ¶ 232; accordingly, it can only be a "class action." *See* Notice of Removal at ¶¶ 81-82. But it is not a *properly pleaded* class action; indeed, the Attorney General's claim flunks most of the class action requirements under both federal and Ohio law. The Attorney General, for example, has identified no named plaintiffs, much less provided a class definition; he has also failed to allege any of the elements of a class action required by Civil Rule 23, including adequacy, typicality, commonality, predominance, and superiority. *See* Fed. R. Civ. P. 23(a), (b)(3); *cf.* Ohio R. Civ. P. 23(a), (b)(3). The Attorney General's claims for CSPA damages thus fail because they flout the requirements of Rule 23, as required under the plain text of R.C. 1345.07. *Cf. State v. Beatty*, 253 N.E.3d 73, 77 (Ohio 2024) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." (citation omitted)).

17

In an attempt to support his inadequately pled claim for class action damages, the Attorney General will likely rely on *Celebrezze v. Hughes*, 479 N.E.2d 886 (Ohio 1985). *Hughes* affirmed a statutory damages award in a suit brought by the Attorney General "on behalf of consumers pursuant to the provisions of the [CSPA] *and the Odometer Rollback and Disclosure Act*" even though the Attorney General had not brought the case as a class action. *Id.* at 890 (emphasis added). But *Hughes* does not support the CSPA damages claim in this case for at least three reasons.

First, *Hughes* did not actually permit the Attorney General to seek "actual damages" *under the CSPA.* Compl. ¶¶ 236-37. Indeed, the Attorney General in *Hughes* did not *request* actual damages. *See generally* Ex. 2 (Complaint, *Brown v. Hughes*, No. 82-159 (Ohio Ct. Common Pleas, Montgomery Cnty. Jan. 20, 1982)). Nor did he "present any evidence of damages." *Hughes*, 479 N.E.2d at 890. Rather, the statutory damages requested by the Attorney General and upheld in *Hughes* were awarded under a *different statute:* the Odometer Rollback and Disclosure Act. *See* Ex. 2 at p.4, ¶ 2(a) (requesting $1500 statutory damages awards under the Odometer Act); *see also Hughes*, 479 N.E.2d at 890 (awarding same under R.C. 4549.49(A)(1)). For that reason, the majority of cases citing *Hughes* are Odometer Act cases. *See, e.g.*, *State ex rel. Celebrezze v. Calautti*, 1989 WL 101640, at *3 (Ohio Ct. App. Sept. 1, 1989) (again granting $1500 statutory damages under the Odometer Act). *Hughes* cannot be read to erase R.C. 1345.07(A)(3)'s class action language entirely from the statute. *See A.S.*, 131 N.E.3d at 48. Reading the CSPA to permit the Attorney General to seek damages absent a viable class action would write other important provisions out of the statute, too—including procedural safeguards for the consumers on behalf of whom the Attorney General seeks damages. *See* R.C. 1345.10(B) ("If the attorney general brings a class action on behalf of consumers, a consumer may withdraw . . . at any time.").

Second, *Hughes* offers no support for this action. The *Hughes* Court affirmed post-trial Odometer Act damages awards largely because the case involved such "a small group of consumers" that a class action would have been "impracticable," "absurd, vain, and useless." *Id.* at 889. This suit is fundamentally different, as it purports to involve "thousands of Ohio homebuyers." Compl. ¶ 1. Indeed, this suit is nearly identical to the class action already filed by the same counsel in the Eastern District of Michigan, on behalf of many of *the very same* Ohio consumers. It is difficult to imagine that counsel could turn around and insist that the class action they have already filed is "absurd, vain, and useless." *Hughes*, 479 N.E.2d at 889.

Third, to the extent *Hughes* could be read as broadly as the Attorney General might hope, it has been abrogated by *Felix*, 49 N.E.3d at 1233. In *Felix*, the Ohio Supreme Court reversed a lower court order that expressly relied on the *Hughes* line of cases. The Ohio Supreme Court reversed because "[t]he trial court's holding that it could award $200 to each member of the class as a matter of the trial court's discretion is based on a fiction." *Id*. In doing so, the *Felix* Court confirmed that *Hughes* is confined to cases where "a specific statute govern[s] the amount of damages to be awarded." *Felix v. Ganey Chevrolet*, 2013 WL 4238945, at \*19 n.8 (Ohio Ct. App. 2013) (Rocco, J., dissenting) (dissenting opinion later cited favorably by Ohio Supreme Court, noting that the plaintiffs could not rely on *Hughes* without "a specific statute governing the amount of damages to be awarded").

As the CSPA's text makes clear, the Attorney General cannot bring a *de facto* class action that avoids Rule 23's protections for both defendants and absent putative class members, *see* R.C. 1345.10(B), nor can he seek massive civil penalties in a first-of-its-kind suit without precedent in rule or caselaw. Accordingly, the CSPA claims should be dismissed to the extent that they seek civil penalties and damages.

19

**2. The Attorney General has no statutory authority to seek damages under the Residential Mortgage Lending Act (Count 4).**

The Attorney General also lacks statutory authority to seek damages under the RMLA. While "buyer[s]" are granted the power to "bring an action for recovery of damages" under the Act, R.C. 1322.52(A)(1), the Attorney General is granted only the power to "bring an action to enjoin a [RMLA] violation" or initiate criminal prosecution, *id.* 1322.52(B)(1)-(2). Nowhere does the statute give the Attorney General authority to bring an action for damages. And while the RMLA says "[t]he remedies provided by this section are in addition to any other remedy provided by law," *id.* 1322.52(C), there is no "other remedy provided by law" to the Attorney General to seek damages for consumers here. *Cf. GE v. U.A.W.-C.I.O.*, 108 N.E.2d 211, 219 (Ohio Ct. App. 1952) ("The established rule of statutory construction is to treat a statutory remedy to enforce an existing right or duty as an additional remedy, leaving the existing remedies unaffected."). Indeed, based on its review, UWM is aware of no case in which the Attorney General successfully pursued damages under the RMLA. So this claim must be limited to a request for injunctive relief as well.

**3. The Attorney General has no statutory authority to initiate a civil suit under the Ohio Corrupt Practices Act without an injury to the State (Count 5).**

The Attorney General brings Count 5 under the OCPA. But the Ohio Legislature has given the Attorney General no authority to initiate a civil suit under the OCPA on behalf of consumers. The OCPA contains a finely tuned enforcement regime, allowing for both criminal prosecutions and civil actions, with precise rules for proceeding down either path.

Critically, only a "person who is injured or threatened with injury by a violation of [the OCPA] may institute a civil proceeding." R.C. 2923.34(A). The statute then provides that the Attorney General can "intervene" in a private plaintiff's civil proceeding if he determines that "the proceeding is of general public interest." R.C. 2923.24(C). But the statute does not provide any

20

cause of action for the Attorney General to *initiate* a purely civil proceeding by himself, except where the Attorney General himself (or some other State entity) is the "injured" person.

Ohio has not alleged any plausible injury to itself (or any of its entities). *See Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *9 (Ohio Ct. App. Mar. 21, 2013) ("These actions have caused no damages to the City individually."); *cf. Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 104 (2d Cir. 1990) (injuries to "general economy" "do not fall within the ambit" of RICO). While the State asserts the legal conclusion that "[t]he State and Ohio borrowers were directly and indirectly harmed as a result of UWM's conduct," Compl. ¶ 299, nowhere does Ohio allege how or why the State itself was "harmed." Ohio, for example, never claims that the State or any relevant State entity got a loan from UWM, lost funds based on UWM's alleged behavior, was deceived by UWM, or was otherwise affected in any way. To the contrary, it is clear throughout the Complaint that the supposedly "injured" parties here are Ohio borrowers. *Id.* ¶ 1 (UWM "deceive[d] thousands of Ohio homebuyers into paying millions of dollars in improper fees and excessive interest rates on their mortgages"); *see also, e.g., id.* ¶¶ 18, 151, 236, 252, 279-80, 299, 301-03, 306, 320, 324-25, 335, 337, 343 (same). Under the civil provisions of the OCPA, only those "injured" parties can initiate a suit. Nothing in the OCPA permits the Attorney General to initiate a civil suit without a plausible claim of injury. This claim should therefore be dismissed.

        **4.**     **The Attorney General has no statutory authority to bring common-law tort claims on behalf of individual citizens (Counts 6 through 8).**

Finally, the Ohio Legislature has never statutorily authorized the Attorney General to bring suits for private common-law torts on behalf of individual citizens as he tries to do here. *Compare* R.C. 109.81 (granting *parens patriae* authority for only antitrust suits). If the Attorney General wishes to appropriate private citizens' common law claims without their notice or consent, without any ability for them to opt out or participate in the litigation, and without any procedural

21

protections, he can ask the Legislature to provide him with that power. *See Cordray*, 915 N.E.2d at 638. Until that day, he has no authority to bring these claims.

The Attorney General has far outstripped his authority here. With no basis in common law or statute, the Attorney General cannot pursue: (1) the claims for civil penalties and damages on behalf of consumers under **Counts 1, 2, and 3**; (2) any claim for damages under **Count 4**; or (3) any civil action at all under **Counts 5, 6, 7, and 8**. Those claims should be dismissed, leaving only the Attorney General's requests for declaratory and injunctive relief under Counts 1 to 4.[7]

## II. IN ANY EVENT, THE STATE'S CLAIMS FAIL ON THE MERITS.

Leaving aside the Attorney General's lack of authority, the State's claims also fail on the merits for a number of reasons. First, all of the State's claims sound in fraud and are thus subject to—but fail to meet—the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). On top of that, the CSPA claims in Counts 1 through 3 fail for lack of actionable, deceptive conduct. The RMLA claims in Count 4 fail because the "Additional Responsibilities" provision does not apply to "wholesale lenders," and because the State fails to allege actionable misstatements and/or dishonest dealings. The OCPA claim in Count 5 fails for three reasons: lack of any corrupt enterprise, lack of proximate cause, and lack of any viable predicate acts. And the common-law claims in Counts 6 through 8 each fail for multiple reasons. The civil conspiracy claim fails because the Complaint does not allege a malicious combination or unlawful acts, and

---

[7] Viewed through a similar lens, the State of Ohio also lacks standing to pursue the damages claims alleged here. *See Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022) (states cannot bypass standing requirements). Ohio does not allege injury to itself or any of its instrumentalities from UWM's alleged activity. *See supra* p. 21. Instead, Ohio alleges a "sovereign interest" in the "integrity of the mortgage lending market," Compl. ¶ 19, but that purported "sovereign interest" by itself does not support a claim for individual damages on behalf of a subset of Ohioans. *See Chapman*, 940 F.3d at 305 ("[T]he only injury alleged is injury to an identifiable group of Arizonans."); *see also Alfred L. Snapp*, 458 U.S. at 602 (noting that the failure to require legitimate "quasi-sovereign interests" in a *parens patriae* action can create a standing issue).

because a claim for inducing breaches of fiduciary duty is not cognizable under Ohio law. The unjust enrichment claim fails because the Complaint does not adequately plead actual knowledge of a benefit, the claim is duplicative of the other claims, and the claim is barred by express contracts. And the fraud claim fails because the Complaint does not allege actionable misrepresentations or justifiable reliance.

### A. The Consumer Sales Practices Act Claims Fail.

As explained above, Counts 1, 2, and 3 should be dismissed for a lack of authority to the extent they seek damages or civil penalties. But the CSPA counts also fail on the merits—regardless of the remedy sought—both because the Complaint fails to plead fraud with particularity, as Rule 9(b) requires, and because it fails to allege actionable, deceptive conduct.

### 1. The Complaint fails to plead the CSPA claims with particularity under Rule 9(b).

The CSPA claims fail under the heightened pleadings standard of Rule 9(b). When an "action sound[s] in fraud," the "9(b) standard applies." *Kolominsky v. Root, Inc.*, 100 F.4th 675, 684 (6th Cir. 2024). Courts in the Sixth Circuit have recognized that CSPA claims sound in fraud, especially where "the language the plaintiff uses to plead the claim" includes allegations "characterizing a defendant's misrepresentations as 'misleading' [or] 'materially false'" or includes "general allegations that a defendant knowingly made misrepresentations to induce another to act to their detriment." *Detrick v. KCS Intl. Inc.*, 2025 WL 1133516, at *18-20 & n.16 (N.D. Ohio Apr. 17, 2025); *Scheetz v. Consumer Rsch. Corp.*, 2008 WL 11350242, at *3 (S.D. Ohio June 23, 2008) (applying 9(b) to CSPA claims); *cf. Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 & n.1 (6th Cir. 2024) ("Rule 9(b) applies to plaintiffs' . . . claims under the various state deceptive-business-practices statutes . . . .").

23

The Complaint, which focuses on "fraudulent oral or written misrepresentations," Compl. ¶ 232, does not hide the ball on this point. The gravamen of this suit is that UWM used a "blizzard of intentional misrepresentations and material omissions" to persuade borrowers to hire "corrupted brokers," who in turn "funneled" borrowers into UWM loans. Compl. ¶¶ 15-16. In the State's telling, all of that amounted to a "fraudulent scheme." *Id.* ¶ 1; *see also id.* ¶¶ 1, 14, 19, 259, 263, 273, 283-84, 297-98, 300, 318, 339, 343 (all alleging "fraud[]"). The CSPA claims—and this entire action—thus plainly "sound in fraud." *Kolominsky*, 100 F.4th at 684; *Detrick*, 2025 WL 1133516, at *20.

That means the State must plead "with particularity" the "time, place, and content of the alleged misrepresentations on which [Ohioans] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (quotes and citation omitted); *see also Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255-56 (6th Cir. 2012) (fraud-by-omission allegations are likewise subject to Rule 9(b)'s heightened pleading standard). While the Complaint and its Appendix A rattle off a series of statements by UWM, its CEO, and mortgage brokers, the State does not identify a single statement that any particular Ohio resident actually "relied" upon—or even *actually heard*. Without identifying the "alleged misrepresentations on which [Ohioans] relied," the State necessarily fails to plead their "time, place, and content," let alone "the injury resulting" therefrom. *Id.* The State's fundamental inability to satisfy Rule 9(b) dooms this entire lawsuit, including the CSPA claims.

### 2. The Complaint fails to allege actionable, deceptive conduct.

The CSPA claims also fail because, as a matter of law, the Complaint fails to allege actionable "deceptive" conduct as defined by the CSPA.[8]  None of the supposedly "deceptive" statements or omissions identified in the Complaint support a CSPA claim because they are either (1) outside of the statute of limitations, (2) were not false according to the Complaint itself, (3) are not "actionable" under the CSPA, (4) were made by third-party brokers, or (5) did not proximately cause any harm to any particular consumer.  Indeed, every single alleged misstatement identified in the Complaint fails for one or more of these reasons.

***Statute of limitations***.  Many of the alleged statements made by UWM and its representatives, as well as the data supporting the State's CSPA claims, fall outside the relevant limitations period.  "No action may be brought by the attorney general under [the CSPA] to recover for a transaction more than two years after the occurrence of a violation."  R.C. 1345.07(E).  Therefore, the Attorney General cannot rely on any statement made more than two years ago as the basis for a CSPA claim.  *See Luft v. Perry Cnty. Lumber & Supply Co.*, 2003 WL 21027291, at *5-6 (Ohio Ct. App. May 8, 2003); *see, e.g.*, Compl. ¶ 41 (listing ten statements from UWM's CEO, all predating April 16, 2023); *id.* ¶ 45 (listing a 2022 UWM SEC statement); *id.* at 57, Figs. 19, 20 (including data from 2020-2023); *see also id.* ¶¶ 174-205 (including allegations and data from 2020-2023 to describe behavior of unnamed Ohio brokers who worked with UWM).

***Not false***.  Next, many of UWM's alleged "misrepresentations" about the independence of brokers are true, factual statements—*according to the Complaint itself.*  Even "at the motion to dismiss stage," if a plaintiff's "pleadings internally contradict verifiable facts central to his claims,

---

[8] Counts 1 through 3 are all brought under the same statutory cause of action at R.C. 1345.07(A), *see supra* Part I.B.1, but invoke violations of different provisions of the CSPA.  All three counts rely on the same allegedly deceptive acts and statements by UWM, and share the same deficiencies.

25

that makes his allegations implausible." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017). By the Complaint's own account, "independent mortgage brokers are intermediaries matching borrowers and lenders." Compl. at p.14 Fig. 1. "[W]hat makes them brokers is their *ability to work with a variety of lenders*." *Id.* at ¶ 37 (emphasis changed). Many of UWM's alleged "misrepresentations" say just that: For instance, the State objects to UWM's statements about the industry-wide advantages of wholesale mortgage brokers, such as its statements that "brokers have access to numerous lenders," Compl. ¶ 41, and "are able to provide borrowers with multiple options," *id.* at ¶ 45—but those are consistent with the Complaint's own statements about brokers.

While the Complaint asserts in conclusory fashion that UWM represented "that brokers could independently shop for the best rates from any [lender]," Compl. ¶¶ 251, 273, the Complaint does not include any actual representation by UWM that any given broker (or every single broker) would shop the *entire universe* of loan products. That is not what any independent brokers do, as the State's own allegations make plain. Compl. ¶ 37 & Fig. 2 (quoting one broker for the proposition that a best practice is to use "at least seven different lenders"). Thus, many of the alleged misrepresentations on which the Complaint relies are not false by the Complaint's own terms.

*Not actionable*. Many of the statements identified in the Complaint are also "not actionable" as a matter of law. *Davis v. Byers Volvo*, 2012 WL 691757, at *8 (Ohio Ct. App. Feb. 24, 2012). Ohio courts have "set forth certain acts and practices that do not constitute a deceptive act or practice" under the CSPA. *Id.* Those acts include (1) statements of puffery, and (2) mere non-disclosure of certain facts. Many statements at issue fall into one or both of those categories.

**1.** First, "statements of mere puffing or opinion [are] not actionable under the [CSPA]." *Id.* (citation omitted). "Courts have routinely held that claims of general superiority" are mere

26

puffery and thus are "not actionable as deceptive acts or practices." *Id.* at *11; *cf. In re Ford Motor Co. Sec. Litig.,* 381 F.3d 563, 570-71 (6th Cir. 2004) (affirming 12(b)(6) dismissal of securities fraud claims, observing that all "public companies praise their products and their objectives," and emphasizing that "[c]ourts everywhere" find such "puffing" to be "immaterial as a matter of law"). Courts have dismissed CSPA claims where the underlying statements were puffery as a matter of law. *See, e.g.*, *McCoy*, 2023 WL 6140641, at *8 (dismissing CSPA claims because "general boasts of durability and quality fall into the category of puffery, and thus are not actionable"); *see also, e.g.*, *Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271-72 (6th Cir. 2018) (affirming 12(b)(6) dismissal of false advertising claims based on the "obvious impediment" of puffery); *In re Ford*, 381 F.3d at 570 (finding at the motion to dismiss stage that statements that Ford has made "quality a top priority," "is a worldwide leader in automotive safety," and "is going to lead in corporate social responsibility" were immaterial puffery); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 763-66 (N.D. Ohio 2020) (dismissing securities fraud claims based on puffery); *Die-Mension Corp. v. Dun & Bradstreet Credibility Corp.*, 2015 WL 5307472, at *4-5 (W.D. Wash. Sept. 10, 2015) (dismissing Ohio negligent misrepresentation claims based on puffery).

Many of UWM's general statements touting the benefits of the wholesale mortgage industry are puffery—the sort of statements of "general superiority" in which all businesses deal. UWM's stated opinion that mortgage brokers are "best for consumers" and offer "the best deal," Compl. ¶ 41(b), (f), for instance, amount to "subjective boasting upon which no consumers would rely." *Davis*, 2012 WL 681757, at *8. Many of the alleged broker statements involve this same kind of puffery. *See generally* Compl. Appx. A ("Our menu has more options"; "You already know the rates are great"; "We shop 'til we drop your rate!"). None of those statements are actionable under the CSPA.

**2.** The alleged omissions are not actionable, either. "Ohio caselaw holds that mere non-disclosure . . . , without more, does not fall within the purview of deceptive or unconscionable practices prohibited by the Act." *Radford v. Daimler Chrysler Corp.*, 168 F. Supp. 2d 751, 754 (N.D. Ohio 2001) (marks, brackets, and citation omitted) (granting motion to dismiss CSPA claims); *see also Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 296-97 (N.D. Ohio 2020) (granting motion to dismiss CSPA claim based on alleged failure to disclose a vehicle defect); *Grgat v. Giant Eagle*, 135 N.E.3d 846, 851-52 (Ohio Ct. App. 2019) (holding that "there [was] nothing deceptive or inaccurate" when a retailer advertised savings on the purchase of multiple items without advertising that the same savings were available through single-item purchases). And Ohio courts have held that a failure to tell a consumer about the practices of a third party, absent some additional duty to disclose, is not actionable as a deceptive practice under the CSPA. *See Rupp v. Premier Health Partners*, 2025 WL 880618, at *15 (Ohio Ct. App. 2025). Thus, to the extent the CSPA claims rely on allegations of *mere non-disclosure* about the broker's use or non-use of various third-party lenders, that non-disclosure is not actionable.

*Third-party statements*. Along similar lines, statements by third-party brokers cannot form the basis of a claim against UWM because a defendant cannot be held liable under CSPA for the actions of third parties. *See Charvat v. Farmers Ins. Columbus, Inc.*, 897 N.E.2d 167, 177-78 (Ohio Ct. App. 2008). In *Charvat*, Farmers Insurance suggested that an independent insurance agent reach out to a telemarketer to increase his business. The telemarketer then violated various anti-telemarketing laws, including the CSPA. Although "Farmers could have obtained a financial benefit" from the call and suggested the use of the telemarketer, the court found that Farmers could not be liable for the behavior of those third parties because its benefit was "too far removed . . . from the actual solicitation." *Id.* at 178. Plaintiffs' claims suffer the same fate here. *See also*

*Pilgrim v. Universal Health Card, LLC*, 2010 WL 447249, at *3 (N.D. Ohio Feb. 3, 2010) (granting motion to dismiss because, "[s]imilar to Farmers, Coverdell's actions were one step removed . . . ."); *Lucas v. Telemarketer*, 2019 WL 3021233, at *7 (6th Cir. May 29, 2019), *vacated in part on other grounds*, 2019 WL 13545379 (6th Cir. Nov. 1, 2019) (holding that the district court "properly dismissed [plaintiff's] OCSPA claim," citing discussion of third-party transactions in *Charvat*).

  ***Proximate Cause***.  Finally, the CSPA claims seeking damages fail for a lack of proximate cause.  "[T]o recover actual economic damages, a consumer must show pecuniary losses because of a violation of the CSPA." *Scott v. First Choice Auto Clinic, Inc.*, 226 N.E.3d 1132, 1144 (Ohio Ct. App. 2023); *see also Reeves v. PharmaJet, Inc.,* 846 F. Supp. 2d 791, 798 (N.D. Ohio 2012) (dismissing CSPA claims for failure to allege proximate cause).  Purported representations by third party brokers in the abstract do not suffice.  *Cf. Cleveland Bakers & Teamsters Health & Welfare Fund v. Publicis Health, LLC*, 768 F. Supp. 3d 898, 908-10 (N.D. Ohio 2025) (granting motion to dismiss OCPA claims for lack of causation based on intervening third-party statements).  Nor does the Complaint set forth facts demonstrating that any particular individual suffered damages that were caused by any particular alleged violation.   Most notably, it fails to allege that any particular consumer could have gotten a better—or even a substantially similar—loan from a different lender absent the alleged CSPA violations.  If there was no better deal available—taking into account the product the consumer wanted, the lock-in period they chose, their credit score, and all the other relevant details that go into bottom-line cost—then that consumer was not harmed.  *Cf. Reeves*, 846 F. Supp. 2d at 798.

29

**B.      The Residential Mortgage Lending Act Claim Fails.**

The State next seeks injunctive relief for alleged violations of the RMLA, R.C. 1322.01 *et seq*. Compl. ¶ 255. That claim fails for two reasons: The Complaint fails to satisfy Rule 9(b)'s heightened pleading standard, and the State fails to plead a violation of the statute.

**1.** The RMLA claim—which is predicated on UWM's allegedly fraudulent statements—fails because it does not satisfy the Rule 9(b) heightened pleading standard. *See supra* Part II.A.1; *Kolominsky*, 100 F.4th at 684 (holding that a claim "sounds in fraud" when it is "grounded in one fraudulent course of conduct relying on one set of facts, alleging . . . materially false and misleading statements and omissions") (emphasis omitted); Compl. ¶¶ 254-74 (alleging "false or misleading statements," "false promises," and "fraudulent" acts several times in the RMLA count).

**2.** In any event, the State fails to plead of a violation of any of the RMLA provisions on which it relies.

*RC 1332.45.* The State first claims that UWM violated R.C. 1322.45's "Additional Duties of Registrants." R.C. 1322.45(A)(3), (A)(4); *see also* Compl. ¶¶ 268-70. But R.C. 1322.45(B) makes clear that these duties "shall not apply to wholesale lenders." The statute defines "wholesale lender" to mean "a company . . . that enters into transactions with buyers exclusively through unaffiliated third-party mortgage brokers." *Id.* That exactly describes UWM, as the Complaint itself alleges that UWM is a "wholesale mortgage lender" that transacts exclusively through "third-party" "mortgage brokers." Compl. ¶¶ 1-3, 26. The State tries to say that UWM falls outside the "wholesale lender" definition because, due to the alleged "conspiracy" here, *id.* ¶ 318, the brokers UWM works with should not be considered "unaffiliated third-part[ies]," *id.* ¶ 270. But the State itself agrees elsewhere in the Complaint that the "mortgage brokers" with whom UWM works are "third part[ies]." *Id.* Part I & ¶ 26. Moreover, the alleged "conspiracy" does not make mortgage brokers "[]affiliated" with UWM because, under the Consumer Finance sections of the Ohio

30

Administrative Code, "affiliated" has a defined meaning and refers to an entity's actual corporate relationships—not a subjective determination, in a plaintiff's opinion, whether two different corporate entities may be linked. *See, e.g.*, Ohio Admin. Code 1301:8-3-03 ("common control"); Ohio Admin. Code 1301:8-2-01 ("common control"). RC 1322.45 therefore does not apply to UWM as a matter of law.

**R.C. 1322.40(B).** The State next claims that UWM violated R.C. 1322.40(B), which prohibits "false or misleading statements" and "false promises" of a "material fact," as well as "continued course[s] of misrepresentation[]." As an initial matter, this provision could *at most* apply to *UWM's own* alleged *misstatements*—and not to statements made by third-party brokers, or to any alleged omissions—because the statute is expressly limited to those who "[m]ake" misstatements. R.C. 1322.40(B); *cf. Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it."). And as explained above, none of UWM's statements are actionable as misstatements because they (1) amount to puffery and (2) are not false according to the Complaint itself.

**R.C. 1322.40(C).** The State also invokes R.C. 1322.40(C), which prohibits "conduct that constitutes improper, fraudulent, or dishonest dealings." This claim depends on the same inactionable conduct described above, and thus "fails as a matter of law and must be dismissed." *Hanover v. Real Time Resols., Inc.*, 2024 WL 4626196, at *5 (S.D. Ohio Oct. 30, 2024).

**R.C. 1322.40(I).** The State fares no better under R.C. 1322.40(I), which covers violations of the CSPA. Because the State only pleads violations "as alleged" in Counts 1-3, Compl. ¶¶ 264-66, this claim fails for the same reason as the CSPA claims. *See supra* Part II.A.

### C. The Corrupt Practices Act Claim Fails.

The OCPA claim fails as well, for several reasons. First, the claim fails to satisfy Rule 9(b)'s heightened pleading requirements. Second, the Complaint fails to state a claim. "The Ohio

Corrupt Activities Act, Ohio's RICO statute, is directly adopted from the federal RICO statute, and the same analysis applies to it as the federal statute." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 985 (N.D. Ohio 2008) (citing *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28 (Ohio Ct. App. 1993) (adopting federal caselaw)). A claim under the OCPA, just like a claim under the federal RICO statute, requires several elements, including an "enterprise," a "pattern of corrupt activity" that includes "two or more" predicate acts, and causation. *See* R.C. 2923.34(A) ("Any person who is injured or threatened with injury by a violation. . ."); *see also id.* 2923.32(A)(1); *id.* 2923.31(C), (E), (I) (defining "enterprise," "pattern," and including a list of covered predicate acts). None are met here.

*Failure to Plead with Particularity.* First, for the reasons set out in Part II.A.1, the OCPA claim—which alleges mail and wire fraud as predicate acts and therefore plainly sounds in fraud—fails to satisfy the heightened pleading requirements of Rule 9(b). *See Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 853 (N.D. Ohio 2010) (applying heightened pleading standard to OCPA claims). The State fails to allege that any individual consumer heard or relied on any specific instance of alleged fraud. *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125-26 (2d Cir. 2018) (where a plaintiff "identifies no misrepresentation that induced" any behavior, "conclusory references to [a] fraudulent scheme" fail to "set forth a material misrepresentation with the requisite particularity," affirming dismissal of RICO claims). So, the OCPA claim falters at the starting block.

*Enterprise*. To allege an "enterprise"—*i.e.*, an "association . . . in fact," R.C. 2923.31(C); 18 U.S.C. § 1961(4) (using the same phrase)—the State must plead facts showing an "ongoing organization" with "a purpose, relationships among those associated with the enterprise, and longevity" sufficient to carry out its goals. *Boyle v. United States*, 556 U.S. 938, 945-46 (2009)

32

(citation omitted); *State v. Beverly*, 37 N.E.3d 116, 120 (Ohio 2015) ("We have relied on . . . *Boyle* for guidance[.]"). That test requires "relationships" among the members of the enterprise. *Boyle*, 556 U.S. at 946. Accordingly, courts consistently find that "rimless hub-and-spoke" enterprises— those involving a "relationship with a central figure" but lacking any connection among conspirators in "in some overarching way"—do not qualify. *D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018); *see also Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 303 (E.D.N.Y. 2017) (dismissing RICO claims); *In re Countrywide Fin. Corp. Mortg.-Backed Securities Litig.*, 2012 WL 10731957, at *11 (C.D. Cal. June 29, 2012) (dismissing OCPA claims). Further, the alleged enterprise must be a "continuous unit," and cannot be "unstable and fluid" in its membership. *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699-700 (6th Cir. 2000) (affirming dismissal of RICO claims); *see, e.g.*, *HMV Properties, LLC v. IDC Ohio Mgt., LLC*, 2011 WL 53166 (S.D. Ohio Jan. 6, 2011) (dismissing RICO claims for lack of enterprise).

The supposed "enterprise" here is a classic rimless hub-and-spoke conspiracy. UWM allegedly "operated, controlled, or managed the Steering Enterprise," Compl. ¶ 290, and the brokers were supposedly connected to UWM. There are no plausible "relationships" alleged among the brokers—no rim—as three courts have already held. *See Am.'s Moneyline*, 2024 WL 1349301, at *2 ("[P]laintiff does not plausibly allege any horizontal agreement between each spoke (the brokers); only a hub (UWM) and vertical agreements between it and each spoke (the brokers)."); *Okavage*, 2024 WL 982380, at *10, *R&R adopted*, No. 3:21-cv-448, Dkt. 125 (M.D. Fla. Sept. 20, 2024), *aff'd*, 2025 WL 1513150 (11th Cir. May 28, 2025) (same). The Complaint's conclusory allegations of parallel behavior, Compl. ¶ 154, do not show any agreement or cooperation among the brokers. And the alleged enterprise's supposed "common purpose"—to "sell as many mortgages as possible," *id.* ¶ 291—simply describes the common market incentives

of every broker working everywhere in the country. *See Okavage*, 2024 WL 982380, at \*11 (finding that using UWM was not "against the interest of the brokers who did so"); *State v. Baker*, 2013 WL 2635584, at ¶ 22 (Ohio Ct. App. 2013) ("[N]or is there any other indication that the parties joined together to make money *for the same enterprise*.").

In any event, the alleged conspiracy is too "unstable and fluid" to qualify as an "enterprise" under the OCPA. *VanDenBroeck*, 210 F.3d at 699-700. It is unclear from the Complaint whether the enterprise is meant to include every broker who sold a UWM loan in Ohio—hundreds of brokers in 2023 alone, Compl. ¶ 128—or only those who "sent more than 75% of their loans to UWM," *see id.* There is no plausible basis to infer a conspiratorial agreement among so-called "loyalists" based on an arbitrary (and newly created) 75% threshold. *See id.* ¶ 152. And if the alleged enterprise includes every broker who sold a UWM loan, there is even less basis to infer a common illicit purpose. *Cf. Childress v. City of Cincinnati*, 765 F. Supp. 3d 662, 696 (S.D. Ohio 2025) (dismissing RICO claims for lack of enterprise where the allegations "at most, suggest no more than a 'routine business relationship' among these entities"). Finally, as the Complaint plainly alleges, the number of UWM brokers has changed significantly over time, proving the "unstable and fluid" nature of the alleged enterprise. *See* Compl. Figs. 19, 20.

***Proximate cause***. To establish proximate cause, a plaintiff must show that a predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (citation omitted); *Herakovic v. Cath. Diocese of Cleveland*, 2005 WL 3007145, at \*5 (Ohio Ct. App. 2005) *abrogated on other grounds*, 37 N.E.3d 116 (affirming dismissal of OCPA claims and holding that OCPA "is patterned after the federal RICO law" and thus "requires proof of proximate cause"). "To satisfy proximate causation . . . , a plaintiff must demonstrate not only foreseeability but also 'directness of

relationship' between the defendant's alleged wrongdoing and the plaintiff's asserted injuries." *Cleveland Bakers*, 768 F. Supp. 3d at 908 (discussing federal law principles regarding OCPA claim). Proximate cause does "not go beyond the first step," *Hemi Grp.*, 559 U.S. at 10, and "intervening causes" will break the necessary chain of causation, *Collier v. LoGiudice*, 818 Fed. Appx. 506, 511 (6th Cir. 2020). Where the misrepresentations actually inducing reliance were made by third-party brokers, proximate cause is lacking. *See De Los Angeles Aurora Gomez v. Bank of America*, 2013 WL 12165673, at *6 (C.D. Cal. Aug. 21, 2013) (dismissing RICO claims).

Even on the face of the Complaint, the State's alleged theory of proximate cause goes far beyond the first step and, crucially, passes through several intervening causes that break any plausible causal chain as a matter of law. The theory purports that UWM "influence[d]" thousands of brokers through "tactics" that overrode their own judgments and assessments regarding specific loans, Compl. ¶¶ 87, 126; causing brokers to make misrepresentations to borrowers that they would "evaluat[e] options from multiple lenders to offer [them] economically advantageous mortgages," *id.* ¶ 143; in turn causing each individual consumer to hear and rely upon such third party representations for their own specific loans, *see, e.g.*, *id.* ¶ 27. For the theory to succeed, it must also be the case that each broker had pre-existing relationships with other mortgage lenders; that those pre-existing relationships offered a "more affordable" loan while also matching all the other important characteristics of the loan, including speed, efficiency, lock-in period, contingencies, and other factors; and that, if presented with other loan options, each consumer would have selected one of those other loans such that he or she was injured by the choice to take a loan from UWM. *See id.* ¶ 156. "To state the theory is to show that the injury alleged is far beyond the first step in the causal chain." *GM LLC v. FCA US LLC*, 2020 WL 3833058, at *10 (E.D. Mich. July 8, 2020) (dismissing RICO claims).

*Predicate Acts.* Finally, the State's OCPA claim attempts to plead only three predicate acts. *See* Compl. ¶ 294(a), (b). Those three predicates—(1) bribery under the federal Travel Act, 18 U.S.C. § 1952; (2) federal mail and wire fraud, 18 U.S.C. §§ 1341, 1343; and (3) federal honest services fraud, 18 U.S.C. § 1346—all fail as a matter of law.

**1.** The State's alleged Travel Act predicate cannot support its OCPA claim. *See* Compl. ¶¶ 294(b), 304. Ohio does not have a state commercial bribery statute. *Cf.* R.C. 2921.02 (covering bribery of public servants, witnesses, and the like, not commercial bribery). So, there can be no federal Travel Act violation under Ohio law because the Travel Act requires the actions in question be "in violation of the laws of the State in which they are committed." 18 U.S.C. § 1952(b). And no other state's commercial bribery law can support the asserted Travel Act predicate. The Complaint generically references "[m]any states' commercial bribery statutes," Compl. ¶ 294(b), but does not allege anything about those states, including but not limited to which states' statutes supposedly apply, what elements they require, or how UWM supposedly violated them. Even if the Complaint did include those details, the OCPA limits the use of "violations of any law of any state other than this state" as predicate acts to (1) defendants with a prior conviction in the other state and (2) violations of laws "that [are] substantially similar to" the OCPA's list of Ohio criminal predicates. R.C. 2923.31(I)(3). The State does not allege a criminal conviction, and other states' commercial bribery laws are not—and cannot be—substantially similar to Ohio's because Ohio lacks a commercial bribery statute in the first place.

**2.** The federal mail and wire fraud predicates fail as a matter of law, too. The State alleges that UWM "orchestrated" a scheme that involved "misrepresenting material facts" and causing brokers to make "misrepresentations and material omissions." Compl. ¶¶ 283-85. But the State

fails to adequately plead material misrepresentations, actionable omissions, or an intent to defraud as required by the federal mail and wire fraud statutes.

No material misrepresentations:  Mail and wire fraud include an implicit "materiality" requirement—a "demanding" standard that "substantially narrows the universe of actionable misrepresentations." *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025); *see also Universal Health Services, Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016) ("We reject [the] assertion that materiality is too fact intensive for courts to dismiss [fraud] cases on a motion to dismiss . . . ."). Here, all of the alleged misrepresentations fall short either because they are mere puffery as explained above, or because they were merely incidental to the mortgage contract. *See United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005) (noting that "mere sales puffery" is not actionable in the mail fraud context); *United States v. Wal-Mart Stores East, LP*, 858 Fed. Appx. 879, 880 (6th Cir. 2021) (affirming dismissal of fraud claims for lack of materiality). Indeed, none of the supposed misrepresentations have anything to do with UWM's disclosures for any mortgage loan, which included all the material terms of the loan as defined by federal regulations. *See, e.g.*, 15 U.S.C. §§ 1602, 1639; 12 C.F.R. §§ 1026.23(a)(3)(ii), .37, .38 (describing the "material disclosures" required by the Truth in Lending Act); Compl. ¶ 156 (admitting required disclosures were made). Given that UWM's statements or omissions about broker independence do not even qualify as "material disclosures" under the subject-matter-specific rules for TILA, those same statements cannot meet the more "demanding" standard meant to "substantially narrow" liability under the general fraud statute. *Kousisis*, 145 S. Ct. at 1398.

No actionable omissions: To the extent the Complaint relies on mere non-disclosure of the brokers' supposed lack of independence, that does not rise to the level of fraud absent some duty to disclose.  *See United States v. Skeddle*, 940 F.Supp. 1146, 1149 (N.D. Ohio 1996)

("[D]efendants are culpable under this branch of the mail fraud statute only if the government proves the defendants had a duty to disclose[.]"); *Neder v. United States*, 527 U.S. 1, 22 (1999) (mail and wire fraud statutes incorporate the "well-settled meaning" of fraud "at common law"); *Chiarella v. United States*, 445 U.S. 222, 227-28 (1980) ("At common law . . . one who fails to disclose material information . . . commits fraud only when he is under a duty to do so."). No such actionable duty is alleged here. And "a lender does not owe a fiduciary duty to a debtor" as a matter of law. *Harris v. Synovus Bank*, 646 F. Supp. 3d 935, 949 (N.D. Ohio 2022); *see also Five Star Fin. Corp. v. Merch.'s Bank & Tr. Co.*, 949 N.E.2d 1016, 1021-22 (Ohio Ct. App. 2011) (affirming dismissal of claims based on fiduciary duty between debtor and creditor).

No intent to defraud: Finally, the State fails to plausibly allege that Defendants had the required "specific intent to deceive or defraud." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). The State alleges that brokers and UWM did not disclose the Wholesale Broker Agreement—which again, excluded only two of more than seventy potential lenders—or the full extent of the brokers' use of UWM over other lenders. *See, e.g.*, Compl. ¶ 298(i)-(k). But alleged facts like these that are not "indicative of malintent" fail to show specific intent to defraud. *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 703-04 (E.D. Mich. 2020) (dismissing RICO claim on this basis). Federal law allows brokers to use a small number of lenders, or even a single lender. *See* 12 C.F.R. § 1026.36(e), cmts. 36(e)(1)–2(i), 36(e)(3)–1 (noting that § 1026.36(e) "does not require a loan originator to establish a business relationship with any creditor with which the loan originator does not already do business" and that brokers may present three loan options from one lender and "no options from any other creditor").

**3.** The State also alleges that consumers were deprived of their brokers' honest services in violation of 18 U.S.C. § 1346. Compl. ¶ 297. But mortgage brokers do not have a fiduciary duty

under that statute. The U.S. Supreme Court has held that the scope of honest services fraud is "confin[ed] to the core . . . applications" in federal cases that pre-date the 1987 case *McNally v. United States*, which generally involved the federal fiduciary duties of "public official[s] . . . , employee[s] . . . , and union official[s]." *Skilling v. United States*, 561 U.S. 358, 408 & n.41 (2010) (citing *McNally*, 483 U.S. 350). And the Sixth Circuit has confirmed that "[f]ederal law governs the existence of fiduciary duty" for purposes of the honest services statute. *Frost*, 125 F.3d at 366.

The Complaint alleges no federal fiduciary duty. It cites an Ohio case from 2012 and an Ohio law treatise for the claim that mortgage brokers owe a fiduciary duty. Compl. ¶ 30 & n.14 (citing only state law as a basis for a fiduciary duty). But those sources are inadequate: They post-date *McNally* in contravention of *Skilling*, and they rely on state law in contravention of *Frost*. No unprecedented expansion of federal criminal liability is warranted here.

###### D. The Civil Conspiracy Claim Fails.

The State's civil conspiracy claim alleges that UWM conspired with "brokers with the purpose of breaching fiduciary duties owed to Ohio borrowers." Compl. ¶ 317. That claim fails as a matter of law for four reasons.

***First***, the civil conspiracy claims sounds in fraud, Compl. ¶ 318 (alleging "fraudulent omissions or misrepresentations"), and the Complaint fails to meet the applicable heightened pleading requirements of Rule 9(b). *See supra* Part II.A.1.

***Second***, a claim for "aiding, abetting, ***inducing*** or participating in breaches of fiduciary dut[y] . . . is not cognizable under Ohio law." *Cohen v. Dulay*, 94 N.E.3d 1167, 1176 (Ohio Ct. App. 2017) (emphasis added). And that is the State's theory alleged in the Complaint. *See* Compl. Part IV & ¶ 66 (alleging that UWM "***Induces*** Brokers to Steer Borrowers" to breach their "fiduciar[y]" duties (emphasis added)). "The prime distinction" between a true civil conspiracy and a non-cognizable "aiding-abetting" or "inducing" case is that "conspiracy involves an

agreement," not mere "substantial assistance." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (quote omitted). Here, the State's "civil conspiracy" claim lacks any non-conclusory allegations of a separate "agreement," *see* Compl. ¶ 317 (alleging legal conclusion of agreements, but without any factual basis) and instead describes all the ways in which UWM "***substantially assisted*** or encouraged the wrongdoing." Compl. ¶ 319 (emphasis added). Thus, the State's claim is nothing more than a relabeled "aiding and abetting" or "inducing" claim, which is not actionable under Ohio law. *Cf. Noblee Bottling, LLC v. Gora LLC*, 2023 WL 4750124, at *2 (W.D.N.C. July 25, 2023) (dismissing "aiding and abetting" claim that plaintiffs sought to relabel as "civil conspiracy").

***Third***, the State has failed to allege a "malicious combination," which requires either an "express" or "tacit" agreement "to commit an unlawful act." *Aetna Cas. & Sur. Co.*, 219 F.3d at 538. Indeed, "such a claim requires an agreement to defraud *the plaintiffs in the case*." *Parlin Fund LLC v. Citibank N.A.*, 2013 WL 3934997, at *10 (S.D. Ohio July 30, 2013) (dismissing civil conspiracy claims with prejudice). The State does not allege that UWM and brokers explicitly agreed to breach brokers' duties knowingly imposed upon them, let alone an agreement with any particular broker to breach any particular fiduciary relationship. Rather, the State asks this Court to infer a conspiracy to breach fiduciary duties from UWM's business model. *See* Compl. ¶¶ 316-18. But none of UWM's practices qualify for that purpose. For instance, while the "All-In Initiative" excluded just two out of more than seventy lenders, brokers generally work with just a handful of lenders (often just three under federal regulatory guidance). *See id.* ¶ 142; 12 C.F.R. § 1026.36(e), cmts. 36(e)(1)–2(i), 36(e)(3)–1. The State says that "brokers consented to . . . being deceptively advertised," *id.* ¶ 316, but the alleged "deceptive advertisements" promote brokers generally, including brokers who do not work with UWM. The State also alludes to "things of

40

value . . . to steer business," *id.* ¶ 318, but as explained above, UWM's practices incentivizing brokers are modest and commonplace in differing forms. All told, UWM's business practices and the brokers' corresponding reactions are "just as much in line with a wide swath of rational and competitive business strategy" and thus insufficient to allege a conspiracy. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007); *see also Childress*, 765 F. Supp. 3d at 696 (dismissing civil conspiracy claims for lack of a malicious combination).

**Fourth**, the State fails to plead "an unlawful act"—*i.e.,* that brokers actually breached their fiduciary duties. *Woodward Const., Inc. v. For 1031 Summit Woods, LLC*, 30 N.E.3d 237, 243 (Ohio Ct. App. 2015). The extensive disclosures every Ohio borrower receives—and that the State affirmatively alleges were received here, Compl. ¶ 156—circumscribe brokers' duties to consumers. *See FV 1 Inc. v. Goodspeed*, 974 N.E.2d 664, 672 (Ohio Ct. App. 2012) (rejecting fiduciary claim based on information "disclosed" "before and during the closing"). One disclosure reads: "Under Ohio law, you are not required to complete this transaction merely because you received prior estimates of closing costs or have signed an application. You should not close this loan transaction if it contains different terms and conditions than those you were promised."[9] All borrowers also receive federal "anti-steering" disclosures, which provide borrowers with alternative loan options. 12 C.F.R. § 1026.36(e). The attending federal regulations make clear that a broker may lawfully present options from just one creditor with no obligation to survey others. *See id.*, Comments 36(e)(1)-2(i), 36(e)(3)-1. The State does not (and cannot) claim that brokers failed to comply with these disclosure obligations. And because borrowers received

---

[9] Ohio Attorney General, *Required Mortgage Disclosures*, at https://www.ohioattorneygeneral.gov/Business/Services-for-Business/Required-Mortgage-Loan-Disclosures ("Closing Disclosure Form").

"advance disclosure" of what the State complains of, no fiduciary breaches occurred. *See FV 1*, 974 N.E.2d at 673.

### E. The Unjust Enrichment Claim Fails.

To state a claim for unjust enrichment, the State must plausibly allege that "(1) a benefit was conferred by the plaintiff to the defendant; (2) the defendant knew of the benefit; and (3) defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Busch Truck Leasing, Inc. v. Cummins, Inc.*, 2020 WL 3871322, at *8 (S.D. Ohio July 9, 2020). The State's unjust enrichment claim fails for three independent reasons.

***First***, this unjust enrichment claim "is also subject to the particularity requirement in Rule 9(b)." *Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1059 (N.D. Ohio 2014) (dismissing unjust enrichment claim). As outlined above, the State's allegations do not satisfy Rule 9(b). *See supra* Part II.A.1; *see also Busch Truck Leasing*, 2020 WL 3871322, at *8 (dismissing unjust enrichment claim where fraud allegations failed Rule 9(b)).

***Second***, the State fails to plead that UWM actually "knew" of any "benefit" that was unjustly conferred. *See id.*; *see also Szep*, 491 F. Supp. 3d at 299 (dismissing unjust enrichment claim because "Plaintiff's general allegations as it relates to GM's knowledge of the defect are insufficient to establish that GM had knowledge of the alleged benefit"). The State claims that Ohio borrowers "conferr[ed] more money to UWM . . . than [they] otherwise would have paid for a comparable wholesale mortgage loan" "as a result of UWM's illicit steering scheme." Compl. ¶¶ 324-25. But to know whether any particular borrower actually overpaid, UWM would first need to know: (1) how many other lenders the borrower's broker had available; (2) whether the borrower would have qualified for a comparable loan with lower rates and fees from those other lenders; (3) whether the broker promised to and yet failed to look at those lenders due to UWM's allegedly wrongful actions; and (4) whether the borrower would have selected UWM anyway for

42

non-price factors like "faster turn times," *id.* ¶ 114 (admitting that this is "crucial"). UWM does not (and could not) know this information, nor does the State plead facts to support as much. Accordingly, the State has not plausibly pleaded that UWM "knew" of even a single borrower "unjust[ly]" conferring a benefit to UWM. *Busch*, 2020 WL 3871322, at *8.

  **Third**, the State's unjust enrichment claim is barred because "express contract[s] cover[] the same subject matter." *Aurora Hill, Ltd. v. Bremner*, 226 N.E.3d 555, 564 (Ohio Ct. App. 2023). Where "the allegations in the Complaint demonstrate that [the] unjust enrichment claim arises directly from . . . express contract[s]," an unjust enrichment claim cannot proceed. *Long v. State Farm Ins.*, 2014 WL 12654134, at *5 (S.D. Ohio June 3, 2014) (citing *Wolfer Enters., Inc. v. Overbrook Dev. Corp.*, 724 N.E.2d 1251, 1253 (Ohio Ct. App. 1999)). The State concedes that Ohio borrowers entered into "mortgage loan agreements with UWM." Compl. ¶ 332. Despite the State's naked assertion to the contrary, these agreements plainly "cover[] the subject matter" of this lawsuit. *Aurora Hill*, 226 N.E.3d at 564. Indeed, the State's pleaded claims are all based on the theory that the rates and fees contained within those contracts were unduly "significant." Compl. ¶ 325. To the extent the State argues its fraudulent inducement allegations circumvent this doctrine, those allegations fail for lack of particularity. *See Pattie*, 29 F. Supp. 3d at 1059.

  **Fourth**, the State's claims fail because they concern the same underlying allegations as its other claims—and unjust enrichment is not meant to be a duplicative cause of action. If this Court concludes that the State has made out a claim for "fraud," then it is "unnecessary and unwise" to impose the "equitable doctrine" of unjust enrichment "where remedies at law . . . provide an adequate remedy." *Banks v. Nationwide Mut. Fire Ins. Co.*, 2000 WL 1742064, at *5 (Ohio Ct. App. Nov. 28, 2000) (citing cases) ("[A]lmost every alleged consumer fraud [sh]ould [not] be actionable as 'unjust enrichment[.]'"). If this Court concludes that the State does not have a viable

fraud claim, as UWM shows below, then this claim "must fail" anyway because it "depends on [those] allegations of fraud." *Rorig v. Thiemann*, 2007 WL 2071909, at *10 (S.D. Ohio July 17, 2007); *see Trohoske v. Chi. Title Ins. Co.*, 2011 WL 6012412, at *9-10 (N.D. Ohio Nov. 30, 2011). Because one or the other must be true, an unjust enrichment claim has no place in this action under any circumstance.

> ### F. The Common-Law Fraud Claim Fails.

Lastly, the State claims that "UWM engaged in false representations and fraudulent concealments" and deceived borrowers "regarding the independence of wholesale mortgage brokers." Compl. ¶¶ 339-43. The State's fraud claim fails for four independent reasons.

*First*, the Complaint does not identify a single statement from UWM that any consumer even heard—much less the factual details about any such statement that Rule 9(b) requires. Thus, the fraud claim cannot satisfy Rule 9(b)'s particularity standard. *See supra* Part II.A.1.

*Second*, as outlined above, the State does not allege an actionable misstatement or omission. And any claim based on an alleged "concealment" of facts requires a "duty to disclose." *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000) (affirming dismissal of Ohio fraud claim). The Complaint pleads nothing beyond the relationship between "a creditor and consumer stand[ing] at arm's length," which creates "no duty to disclose." *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 365 (Ohio 1988). In any event, the Complaint offers no specific facts showing that UWM concealed its tactics; quite the opposite, the Complaint alleges UWM publicly touted its actions. *See, e.g.*, Compl. ¶¶ 75-76 & nn. 71-72 ("All-In Initiative"); *id.* ¶¶ 105, 111-13 & nn. 89, 92-94 ("PRO Score" means broker "get[s] more FindAMortgageBroker.com leads"); *id.* ¶¶ 121-25 & nn. 98-99 ("networking events and trainings").

*Third*, even if UWM's statements were actionable, the State does not plausibly allege an "intent [to] mislead[]." *Glassner*, 223 F.3d at 352. Again, the means by which UWM allegedly

"influenc[ed] brokers," Compl. ¶ 67, were not just publicly available but openly disseminated by UWM.  And as explained above, UWM's supposed "tactics" and the brokers' behavior complied with all applicable law and regulations.  The Complaint's allegations therefore not only fail to plead an "intent to mislead," but are also better explained by the fact that UWM had nothing to hide in the first place.

*Fourth*, the State fails to plead "justifiable reliance."  *Glassner*, 223 F.3d at 352.  Again, the State does not allege that any specific consumer actually heard or relied on any of the particular misstatements alleged.  And in any event, "[a]n individual has no right to rely on a representation when the actual facts are equally open to both parties."  *Dalrymple v. Westerville*, 201 N.E.3d 382, 403 (Ohio Ct. App. 2022); *cf. MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 665 (6th Cir. 2023) ("A plaintiff unreasonably relies on one of the defendant's statements if another of the defendant's statements contradicts it.").  Thus, the fraud claim fails as well.

## CONCLUSION

For the reasons above, the Court should dismiss the Complaint in its entirety.

Dated: July 7, 2025

Respectfully submitted,

*/s/ Jeffrey J. Jones*
Jeffrey J. Jones* (Bar No. 30059)
    *Trial Attorney*
Michael R. Gladman (Bar No. 59797)
Brandy Hutton Ranjan (Bar No. 86984)
JONES DAY
325 John H McConnell Blvd #600
Columbus, OH 43215
(614) 469-3939
jjjones@jonesday.com
mrgladman@jonesday.com
branjan@jonesday.com

*Counsel for United Wholesale Mortgage, LLC*

45

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Stephen J. Cowen
Amanda K. Rice
Andrew J. Clopton
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Pro hac vice* applications forthcoming

46

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2025, I caused the foregoing document to be filed with the

Clerk of the Court using CM/ECF, which will effectuate service upon all counsel of record.

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones
JONES DAY
325 John H McConnell Blvd #600
Columbus, OH 43215
(614) 469-3939
jjjones@jonesday.com

*Counsel for United Wholesale Mortgage,*
*LLC*